# Deposition of Jay Hawthorne

August 7, 2019

Hawthorne v. City of Prattville, AL

2:19-CV-139

Pages 1 through 213



205.545.5155

info@citedepos.com

www.citedepos.com



Jay Hawthorne                                                    August 7, 2019

---

**1**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

JAY HAWTHORNE,

      Plaintiff,

Vs.               CIVIL ACTION NO.

                  2:19-CV-139

CITY OF PRATTVILLE, AL,

      Defendant.

* * * * * * * * * * * * *

DEPOSITION OF JAY HAWTHORNE, taken pursuant to
stipulation and agreement before Pamela Wilbanks Owens,
Certified Court Reporter, ACCR #391, and Commissioner
for the State of Alabama at Large, in the Law Offices of
Holtsford, Gilliland, Hitson, Higgins & Howard, 4001
Carmichael Road, Suite 300, Montgomery, Alabama, on
Wednesday, August 7, 2018, commencing at approximately
8:55 a.m.

* * * * * * * * * * * * *

---

**2**

APPEARANCES

FOR THE PLAINTIFF:
Mr. Joseph C. Guillot
MCPHILLIPS SHINBAUM
Attorneys at Law
60 Commerce Street
Montgomery, Alabama
FOR THE DEFENDANT:
Mr. Rick A. Howard
Ms. April W. McKay
HOLTSFORD, GILLILAND, HIGGINS, HITSON & HOWARD
Attorneys at Law
4001 Carmichael Road, Suite 300
Montgomery, Alabama

Mr. Rob Riddle
RIDDLE LAW GROUP
Attorney at Law
119 First Street
Prattville, Alabama  36067

ALSO PRESENT:

Ms. Lisa Thrash

* * * * * * * * * * * * *

EXAMINATION INDEX

BY MR. HOWARD . . . . . . . . . . . . . . . . . . 4
BY MR. GUILLOT . . . . . . . . . . . . . . . . 206
BY MR. HOWARD . . . . . . . . . . . . . . . .209
BY MR. HOWARD . . . . . . . . . . . . . . . .210

* * * * * * * * * * * *

---

**3**

DEFENDANT'S EXHIBIT INDEX
1   Doctor's note concerning treatment plan   179
2   Email string between Lisa Thrash and Jay   186
    Hawthorne regarding accommodation status

3   5/14/18 letter to Jay Hawthorne from Chief   202
    Whaley regarding guidelines to be followed

STIPULATION

It is hereby stipulated and agreed by and
between counsel representing the parties that the
deposition of JAY HAWTHORNE is taken pursuant to the
Federal Rules of Civil Procedure and that said
deposition may be taken before Pamela Wilbanks Owens,
Registered Professional Reporter, ACCR #391, and
Commissioner for the State of Alabama at Large, without
the formality of a commission, that objections to
questions other than objections as to the form of the
question need not be made at this time but may be
reserved for a ruling at such time as the said
deposition may be offered in evidence or used for any
other purpose by either party provided for by the
Statute.

It is further stipulated and agreed by and

---

**4**

that the filing of said deposition is hereby waived and
may be introduced at the trial of this case or used in
any other manner by either party hereto provided for by
the Statute regardless of the waiving of the filing of
the same.

It is further stipulated and agreed by and
between the parties hereto and the witness that the
signature of the witness to this deposition is hereby
waived.

* * * * * * * * * * * *

COURT REPORTER:  Is this going to be
    usual stipulations?

MR. HOWARD:  Yes.

MR. GUILLOT:  Yes.

* * * * * * * * * * * *

JAY HAWTHORNE

The witness, after having first been duly sworn
to speak the truth, the whole truth and nothing but the
truth testified as follows:

EXAMINATION

BY MR. HOWARD:

---

Jay Hawthorne                                          August 7, 2019

5

1    represent the City of Prattville in the lawsuit
2    that you filed in federal court.  Today is my
3    day to get to ask you questions about your
4    claims.
5              Do you go by Jay?
6  A.  Yes, sir.
7  Q.  What is your full name?
8  A.  Jay Carl Hawthorne.
9  Q.  Today when I ask you questions, I ask that you
10   verbalize your response.  Usually when I answer
11   a question that my wife asks, I go huh-huh or
12   uh-huh.  She can't get that down if you do that.
13             If you need to take a break, that will be
14   fine.  Just let me know.  I do ask that you
15   answer the question that's on the table before
16   we take a break.  And also we'll probably break
17   around 11:30.  I have lunch coming in for us
18   today.
19             What is your date of birth?
20 A.  ███████████
21 Q.  Have you ever been in the military?
22 A.  No, sir.
23 Q.  What is your current address?

6

1  A.  ██████████████████████████████████████
2  Q.  How long have you lived there?
3  A.  Approximately 15, 16 months.
4  Q.  Where did you live at before?
5  A.  ██████████████████████████████████████
6      And lived there 2007 to 2000 -- approximately 10
7      years, 11 years there.
8  Q.  How long have you lived in Prattville?
9  A.  Since '92, sir.
10 Q.  How many times have you been married?
11 A.  Three.
12 Q.  What's your first wife's name?
13 A.  Renee Peek.
14 Q.  Where does she live?
15 A.  I don't know.
16 Q.  What does she do?
17 A.  I don't know.  I haven't had any contact with
18     her in about eight, nine years.
19 Q.  Where did she work the last time that you had
20     contact with her?
21 A.  Autauga Dental Station up in Prattville,
22     Alabama, last known employment.
23 Q.  What year did you divorce Renee?

7

1  A.  I divorced her, I believe it was, November.  It
2      was finalized in 2009.
3  Q.  Did you and Renee have any children?
4  A.  Yes.
5  Q.  How many?
6  A.  One.
7  Q.  Name?
8  A.  Harrison Taylor Hawthorne.
9  Q.  How old is Harrison now?
10 A.  He is 24.
11 Q.  Where does he work?
12 A.  Right now he coaches travel ball, and he's
13     going -- trying to finish up at Jacksonville
14     State University.  He played baseball for them.
15 Q.  Who does he coach the travel team for?
16 A.  Oxford -- I don't know the exact name.
17 Q.  Excel in Oxford?
18 A.  Actually, his roommate, Hayden White, coaches
19     Excel, and he does the other team.
20 Q.  What age group does he coach?
21 A.  He told me he went to Perfect Game and did 17s
22     three weeks ago.  I haven't talked to him since.
23 Q.  At Emerson?

8

1  A.  Sir?  Could you repeat the question?
2  Q.  Yes.  Perfect Game in Emerson, Georgia?
3  A.  No.  That's up in -- it was Marietta.
4  Q.  It's the same thing.
5  A.  Okay.
6  Q.  At East Cobb --
7  A.  Yes.
8  Q.  -- to be more specific.
9           (Brief interruption.)
10 Q.  Does Harrison have any children?
11 A.  No.
12 Q.  Is he married?
13 A.  No.
14 Q.  Do you have any idea whether Renee lives in this
15     area now?
16 A.  I don't know.
17 Q.  Who was the second wife?
18 A.  Second wife is my current wife, Alisa Ayers
19     Hawthorne.
20 Q.  What was her middle name or maiden name?
21 A.  Ayers, A-Y-E-R-S.
22 Q.  When did you marry Alisa?
23 A.  7/6/13.

2  (Pages 5 to 8)

Jay Hawthorne                                          August 7, 2019

9

1    Q.   Any children?
2    A.   She has two.
3    Q.   What are their ages?
4    A.   Amanda is 22, and her last name is Davis.  And
5         then there's Andrew Logan Dortch, and he's 15.
6    Q.   Where does Andrew go to school?
7    A.   Prattville High School.
8    Q.   Does Amanda work anywhere or go to school?
9    A.   She lives up in Auburn, and she works at a day
10        care.
11   Q.   Is she married?
12   A.   No, sir.
13   Q.   Has Alisa been married before?
14   A.   Yes.
15   Q.   Do you know how many times?
16   A.   Twice.
17   Q.   What was her first husband's name?
18   A.   His name was Mike Davis.  That is Amanda's
19        father.  They were married for about six months.
20   Q.   Does Mike still live around here?
21   A.   Lives in, I believe, Attalla.
22   Q.   Do you know what he does?
23   A.   Alabama Power.

10

1    Q.   Who is Logan's father?
2    A.   Ken Dortch.
3    Q.   Do you know anything about Ken Dortch?
4    A.   Yes.  He works for Drummond Coal.  He's like
5         vice president.  He's like top four in the
6         company.  He's been with them for between 25 --
7         I'd say 25 to 30 years.
8    Q.   And her second marriage, I guess, was you?
9    A.   No.  I was the third marriage.
10   Q.   Who was her second husband?
11   A.   That was --
12   Q.   Oh, Ken Dortch.
13   A.   Yeah.
14   Q.   They were married.  Okay.
15        Where does Alisa work?
16   A.   She does not.
17   Q.   Where has she worked in the past?
18   A.   For Drummond Coal.
19   Q.   When is the last time that Alisa worked?
20   A.   I estimate nine years ago.
21   Q.   Who did you marry the third time?
22   A.   Me?
23   Q.   You said you've been married three times.

11

1    A.   I was married to Renee Peek twice.
2    Q.   Two women, three marriages?
3    A.   Correct.
4    Q.   Do you have any children that we have not
5         discussed?
6    A.   None that I know of.
7    Q.   Does Alisa have any children that we have not
8         discussed?
9    A.   None that I know of.
10   Q.   Other than working for the City of Prattville,
11        have you had any part-time jobs in the last ten
12        years?
13   A.   I worked for my -- in 2019 -- no.  The last ten
14        years, no.
15   Q.   What is your educational background?
16   A.   B.S. in public -- justice and public safety,
17        AUM, 1991.  I have a paramedic degree from
18        Trenholm, 1994.  I have an associate's degree
19        obtained in the mid-'90s from Wallace --
20   Q.   What subject?
21   A.   -- Selma, in fire science.  And then I also have
22        a paramedic degree.  It's also called an allied
23        health degree, another associate's degree.

12

1    Q.   What year was that?
2    A.   Mid-'90s.  I got both of those around the same
3         time.
4    Q.   Have you ever filed bankruptcy before?
5    A.   No, sir.
6    Q.   Have you ever been arrested before?
7    A.   No, sir.
8    Q.   Have you applied for any other jobs in the last
9         ten years other than with Prattville and --
10        well, I guess any part-time job?
11        Have you applied for any employment other
12        than Prattville?
13   A.   Not that I can recall.
14   Q.   Have you filed any lawsuits other than the
15        workers' comp suit against Prattville and the
16        discrimination suit against Prattville?
17   A.   Yes.  I had one that was filed November 9 of
18        2017.  It was a countersuit to a homeowner's,
19        Winchester Ridge HOA.
20   Q.   What happened there?
21   A.   They wanted $1487.50 from past dues from people
22        that owned the property.  And when we went to
23        close, they wanted us to pay it.  But we don't

3  (Pages 9 to 12)

Jay Hawthorne                                      August 7, 2019

---

13

1      owe that, so that's still an active case.
2   Q.  What was the counterclaim for?  What did you say
3       they did?
4   A.  They put a lien against the house for $1487.50,
5       but we don't owe -- our contention is we don't
6       owe them that, so that's being fought right now.
7   Q.  Who is your lawyer in that case?
8   A.  Kyle Shirley.
9   Q.  Have you applied for disability at any time in
10      the last ten years?
11  A.  Yes.
12  Q.  How many times?
13  A.  Once.  June of 2017.
14  Q.  Why did you apply for disability?
15  A.  I had an off-duty wreck, and I had never felt
16      pain like that before, and I wanted to look out
17      for my options.  If somehow my injuries were
18      worse than I anticipated, I wanted to have
19      somebody that -- if I couldn't perform my work,
20      because it's the only job that I've done for
21      25-plus years almost at that point, that -- I
22      wanted to check into my options.
23  Q.  Did you actually file the suit?

---

14

1   A.  I filed the claim, yes.
2   Q.  What did you say was your disability?
3   A.  At the time it had to do with the neck pain and
4       the ability -- if I wasn't able to work or
5       couldn't, you know, get better from it.
6   Q.  What was the result of that claim?
7   A.  It was denied.
8   Q.  Do you know why it was denied?
9   A.  I went before a judge on April 2 and had a
10      hearing, and they told me that I could do other
11      things and that my neck was fine.  They told me
12      that the torn labrum, which I sustained, would
13      be an issue for my work; however, I could still
14      do other jobs like maybe be a greeter or be a
15      electronics -- I don't know -- an electronics
16      type -- put stuff together, that type of thing.
17  Q.  April 2 of what year?
18  A.  2019.
19  Q.  Do you remember the judge's name?
20  A.  Judge Wright out of Killen.  Video
21      teleconference.
22  Q.  Killen, Alabama?
23  A.  Yes.

---

15

1   Q.  Do you happen to know the case number?
2   A.  No, sir, I don't.
3   Q.  What was the judge's last name?
4   A.  Wright, W-R-I-G-H-T.
5   Q.  I remembered the Killen but not the Wright.
6           Did you appeal that decision?
7   A.  No.
8   Q.  And you've only applied for disability one time
9       in the last ten years?
10  A.  Yes.
11  Q.  When is the last time you went to a doctor?
12  A.  I went to my counselor yesterday.
13  Q.  What kind of counselor?
14  A.  LPC.  James Baker, right across the street.
15      Went to him yesterday.
16  Q.  I guess I need to find out about that.
17              MR. HOWARD:  Are you claiming any type
18          of privileges or can I ask
19          questions about that, or what do I
20          do?
21              MR. GUILLOT:  We're going to use it.
22              MR. HOWARD:  I mean, if you're going
23          to claim mental damages, I

---

16

1           probably -- okay.
2   Q.  Who are the mental health counselors that you've
3       seen?  I know about Baker.  Who else?
4   A.  He's the only counselor that I've seen.
5   Q.  What do you go to Baker for?
6   A.  I go there for stress.  I go there for anxiety.
7   Q.  What do you have stress about?
8   A.  I'm under a lot of stress.
9   Q.  What --
10  A.  I've been under egregious treatment by the City.
11  Q.  Defined egregious.  What do you mean by that?
12      Let's list all the ways they've been egregious.
13      Number one is what?
14  A.  Well, they took away my job, my accommodation.
15  Q.  Took away job.
16      What do you mean about accommodation?
17  A.  Took away my job.
18  Q.  Well, you said accommodation.  What do you mean
19      by that?  Do you understand the question?  I
20      guess we can break it down like this.
21      What accommodation are you referring to? and
22      then we'll talk about how they took it away.
23      What accommodation are you talking about?

4  (Pages 13 to 16)

Jay Hawthorne                                          August 7, 2019

|  | 17 |
|---|---|
| 1 | A. The accommodation that I had that -- of having a |
| 2 | job that all officers that are either injured on |
| 3 | duty or off duty would have where they would |
| 4 | have their own office.  They would have a |
| 5 | company vehicle, and they would be able to do |
| 6 | their job as I had been able to do since 1998. |
| 7 | Q. Let me stop you there. |
| 8 | With your injuries could you do your job? |
| 9 | A. My job was a clerical -- the restrictive duty |
| 10 | status had me at a clerical nonemergency status. |
| 11 | Q. With your disability could you do your full job |
| 12 | as BC? |
| 13 | A. Yes, I could.  From the office I could because |
| 14 | that is clerical.  You don't perform emergency |
| 15 | calls in an office.  You do it in the field. |
| 16 | Q. Are all the duties of a BC clerical? |
| 17 | A. No. |
| 18 | Q. So could you do a full BC job with your |
| 19 | disability? |
| 20 | A. No. |
| 21 | Q. Is there any -- let's get it for the record. |
| 22 | What does BC stand for? |
| 23 | A. Battalion chief. |

|  | 18 |
|---|---|
| 1 | Q. Are there any battalion chief positions that are |
| 2 | simply and solely clerical? |
| 3 | A. No. |
| 4 | Q. Okay.  So you said that yours was.  Please |
| 5 | explain how just yours was. |
| 6 | A. The restrictive duty status that I was put |
| 7 | under, that was the status.  And I hadn't even |
| 8 | been diagnosed from the injury that I sustained |
| 9 | on May 2 on duty, and then I was let go on |
| 10 | August 15. |
| 11 | Q. That's not my question.  How did you just get a |
| 12 | BC job that was simply just clerical? |
| 13 | A. The City always accommodates in every way.  They |
| 14 | always have. |
| 15 | Q. Let me stop you there.  Let me write them down. |
| 16 | City accommodates.  They always have. |
| 17 | List who has been accommodated this way as |
| 18 | battalion commander that's been given just an |
| 19 | administrative job.  Who? |
| 20 | A. None. |
| 21 | Q. Okay.  When you said they always have, what are |
| 22 | you talking about? |
| 23 | A. I'm talking about the City has always |

|  | 19 |
|---|---|
| 1 | accommodated personnel who have been injured on |
| 2 | shift. |
| 3 | Q. Who? |
| 4 | A. Pete Neal. |
| 5 | Q. What was his injury? |
| 6 | A. To the best of my ability, back. |
| 7 | Kenny Rhodes, back injury. |
| 8 | Q. Who else? |
| 9 | A. I know of a bunch of people that also had |
| 10 | off-duty injuries. |
| 11 | Q. Let's list them. |
| 12 | A. Tony Shaw. |
| 13 | Q. Okay.  What was Tony's injury? |
| 14 | A. He had an accidental gunshot to his knee from |
| 15 | his son.  He was about a two-year veteran when |
| 16 | it happened, and I was a captain. |
| 17 | Q. Say that again.  You were a captain, and he was |
| 18 | a two-year veteran? |
| 19 | A. No.  No.  He had been there for about two years. |
| 20 | Now he's been there about ten-plus, and he's a |
| 21 | captain now. |
| 22 | Q. Who else has been accommodated like you think |
| 23 | you should have been? |

|  | 20 |
|---|---|
| 1 | A. Jason Ogletree. |
| 2 | Q. What was his injury? |
| 3 | A. Numerous injuries.  He's been on FMLA. |
| 4 | Shoulder.  He just had a left heel injury.  This |
| 5 | last February they put him on restrictive duty, |
| 6 | but he was allowed to drive a city vehicle, |
| 7 | respond to calls, be a battalion chief's aide, |
| 8 | et cetera, et cetera. |
| 9 | Q. Could you respond to calls? |
| 10 | A. I could drive. |
| 11 | No.  Could you respond to calls? |
| 12 | A. Yes, I could respond to calls. |
| 13 | Q. What could you do when you got there? |
| 14 | A. I could be a battalion chief's aide since I'm |
| 15 | the senior battalion chief. |
| 16 | Q. Could you -- |
| 17 | A. They are having junior people be a battalion |
| 18 | chief's aide. |
| 19 | Q. Could you take any actions while you were there |
| 20 | to help fight the fire? |
| 21 | A. Battalion chiefs don't have to do that. |
| 22 | Q. Okay.  Then why should they let you drive to a |
| 23 | fire that you can't fight? |

5  (Pages 17 to 20)

Jay Hawthorne                                        August 7, 2019

21

1   A.   Those guys weren't cleared to fight any fires,
2        too, and they still --
3   Q.   No.  Why should they let you drive to a fire
4        that you can't fight?
5   A.   My restrictions from the doctor didn't say I
6        can't drive, and I didn't have to drive
7        emergency.
8   Q.   That's not what my question was.  My question
9        was, why should the City let you drive to a fire
10       that you can't fight?
11  A.   I guess my answer would be they let everybody
12       else do it.
13  Q.   Okay.  We're talking just about you.  Why should
14       the City let you drive to a fire you can't
15       fight?
16  A.   Battalion chiefs don't fight fire.
17  Q.   Okay.  Why should the City let you drive to a
18       fire you can't fight?
19              MR. GUILLOT:  Objection.  Asked and
20                  answered.
21  Q.   Well, what's your answer?  I haven't heard one
22       yet.
23  A.   No.

22

1   Q.   You're saying the City shouldn't let you drive
2        to a fire that you can't fight?
3   A.   No.
4   Q.   How many cars are there available for battalion
5        commanders?
6   A.   One.
7   Q.   Who else is in this list of people here that
8        have been accommodated by the City of
9        Prattville?
10  A.   Who else has been accommodated like with
11       restrictive duty status?
12  Q.   Yeah.  We've got Tony Shaw, Ogletree, Rhodes.
13              Who else is on your list?
14  A.   Sergeant Brett Johnson.
15  Q.   Red Johnson?
16  A.   Brett, B-R-E-T-T.
17  Q.   What was his problems?
18  A.   He went to American Family Care, and he had a
19       complaint of a potential cardiac issue.  And the
20       City accommodated him with a status -- a
21       restrictive status where he was still allowed to
22       drive and even respond, if needed, to
23       nonemergency calls.

23

1   Q.   Who else is on your list?
2   A.   I can't remember any more, even though I know
3        there are some.
4   Q.   What position was Brett Johnson in when he was
5        accommodated?
6   A.   Sergeant.
7   Q.   What position was Tony Shaw in when he was
8        accommodated?
9   A.   Firefighter.
10  Q.   What about Ogletree?
11  A.   Fire medic.
12  Q.   What about Pete Neal?
13  A.   I believe firefighter.
14  Q.   What was Kenny Rhodes?
15  A.   I believe he was a sergeant.
16  Q.   What was Brett Johnson's accommodation?
17  A.   His accommodation?
18  Q.   Yes.
19  A.   He was able to drive a departmental vehicle.  He
20       didn't have to -- he could go anywhere at any
21       time to deliver EMS supplies, service air
22       bottles, air and such as that.
23  Q.   Could you deliver supplies with a restriction of

24

1        lifting no more than 15 pounds?
2   A.   Supplies.
3   Q.   Yes.
4   A.   EMS supplies?
5   Q.   Anything over 15 pounds could you go deliver it?
6   A.   Mail and paperwork and stuff like that, sure.  I
7        could do all that.
8   Q.   So if the paperwork and mail is over 15 pounds,
9        you could do it?
10  A.   No, then I couldn't do it.
11  Q.   My question was, is there anything over 15
12       pounds that you could drive and deliver?
13  A.   No.
14  Q.   What was Tony Shaw's accommodation?
15  A.   Well, he has never been able to fulfill a
16       heavy-duty rated status which is required for
17       every employee in the City of Prattville.
18  Q.   What is a heavy-duty rated status for every
19       employee in the City of Prattville?
20  A.   That means you have to at least be able to carry
21       and do the duty over a hundred pounds as well as
22       participate in PT, physical training.
23  Q.   Okay.  That's a rating for firefighters in the

6 (Pages 21 to 24)

Jay Hawthorne                                          August 7, 2019

|  | 25 |
|---|---|
| 1 | City of Prattville, not every employee in the |
| 2 | City of Prattville. |
| 3 | A.  No.  Correct.  Firefighters.  Yes, sir. |
| 4 | Q.  I didn't know what we were going to have Cathy |
| 5 | Dickerson do. |
| 6 | What was Tony Shaw's accommodation? |
| 7 | A.  He was given a job. |
| 8 | Q.  Just a job?  That's it? |
| 9 | A.  He was given a job, and he was able to flourish |
| 10 | and promote through the ranks when he was not |
| 11 | fully capable to do the job. |
| 12 | Q.  What was Jason Ogletree's accommodation? |
| 13 | A.  He was put on restrictive duty status this last |
| 14 | February for a left heel injury, and he was able |
| 15 | to do the same thing that Brett Johnson was.  He |
| 16 | could be a battalion chief's aide.  He could |
| 17 | drive city vehicles and -- you know, the same |
| 18 | type of accommodation. |
| 19 | Q.  What was Pete Neal's accommodation? |
| 20 | A.  He was so long ago.  All I know is they kept him |
| 21 | at the annex on a light duty accommodation until |
| 22 | he reached either SSDI or a state-type |
| 23 | settlement. |

|  | 26 |
|---|---|
| 1 | Q.  Was that back prior to Mayor Gillespie? |
| 2 | A.  I don't know.  Could be. |
| 3 | Q.  What about Kenny Rhodes?  What was his |
| 4 | accommodation? |
| 5 | A.  He injured his back, and he stayed on and he |
| 6 | eventually even got promoted to captain in codes |
| 7 | and standards with Chief Brown.  He stayed and |
| 8 | stayed at the administrative level position. |
| 9 | Q.  Can you be more specific about what his |
| 10 | accommodation was? |
| 11 | A.  No. |
| 12 | Q.  Can you think of anybody else that was |
| 13 | accommodated like you want to be? |
| 14 | A.  No. |
| 15 | Q.  Earlier you said that you were really stressed |
| 16 | out, and I asked you to list things.  The first |
| 17 | thing you said is that the City's actions were |
| 18 | so egregious, and then we started listing that. |
| 19 | You said they took away your job, and then you |
| 20 | changed -- or additionally said they took away |
| 21 | your accommodation. |
| 22 | What next is on your list that stresses you |
| 23 | out or think the City did that was so egregious? |

|  | 27 |
|---|---|
| 1 | A.  I think they humiliated me. |
| 2 | Q.  How did they do that? |
| 3 | A.  By taking my office away.  As a senior battalion |
| 4 | chief, that's never been done.  As a matter of |
| 5 | fact, it's never been done to any employee in my |
| 6 | 27 years in the fire service, for me to answer |
| 7 | to subordinates. |
| 8 | Q.  Let's talk about that. |
| 9 | Who is your subordinate? |
| 10 | A.  I answered per Chief Whaley in any restrictive |
| 11 | duty status to Captain Brown. |
| 12 | Q.  What was Captain Brown's position when you were |
| 13 | answering to him? |
| 14 | A.  An acting battalion chief. |
| 15 | Q.  How is an acting battalion chief not a battalion |
| 16 | chief? |
| 17 | A.  We are a paramilitary organization.  That would |
| 18 | be like having a sergeant answer to a captain. |
| 19 | It's never been done in my organization, and I |
| 20 | knew that that was just straight retaliation and |
| 21 | humiliation to force me out. |
| 22 | Q.  My question was how was answering to an acting |
| 23 | battalion chief not a battalion chief. |

|  | 28 |
|---|---|
| 1 | A.  He's not a battalion chief.  He would answer to |
| 2 | me.  I'm the senior battalion chief.  That's |
| 3 | what ranks are about. |
| 4 | Q.  So in your mind, because he has the word |
| 5 | "acting" in front of battalion chief, he's not |
| 6 | the battalion chief? |
| 7 | A.  I still run the shift. |
| 8 | Q.  What makes you think that? |
| 9 | A.  Because I still run the personnel, and I can |
| 10 | still run everything from the office that they |
| 11 | gave me and the clerical duties.  He can go out |
| 12 | and handle the scenes. |
| 13 | Q.  So why do they need a battalion chief if you're |
| 14 | doing all this battalion chief commanding? |
| 15 | A.  Repeat the question. |
| 16 | Q.  Sure.  They put him in as the acting battalion |
| 17 | chief.  Why do they need an acting battalion |
| 18 | chief if you're the battalion chief?  Do you |
| 19 | know? |
| 20 | A.  All I know is it's never been done before. |
| 21 | Q.  Okay.  My question was, why do they need an |
| 22 | acting battalion chief if you're the battalion |
| 23 | chief? |

7 (Pages 25 to 28)

Jay Hawthorne                                          August 7, 2019

29

1   A.   The duties they gave me -- my restrictive duty
2        status should not have taken away my office or
3        my rank.
4   Q.   You've already testified you couldn't do the
5        duties of battalion chief.  We got that one set
6        early on.  Why do they need an acting battalion
7        chief if you're the battalion chief?
8   A.   They don't.
9   Q.   But you couldn't do your job as a battalion
10       chief, right?
11  A.   For the duties they gave me on a restrictive
12       duty status, I could do it.
13  Q.   Could you do your full duties as a battalion
14       chief?
15  A.   No.
16  Q.   So they got somebody to replace you?
17  A.   Yes.
18  Q.   And you're upset because you had to answer to
19       the guy that replaced you?
20  A.   Yes.
21  Q.   If you couldn't do your job as a battalion
22       chief, what upset you about answering to the guy
23       that replaced you that could do your duties?

30

1        Do you need her to read the question back?
2   A.   Yes, please.
3        MR. HOWARD:  Would you read the
4             question back?
5        (The immediately preceding question
6             was read back by the court reporter
7             as requested.)
8   A.   I had never seen it done in my whole career at
9        the fire department for the City of Prattville
10       where a senior officer answered to a junior
11       officer under any circumstance, whether it be at
12       the administrative level or in the operations
13       level.
14  Q.   If he was doing your job, what made him junior?
15       His age?
16  A.   No.  His rank.
17  Q.   Well, at that time he was the battalion chief,
18       correct?
19  A.   The acting battalion chief.
20  Q.   So --
21  A.   Yes.
22  Q.   -- that was equal to you except you couldn't do
23       your job; is that correct?

31

1   A.   Yes.
2   Q.   So if his rank is equal to you, how do you get
3        your answering to somebody with a lower rank?
4   A.   I had seniority over him.
5   Q.   So you've just been through the door more than
6        he has, and you didn't like that?
7   A.   No, sir.  I just -- it's a paramilitary
8        organization.
9   Q.   Okay.  Let's go with that.  It's a paramilitary
10       organization.
11  A.   Yes, sir.
12  Q.   So even though you can't do your job, you think
13       you still should have had the rank?
14  A.   I didn't get demoted or lose pay.  I got hurt.
15  Q.   Off duty, correct?
16  A.   No.  This restrictive duty status, sir, was when
17       I got hurt.  It wasn't even diagnosed from my
18       labrum, shoulder surgery, until August 27.
19  Q.   What year?
20  A.   2018.
21  Q.   So you still couldn't do your job no matter when
22       it happened, correct?
23  A.   No.  I understand.  Yes.

32

1   Q.   So this paramilitary organization, in your mind
2        somebody that's brought in to replace you and do
3        your job, you think you should still have a
4        higher rank than him?
5   A.   Just because you're injured on an on-duty injury
6        doesn't mean that somebody else can come in and
7        just take your job --
8   Q.   Well, that --
9   A.   -- and then they can remove me like they did on
10       August 15 when I got TTD'd, and I hadn't even
11       been diagnosed until August 27 for a torn labrum
12       that was sustained from a PT test on May 2,
13       2018.
14  Q.   We'll talk about that.
15       So you just think they should not have had
16       a BC while you were injured?
17  A.   Oh, no.  They should -- you have to have a BC.
18  Q.   I agree.
19  A.   But we also have captains.  We have people that
20       fill in for BCs, too, at all levels.
21       MR. GUILLOT:  Can we take a short
22            break?
23       MR. HOWARD:  Sure.

8 (Pages 29 to 32)

Jay Hawthorne                                          August 7, 2019

33

1              (Brief recess.)
2              MR. HOWARD:  We're back on the record.
3    Q.   (Continuing by Mr. Howard) You were telling me
4         why you were upset, and you thought the City's
5         actions were egregious.  You told me they took
6         away your job accommodation, and you were
7         humiliated.
8              What's the next thing, if anything?
9    A.   Are we talking actual damages or what -- could
10        you repeat the question again so I can -- or
11        rephrase it?
12   Q.   Sure.  I asked you kind of what you were upset
13        about.  The first thing you said was Prattville
14        took your job and accommodation away.  The
15        second thing you said was you were humiliated by
16        taking your office away.  And I was asking you
17        is there a number three.
18   A.   In reference to my prior statements, what needs
19        to be known is that whenever somebody used to --
20        since we have no city manual since 1994, we
21        don't have any up-to-date rules at that time.
22             Whenever somebody got injured on duty, if
23        they couldn't perform the job, for example, of a

34

1         battalion chief at full duty, they would have an
2         accommodation of doing clerical work --
3    Q.   Let me ask you, are you changing any of your
4         previous answers?  Are you changing any of your
5         previous answer?
6    A.   I'm just making an additional statement.
7    Q.   To which one?  One or two?
8    A.   To what I just said.
9    Q.   Okay.  Does this go under the heading of took
10        away my job accommodation or I was humiliated,
11        and are you changing an answer?
12   A.   I'm not taking away anything.
13   Q.   Okay.  What's your speech now?
14   A.   My speech is what I just told you.  The City has
15        no handbook.  It's total subjectivity, and up
16        until me they decided -- in the past whenever
17        somebody got hurt, they were accommodated with a
18        clerical job.  I was also given a restrictive
19        duty status job.  However, it was on shift.
20        That was a form of humiliation.
21   Q.   Wait.  Explain that because I don't understand
22        it:  on shift and that's a form of humiliation?
23   A.   On shift as opposed to doing clerical work in an

35

1         admin position.  They did not accommodate me
2         like they have prior to me.
3    Q.   Are you saying they made you work your hours?
4    A.   They should have allowed me to have
5         eight-to-five hours --
6    Q.   Why?
7    A.   -- like everybody else.
8    Q.   Why?
9    A.   Because that's the proper accommodation that
10        they've always done in the past.
11   Q.   No.  No.  I don't know about that, but why
12        should they just do that for you?  Why do you
13        not want to work your shift?
14   A.   You just told me I couldn't fulfill the job of a
15        battalion chief.
16   Q.   No.  Let's get that straight.  You answered that
17        question, and I repeated it to you.
18             So why should you get the eight-hour shift,
19        or why should you have a special shift?
20   A.   Why should I be humiliated and answer to a
21        younger man --
22   Q.   Okay.  My question was --
23   A.   -- on shift?

36

1    Q.   -- why should you have a shift --
2    A.   Why should I have a shift?  That's the shift
3         that I'm put on.  I'm the senior battalion
4         chief.  You don't lose your rank just because
5         you're injured on the job.
6    Q.   But you lose your duties, don't you?
7    A.   Yes.  And usually the accommodation is made.
8         But in this case it wasn't made for me for some
9         reason.
10   Q.   Are we through with you supplementing your
11        previous answers?  Can we move onto three now?
12   A.   Sure.
13   Q.   Okay.  What's number three?
14   A.   I've said everything that I've said for the
15        record.  You can move onto your next question.
16   Q.   Okay.  What's number three?
17   A.   I don't have a number three.
18   Q.   Okay.  So we have two.  You're upset because
19        they took your job accommodation away, and you
20        thought you were humiliated.
21             Anything else?
22   A.   Humiliated, job accommodation, and answered --
23        yeah.  Yes.  That's good.  That will cover it.

9  (Pages 33 to 36)

Jay Hawthorne                                              August 7, 2019

---

**37**

1  Q.  What kind of accommodation do you think that
2      you're entitled to?
3  A.  I believe as a 25-plus-year employee that's
4      injured on duty --
5  Q.  Let me stop you there.  Why would that make any
6      difference?  Are all employees equal?
7  A.  Are all employees equal?
8  Q.  Yes.
9  A.  Not for the City of Prattville in the fire
10     department.
11 Q.  No.
12 A.  Some are treated --
13 Q.  In your mind.
14 A.  No.  Factually.
15 Q.  No.  In your mind should they be?
16 A.  Prior to me -- they should all be equal, and we
17     should even have an up-to-date city manual from
18     1994 which would address these issues so the
19     pure subjectivity and whether people like you or
20     not or are trying to influence and desiring you
21     to retire and make you retire -- those kind of
22     things should be avoided.
23 Q.  Why?

---

**38**

1  A.  What do you mean why?  That's not right to do
2      that.  All employees should be treated the same.
3  Q.  Why should somebody not encourage you to retire?
4  A.  Encourage me to retire?
5  Q.  Yeah.
6  A.  Why?
7  Q.  Why is that such a bad thing?  If you can't do
8      your job, why don't you retire?
9  A.  How is that such a bad thing?
10 Q.  No.  You said it was a bad -- or I perceived
11     that you said it was a bad thing.
12 A.  When HR tells me in a memo on 4/4/2017 I need to
13     pursue my option to retire and my accommodation
14     has ended due to no undue burden on the City and
15     for no valid reason, I find that quite
16     offensive.
17 Q.  Why?
18 A.  What do you mean why?  You wouldn't?  You
19     wouldn't --
20 Q.  No.  No.  No.
21 A.  -- after 25-plus years?
22 Q.  I'm not deposed.  You are.
23     Why did you find it offensive?

---

**39**

1  A.  Because I've never seen it done.  I don't know
2      if that's commonplace.
3  Q.  Well, let me ask you this:  All those people you
4      listed over here, do you have any idea whether
5      they took a medical retirement?
6  A.  If anyone what?
7  Q.  Took a medical retirement.
8  A.  I don't know that for a fact.
9  Q.  Okay.  Back to my question.
10     What kind of entitlement -- what kind of
11     accommodation do you think that you are entitled
12     to?  You started off as this 25-year something,
13     and then I stopped you.  Finish.
14 A.  Until I healed from an on-duty wreck or was even
15     properly diagnosed, which I wasn't until the
16     27th, I felt that I should have had a clerical
17     job which was decided in my restrictive duty
18     status in an admin position at the Public Safety
19     Building.
20 Q.  Doing what?
21 A.  Whatever needs to be done.
22 Q.  What needs to be done?  You walk in the door.
23     What do you think you're entitled to be doing?

---

**40**

1  A.  When I walk in the door, just like Chief Whaley
2      on May 14, 2018, he gave me a restrictive duty
3      status.  I do what I'm told.  So they tell me
4      what my work duties are while I work to get
5      better to get back to work.  Then that's what
6      you do.  That would be the proper accommodation,
7      and that's the accommodation that's been there
8      ever since up until me.
9  Q.  And you've already listed those people, correct?
10 A.  What?
11 Q.  You gave me a big list of people.  Is that what
12     you're talking about when you answered that
13     question then?  You said it's always been there
14     and --
15 A.  On-duty, off-duty wreck, the City has always
16     been kind and proper to help people.  But when
17     people are injured on duty, that's a whole
18     different thing.
19 Q.  Well, let's break that down.  The list you gave
20     me earlier are people that you think were
21     accommodated differently than you.
22 A.  They have been accommodated before differently.
23 Q.  Can you add to that list now?  Do you know

---

10 (Pages 37 to 40)

Jay Hawthorne                                                    August 7, 2019

41

1        anybody else?
2    A.  I think we could probably look at a couple more.
3    Q.  Who are they?
4    A.  We could look at Battalion Chief Strock, and we
5        could look at demoted Battalion Chief Andy
6        Ellison who became a captain.
7    Q.  What was his problem?
8    A.  The rumor had -- and I do have an exhibit --
9        that he got --
10   Q.  Let's talk about your exhibit.  Have you got it?
11   A.  I didn't bring anything.
12   Q.  Okay.
13   A.  I believe my exhibit per counsel I think is
14       different than what you have.  I believe his
15       exhibit to me is Exhibit 15, the accommodation
16       for Captain Ellison.  That's the number that I
17       have.
18   Q.  That was a question number.
19           What was Ellison's disability or --
20   A.  He was working on a -- he was a 19-year captain
21       who was just demoted from BC, and he went to
22       Birmingham and he was going to get some kind of
23       PTSD disability 19-year check that was pending

42

1        on per the memo that Ms. Thrash had written that
2        he -- they would accommodate him as long as --
3        until the medical review board actually approved
4        it.
5    Q.  What was his disability?  What did he have?
6    A.  I believe it was PTSD.
7    Q.  And he just couldn't ride in the back of an
8        ambulance, correct?
9    A.  No, sir.  That's Sergeant Law.  You can put him
10       down, I guess, too.  That's Sergeant Law.
11   Q.  Then what was Ellison's?
12   A.  He could do it.
13   Q.  PTSD from what?
14   A.  Ellison was PTSD from years, I guess, of trauma.
15       I don't know the medical case.  I just know the
16       exhibit.
17   Q.  What was Strock's?
18   A.  He had a catastrophic on-duty wreck.  It was
19       November -- I've got to remember.  I believe it
20       was November of 2014.  He went up unspotted
21       without any personal protective equipment to fix
22       a space heater, and he fell tragically 16 feet.
23   Q.  What was his injury?  Just shoulder? back? legs?

43

1    A.  No, sir.  Catastrophic.  Head.  He went up to
2        Emory, the trauma unit up there.  He was a
3        miracle.  They had vigils for him --
4    Q.  What about Law?
5    A.  -- and everything.
6    Q.  What about Law?
7    A.  Law is the one that you referred to that I just
8        remembered because you brought it up.  He
9        couldn't ride in the back of an ambulance
10       because he was in an ambulance wreck, and so
11       they made an accommodation for him too.  So he
12       really can't even fulfill his duties by riding
13       in the back of the ambulance.
14   Q.  But he could do everything else?
15   A.  Yeah, he can do everything else.  But it's
16       important if somebody's life is on the line
17       that -- you might need him on a call to get back
18       there and actually have to ride with them.
19   Q.  Or might not.
20   A.  Huh?
21   Q.  Or might not.  There might be somebody else.
22   A.  What happens if there's not?
23   Q.  What happens if there is?

44

1    A.  (No response.)
2    Q.  Any other things that you think that you're
3        entitled to?
4    A.  No.
5    Q.  What's your goal in this lawsuit?
6    A.  Goal?  The goal -- long-term goal actually is
7        hopefully this would never happen to anybody
8        again, somebody with a career --
9    Q.  What's your goal?
10   A.  -- loyalty to this organization.
11           I hope that the City would come up and have
12       a handbook -- an up-to-date handbook with
13       today's laws.
14   Q.  What law is outdated in that handbook?
15   A.  1994.
16   Q.  No.  What law is outdated in that handbook?
17   A.  Excuse me?
18   Q.  What law is outdated in that handbook?  You say
19       it's outdated.
20           What part --
21   A.  Just the rules -- general rules and what they
22       put in there.
23   Q.  Which general rule?

11 (Pages 41 to 44)

Jay Hawthorne                                              August 7, 2019

---

45

```
 1  A.  Everything.
 2  Q.  Which one?
 3  A.  How about from page 1 -- I believe it's 125
 4      pages.  A lot of stuff is outdated.  It needs to
 5      be brought up to date.
 6  Q.  What specifically is outdated?  You've said that
 7      several times.  I just want to know why you
 8      think it's outdated just because it's got 1994
 9      on the front cover.
10  A.  Because all it -- it's pure subjectivity.
11  Q.  What is subjective about it?  What does that
12      mean?
13  A.  That's my interpretation.
14  Q.  What do you mean by your interpretation?
15  A.  They do whatever they want to do.
16  Q.  So you don't think there's anything objective in
17      that book?
18  A.  Maybe some, but not much.
19  Q.  Well, what's subjective?  What do you think is
20      subjective in that book?
21  A.  Well, I haven't even -- to be honest with you, I
22      haven't even been able to look at it that much
23      lately, but it's not even something that they
```

---

46

```
 1      even refer to.
 2  Q.  Why not?
 3  A.  Because even -- HR themselves even says -- and
 4      even our fire chiefs say --
 5  Q.  No.  No.  No.
 6  A.  -- it's not applicable.
 7  Q.  We're talking about you.  We're talking about
 8      you.  Why have you not been able to look at it
 9      lately?
10  A.  Huh?
11  Q.  Why have you not been able to look at it lately?
12  A.  I haven't looked at it.
13  Q.  When is the last time you looked at the book?
14  A.  Maybe two, three months ago.
15  Q.  Do you now have anything that you know that's
16      completely outdated in that book that you can
17      cite me to?
18  A.  Not offhand.
19  Q.  In your mind how is it outdated if you can't
20      cite to anything that's outdated?
21  A.  I can't recall anything at this time.
22  Q.  Well, that's fine.  But you're also saying it's
23      outdated, but you can't give me any reason that
```

---

47

```
 1      it's outdated.  So which is it?  Is it outdated,
 2      or you don't know?
 3  A.  I don't know.
 4  Q.  What is your -- have you reached MMI?
 5  A.  That was 7/19.  I have not gotten results on the
 6      rating.
 7  Q.  7/19.  What year?
 8  A.  '19.
 9  Q.  Have you reached MMI?
10  A.  Yes.  7/19/19.
11  Q.  Who --
12  A.  Who did it?
13  Q.  Who told you that you'd reached MMI?
14  A.  Dr. Buggay.
15  Q.  What did he tell you?
16  A.  The workmen's comp doctor.
17          Well, he didn't give the rating.  He just
18      said I reached MMI.
19  Q.  Do you have any idea why you haven't received
20      the rating?
21  A.  I called the office about a week ago, and she
22      said the doctor was really backed up, and she
23      also said that the other people -- my workmen's
```

---

48

```
 1      comp attorney as well as the Millennial Risk
 2      people, they wanted the numbers, so somebody
 3      would be getting ahold of me as soon as the
 4      numbers would come in.
 5  Q.  Do you think you're at a hundred percent?  Do
 6      you think you're ready to go back to work?
 7  A.  He hasn't told me what -- I don't know what's in
 8      it.
 9  Q.  I asked what do you think.
10  A.  I don't know.
11  Q.  Well, do you think you're ready to go back to
12      work?
13  A.  Oh, I definitely would be ready to go back into
14      an admin position and perform that very well,
15      yes.
16  Q.  Do you think you're ready to go back as a BC?
17  A.  No, sir.
18          As a battalion chief on shift, no, sir.
19  Q.  Why not?
20  A.  Well, I had a surgery on October 11 from an
21      injury on May 2 that finally got treated.  Then
22      I went back on the 28th of March of '19, this
23      year, and I had frozen surgery [sic].  Okay?
```

---

12 (Pages 45 to 48)

Jay Hawthorne                                                August 7, 2019

---

49

1         And the doctor said --
2    Q.   I just asked you why, not --
3    A.   Oh.
4    Q.   -- how we got there.
5    A.   Okay.
6    Q.   Why can't you go back as BC?  Are you
7         injured? disabled?  What is it?
8    A.   My shoulder.
9    Q.   What's wrong with your shoulder?
10   A.   I don't have the range of motion that more than
11        likely will allow me to perform the duties of an
12        on-shift battalion chief.
13   Q.   So it's your opinion that you cannot go back as
14        a BC because your shoulder is keeping you from
15        fully performing the duties?
16   A.   I believe it's the opinion of the doctor as well
17        as myself, yes.
18   Q.   Okay.  We're back to your opinion.  The doctor
19        hasn't said it yet.  I want what you think right
20        now before that comes out.
21        Do you think you can go back as the BC and
22        fully perform the duties?
23   A.   Of an on-shift battalion chief is what you're

---

50

1         referring to?
2    Q.   Yes.  A full BC that does everything.
3    A.   No, I could not perform at that level.
4    Q.   And that's because of your shoulder?
5    A.   Correct.
6    Q.   And you think you've got some type of impairment
7         rating coming from the doctor?
8    A.   Correct.
9    Q.   Do you think an accommodation should just be
10        permanent because you've been there so long?
11   A.   No.  I think you call it -- in a legal term it's
12        called a precedent.
13   Q.   No.  No.
14   A.   And the precedent has always been there for the
15        City.
16   Q.   Dude, I just asked you do you think it should be
17        permanent just because you've been there so
18        long.
19   A.   No.
20   Q.   Tell me about when you almost became assistant
21        chief.
22   A.   I believe that was in November of 2016.  There
23        was a position that had come open.  It was an

---

51

1         admin position, and it was between Battalion
2         Chief Owens at the time who was an admin
3         battalion chief.  And it was also --
4    Q.   You keep saying admin battalion chief.  What
5         does that mean?
6    A.   It was -- an admin battalion chief was his
7         position before they had -- before he became an
8         assistant chief.
9         Do you understand what I'm saying?
10   Q.   Well --
11   A.   They've had an admin battalion chief before.
12   Q.   -- let me ask the question so I --
13        What were the duties of the admin battalion
14        chief?
15   A.   Basically the duties of the admin battalion
16        chief, he was basically -- he was doing rules
17        and regs, doing a lot of paperwork.
18   Q.   Did that become the training BC?
19   A.   The admin became -- I don't recall.  Very well
20        may have.
21   Q.   Okay.  And the admin BC that you described went
22        away long before your car accident.
23   A.   Yes.

---

52

1    Q.   So the day you had your car accident, there was
2         no admin BC.
3    A.   No, there was not.
4    Q.   Okay.  You were telling me when you almost got
5         to be assistant chief.
6    A.   No, I didn't almost get it.  They were going to
7         have an interview between two people.
8    Q.   They asked you, didn't they?
9    A.   They what?
10   Q.   They offered it to you.
11   A.   I was not offered the job.  They asked me to
12        interview for it.
13   Q.   Your testimony is you were not offered the
14        position of assistant chief?
15   A.   I was not offered the job of assistant chief,
16        sir.
17   Q.   Did you --
18   A.   I had to go for an interview is what I had to
19        do, and it was between me and Battalion Chief
20        Owens.  It was between two people.  It was a
21        competitive interview.  I never had the
22        interview, and he got the job.  I never had the
23        interview.

---

13 (Pages 49 to 52)

Jay Hawthorne                                          August 7, 2019

53

1   Q.   You're saying you didn't turn that down and
2        that's how Owens got that job?
3   A.   I turned it down because I had three elderly
4        parents at the time to take care of.  And guess
5        what?  There are more important things, and that
6        wasn't conducive to my schedule at that time.
7   Q.   Well, I don't understand what you're saying.
8   A.   Chief Brown didn't ask me -- nobody offered me
9        the job:  the mayor, Lisa ...
10  Q.   You just said you turned it down.  What did you
11       turn down?
12  A.   I didn't turn -- I turned down a job interview.
13       I turned down a job interview for an assistant
14       chief's position.  I was never told -- it was a
15       competitive position.
16  Q.   Is it your testimony under oath that you did not
17       come back and say I do not want that job when it
18       was offered to you?
19  A.   I do not recall -- I do not recall them offering
20       the position to me.
21  Q.   Do you know whether the only reason they asked
22       Owens about it was because they didn't think you
23       wanted it?

54

1   A.   I did not know that.
2   Q.   Did you come back and say, man, I wish I would
3        have taken that job after they gave to Owens?
4   A.   I believe I spoke to Chief Whaley and said, man,
5        I wish I could have -- I wish I could have had
6        that job.
7   Q.   And that was an eight-hour shift job, right?
8   A.   Yes.
9   Q.   Exactly what you want now.
10  A.   He didn't tell me whether I got it or not.  He
11       said it was too late.
12  Q.   Will you agree with me there were only two
13       people available for that job?
14  A.   Correct.  Yes, sir.  Me and BC Owens.  Yes, sir.
15  Q.   And Owens was not approached until after you
16       said you didn't want it.  Do you know anything
17       about that?
18  A.   No, I didn't know.  Nobody told me that.  They
19       just said it was between two people.
20  Q.   You chose a 24-hour shift over the eight-hour
21       shift at that time.
22  A.   I did.  To help with my elderly parents and my
23       father-in-law.

55

1   Q.   So the 24-hour shift, the alarms going off and
2        stuff like that was not too bad.  You stayed on
3        there for the 24-hour shift?
4   A.   You have to understand.  When you're the senior
5        battalion chief, you have an office that is
6        separate from that.  You don't hear a lot of
7        that noise and all that.
8   Q.   I'm asking you a question, and you're giving me
9        an answer I didn't ask.
10       The bells and whistles and alarms and
11       computers and stuff like that was not too bad to
12       make you want to leave the 24-hour shift,
13       correct?
14  A.   Correct.
15  Q.   How did you become a battalion chief?  Was there
16       an interview process?  Was a test taken, or were
17       you just selected to be a battalion chief?
18  A.   I was appointed I believe in 2011 by Mayor Bill
19       Gillespie.
20  Q.   How did that happen?
21  A.   There was a choice between myself -- Chief Brown
22       wanted Captain Mixon at the time, and Mayor
23       Gillespie picked me over him.

56

1   Q.   Do you know why he picked you?
2   A.   I was number one on the test from 1999, and he
3        was number 10, the last competitive test we ever
4        took.  Chief Brown was number two.
5   Q.   Did the union want you to be chief?
6   A.   Union wanted Mike Rogers to be chief.  I turned
7        down chief.  I was even asked to be chief by
8        Bill Gillespie when he first became mayor.
9   Q.   At one point did the union want you to be chief?
10  A.   No.  They took a vote.  I was number two.  Mike
11       Rogers was number one.
12  Q.   How do you think your co-employees perceive you?
13  A.   I don't know.
14  Q.   Do you perceive that you're friends with
15       everybody?
16  A.   No.
17  Q.   Why not?
18  A.   Because a lot of times I just do the job, and a
19       lot of times -- I'm not a good ole boy like a
20       lot of these guys.  I don't hunt and fish.  I
21       also don't think that it's good for a
22       high-ranking officer to kind of cavort and
23       galavant around with the guys.  I don't go to

14 (Pages 53 to 56)

Jay Hawthorne                                           August 7, 2019

|  | | 57 |
|---|---|---|
| 1 | | Christmas parties.  I don't do things like that |
| 2 | | because it can put you in compromising |
| 3 | | positions, as it has for many of our people. |
| 4 | Q. | Did you say that you had taken a test and scored |
| 5 | | higher than Neal Mixon? |
| 6 | A. | Yes. |
| 7 | Q. | Which test was that? |
| 8 | A. | That was the captain's test in 1999.  I was |
| 9 | | number one on the list. |
| 10 | Q. | And that was -- |
| 11 | A. | That was the last competitive test that any of |
| 12 | | us took. |
| 13 | Q. | Can you agree with me that things changed when |
| 14 | | Gillespie came into office as far as testing for |
| 15 | | promotions? |
| 16 | A. | Yes, they did. |
| 17 | Q. | They changed dramatically, didn't they? |
| 18 | A. | Yes. |
| 19 | Q. | Were you put as a BC in the good ole boy system? |
| 20 | A. | Was I put in as a BC in the good ole boy |
| 21 | | system -- no. |
| 22 | Q. | Was it a compromise reached with the union for |
| 23 | | you to become a BC? |

|  | | 58 |
|---|---|---|
| 1 | A. | If it was, I wasn't told that. |
| 2 | Q. | How did Neal Mixon take it when you were put as |
| 3 | | BC and he was not? |
| 4 | A. | I don't know.  I heard two days before it came |
| 5 | | out that the mayor had made the final decision. |
| 6 | | I heard that Chief Brown had gone out to lunch |
| 7 | | with Mixon and celebrated, because they were |
| 8 | | very tight friends, and I imagine that Mixon |
| 9 | | took it hard. |
| 10 | Q. | I want to go through some of these things such |
| 11 | | as your initial disclosures and the response to |
| 12 | | your interrogatories and just get some |
| 13 | | clarification. |
| 14 | | Have you spoken to Mayor Gillespie about |
| 15 | | anything alleged in your lawsuit? |
| 16 | A. | Not to my knowledge. |
| 17 | Q. | How about Chief Brown? |
| 18 | A. | Not to my knowledge. |
| 19 | Q. | How about Michael Whaley? |
| 20 | A. | Not to my knowledge. |
| 21 | Q. | How about Allen Owens? |
| 22 | A. | No. |
| 23 | Q. | Dallis Johnson? |

|  | | 59 |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Josh Bingham? |
| 3 | A. | No. |
| 4 | Q. | Josh Brown? |
| 5 | A. | No. |
| 6 | Q. | Rickey Roberts? |
| 7 | A. | No. |
| 8 | Q. | Lisa Thrash? |
| 9 | A. | No. |
| 10 | Q. | Well, maybe we're not on the same page.  So Lisa |
| 11 | | Thrash has nothing to do with the allegations in |
| 12 | | your complaint. |
| 13 | A. | Oh, no.  I thought you meant talking like |
| 14 | | verbally. |
| 15 | Q. | That's exactly what I mean.  You just told me |
| 16 | | that you had some kind of conversation with |
| 17 | | Lisa, and she was forcing you to retire. |
| 18 | | MR. GUILLOT:  Excuse me.  Let me |
| 19 | | clarify because he was saying "no" |
| 20 | | a lot. |
| 21 | | Is your question did he ever |
| 22 | | discuss any of the issues the |
| 23 | | allegations are about, or did he |

|  | | 60 |
|---|---|---|
| 1 | | discuss the lawsuit with them? |
| 2 | | MR. HOWARD:  Either.  That question is |
| 3 | | so broad. |
| 4 | | MR. GUILLOT:  Okay. |
| 5 | A. | Oh, yes.  Yes to everything. |
| 6 | Q. | Have you spoken to the mayor about any of the |
| 7 | | issues in your complaint? |
| 8 | A. | Not the mayor.  None that I recall. |
| 9 | Q. | And I don't know of any.  I'm just -- |
| 10 | A. | No.  No.  I don't ... |
| 11 | Q. | How about Terry Brown? |
| 12 | A. | No. |
| 13 | Q. | Any promotions or anything like that or |
| 14 | | accommodations with Terry Brown? |
| 15 | A. | No. |
| 16 | Q. | Can we agree that the person that you've spoken |
| 17 | | to the most is Lisa? |
| 18 | A. | Yes.  Very much so. |
| 19 | Q. | What about Michael Whaley? |
| 20 | A. | Other than restrictive duty status, stuff like |
| 21 | | that, minimal. |
| 22 | Q. | He's the one that gave you the list of things |
| 23 | | you can do? |

15  (Pages 57 to 60)

Jay Hawthorne                                                August 7, 2019

|   | 61 |
|---|---|
| 1 | A.  Yes, sir. |
| 2 | Q.  Do you know where that list was derived from? |
| 3 | A.  No, I do not. |
| 4 | Q.  How about Allen Owens? |
| 5 | A.  No, sir. |
| 6 | Q.  Dallis Johnson? |
| 7 | A.  No, sir. |
| 8 | Q.  Do you have any idea what Allen Owens and Dallis |
| 9 |     Johnson have to do with this case? |
| 10 | A.  I know what Allen Owens would have to do with |
| 11 |     this case, yes. |
| 12 | Q.  What's that? |
| 13 | A.  He was the one who told me on April 11 that they |
| 14 |     were holding an admin positions chief once I |
| 15 |     retired for Captain Josh Bingham, and I had |
| 16 |     inquired -- that was on April 11, 2017.  And I |
| 17 |     had asked -- let me make sure about my date. |
| 18 | Q.  Did you say they were holding a BC spot or a |
| 19 |     captain spot? |
| 20 | A.  No.  They were going to hold a BC spot for when |
| 21 |     I retired. |
| 22 | Q.  What was wrong with that? |
| 23 | A.  Huh? |

|   | 62 |
|---|---|
| 1 | Q.  What was wrong with that? |
| 2 | A.  But I had asked Chief Brown for either an admin |
| 3 |     battalion chief's position there or even switch |
| 4 |     with Bingham himself. |
| 5 | Q.  Let me stop you there because I don't understand |
| 6 |     it.  There was no admin BC at that time, |
| 7 |     correct? |
| 8 | A.  Correct. |
| 9 | Q.  And you were inquiring about a captain's |
| 10 |     position? |
| 11 | A.  Bingham at the time was a captain. |
| 12 | Q.  Let me go slow.  Were you inquiring about the |
| 13 |     possibility of becoming a captain? |
| 14 | A.  I inquired about the possibility with Chief |
| 15 |     Brown about both. |
| 16 | Q.  So you wanted to go back and be a captain? |
| 17 | A.  If need be.  If an admin battalion chief didn't |
| 18 |     open up down the road. |
| 19 | Q.  Did you mean open or be created? |
| 20 | A.  Open.  Be created. |
| 21 | Q.  Same thing? |
| 22 | A.  Same thing. |
| 23 | Q.  Okay.  Your complaint talks about this captain |

|   | 63 |
|---|---|
| 1 |     position.  I was wondering, were you asking for |
| 2 |     a demotion? |
| 3 | A.  If need be to be able to teach that paramedic |
| 4 |     job that was the primary job that that job did. |
| 5 | Q.  That paramedic teaching captain position |
| 6 |     required you -- you couldn't have that with a |
| 7 |     hurt shoulder, could you?  You've got to lift |
| 8 |     things. |
| 9 | A.  That wasn't a hurt shoulder.  That was a hurt |
| 10 |     neck from off duty. |
| 11 | Q.  That captain's position that taught paramedics, |
| 12 |     you cannot have any type of disability, can you? |
| 13 | A.  But I was -- |
| 14 | Q.  No.  Can you or can you not? |
| 15 | A.  No. |
| 16 | Q.  You've got to move the 160-pound mannequin and |
| 17 |     all that kind of stuff? |
| 18 | A.  Yes, sir. |
| 19 | Q.  You've got to be able to use your body. |
| 20 | A.  Yes, sir. |
| 21 | Q.  Why did you think you could fulfill that |
| 22 |     captain's role if you had an injury? |
| 23 | A.  Because till I got cleared to do heavy-duty |

|   | 64 |
|---|---|
| 1 |     status, which I got cleared on 4/19 from the |
| 2 |     doctor to let me then go back, which I then |
| 3 |     reported on 5/2/18, I was working to get back to |
| 4 |     that status.  And if that was the case and then |
| 5 |     I was heavy-duty status, then I could have that |
| 6 |     job. |
| 7 | Q.  Well, if you could go back to heavy-duty status, |
| 8 |     you could have been a BC. |
| 9 | A.  That's true too. |
| 10 | Q.  The acting BC would have been moved back to a |
| 11 |     captain, right? |
| 12 | A.  Right. |
| 13 | Q.  And you would have taken his position? |
| 14 | A.  And I then did go -- |
| 15 | Q.  Is that correct? |
| 16 | A.  Correct. |
| 17 | Q.  Okay. |
| 18 | A.  And then I did go on May 2.  I went back, and |
| 19 |     the first day back I injured myself -- my |
| 20 |     shoulder on a quarterly PT test. |
| 21 | Q.  I get that.  I understand. |
| 22 |         What does Josh Bingham have to do with this |
| 23 |     case? |

16 (Pages 61 to 64)

Jay Hawthorne                                     August 7, 2019

65

1   A.   Josh Bingham -- ever since the testing with the
2        new mayor and the standards, it's always been
3        understood that before you are even qualified to
4        take a test that you have to meet all
5        qualifications to even participate in a test.
6        It was brought to my attention from numerous
7        employees last July that he wasn't even eligible
8        to take the lieutenant's test. And if he wasn't
9        eligible to take the -- a lieutenant and a
10       captain is the same today. But if he wasn't
11       eligible to take the lieutenant's test, then he
12       wouldn't even be eligible to even be a battalion
13       chief to this day.
14  Q.   Do you know if those requirements were waived
15       for that test?
16  A.   I do not.
17  Q.   If they were, then that wasn't a requirement,
18       correct?
19  A.   I do not ...
20  Q.   Well, if you've got a requirement and it's
21       waived, is it still a requirement?
22  A.   Why would a requirement be waived when we're
23       supposed to be under new standards?

66

1   Q.   Well, I just asked you the question. If it's
2        waived, is it still a requirement?
3   A.   No.
4   Q.   Anything else about Josh Bingham?
5   A.   No, sir.
6   Q.   Josh Brown?
7   A.   Josh Brown, yes. The last day that I was on
8        shift, August 12, before I was sent home on TTD
9        August 15 -- he had always been very supportive,
10       and I know it put him in an uncomfortable
11       position. I know everybody wants to move up,
12       but he had told me that what they were doing to
13       me was not right, that I wasn't being
14       accommodated properly and that this had never
15       been done before, and he understood that it was
16       a frustrating time for me.
17            And he had also told me that he had asked
18       Battalion Chief Andy Ellison at the time -- he
19       was going through some difficulties on his
20       own -- to switch with Captain Bingham and take
21       the demotion and take that admin job and -- so
22       that didn't obviously transpire.
23  Q.   Anything else with Brown?

67

1   A.   He also did tell me that he was going to make
2        sure because -- there was a big uproar in the
3        department about the question about Bingham's
4        status. I didn't even find this out really
5        until August 12 when they made all these rapid
6        promotions, and I wasn't even on the list. My
7        name completely disappeared, and they said, what
8        happened to you, Chief?
9   Q.   You're talking about the roster list?
10  A.   Yeah, the roster list.
11  Q.   And if you're injured, you go up to the top?
12  A.   No, sir.
13  Q.   If you're injured you don't go up to your own
14       little section up there?
15  A.   No. If you're injured on duty, you don't
16       disappear like I did. I disappeared.
17  Q.   Injured off duty or on duty, what's the
18       difference?
19  A.   I don't -- I've never seen it before.
20  Q.   Could that have been just a clerical error?
21  A.   Yes.
22  Q.   Have you told me everything about Brown that has
23       to do with this lawsuit?

68

1   A.   He said that he knew that he was going to get
2        his job because of what transpired.
3   Q.   Which job?
4   A.   He was going to get one of the future BC jobs,
5        yeah.
6   Q.   Who are the BCs now?
7   A.   Cory Russell on A, Josh Bingham on B, and Josh
8        Brown on C.
9   Q.   And you?
10  A.   The joke is that I'm on -- in the cloud.
11  Q.   I don't care about jokes.
12            You're still considered a BC, aren't you?
13  A.   Yes.
14  Q.   How about Rickey? Is he a BC?
15  A.   Yes. BC of training.
16  Q.   That's four BCs plus you?
17  A.   Five.
18  Q.   Total of five?
19  A.   Yeah. Budget allows for four.
20  Q.   Have you told me everything about Josh Brown?
21  A.   Yes.
22  Q.   How about Rickey Roberts? What does he have to
23       do with this, if anything?

17 (Pages 65 to 68)

Jay Hawthorne                                                  August 7, 2019

---

**69**

1  A.  Nothing about him.
2  Q.  What about Jade?
3  A.  She was just HR.
4  Q.  Same as Lisa?
5  A.  Yes.
6  Q.  Lisa is her boss?
7  A.  Yes.  Jade has taken good care of me.
8  Q.  Michelle Myers, what does she know?
9  A.  Well, she would know everything because she's
10     the HR secretary for the fire department.  She
11     knows everything.  She knows as much as ...
12  Q.  We've got Jade and we have Michelle.  Both of
13     those would do what Lisa told them to do, and
14     Lisa is the policymaker for that?
15  A.  Yeah.
16  Q.  Who is Dr. Leigh Townes at Lemak Health?
17  A.  That was the first guy that I went to after my
18     wreck.  I believe it was on April 5, 2017.  The
19     wreck was on March 31, 2017 -- that I went to.
20  Q.  Carpenter is just your family doctor?
21  A.  No.  He's workmen's comp.
22  Q.  What about Jones?
23  A.  Jones was the doctor that I went to to follow up

---

**70**

1     on July 26 of 2018 because workmen's comp wanted
2     to make sure it wasn't my neck problem that I
3     sustained my injury.  He told me it wasn't my
4     neck.  He told me I needed to go see a shoulder
5     doctor, and I was referred to Dr. Buggay who
6     I saw then on August 27 and surgery followed
7     October 11.
8  Q.  Who is Dr. Swaid?
9  A.  Dr. Swaid was my neck doctor.  Anterior fusion.
10  Q.  Have any doctors told you I don't want to treat
11     you anymore; don't ever call me again?
12  A.  No.  None to my knowledge.
13  Q.  You've looked through all the documents that the
14     City has produced, correct?  You were talking
15     about Exhibit 17 and all that.  I know you've
16     looked at them.
17  A.  Yes, sir.
18  Q.  Have you noticed any glaring omissions or
19     anything that we missed in producing documents?
20  A.  None to my knowledge.
21  Q.  As far as you know, you've got everything that
22     you asked for?
23  A.  Yes, sir.

---

**71**

1  Q.  Why do you think you should get a hundred
2     thousand dollars in compensatory damages due to
3     mental anguish and emotional distress?
4  A.  I was basically -- with the accommodation being
5     taken away, rescinded, I was no burden on the
6     City.  My job was taken away with a little over
7     a three-week notice.  Then I come back.  I'm on
8     duty.  I get hurt.  I get put on restrictive,
9     humiliatory status, and then I go home again.
10        Guess what?  Somebody knows when you get put
11     on temporary total disability a second time, and
12     then you've even been told by people at the fire
13     department have you retired.  Like you say, I'm
14     still on a roster.  I've had people that say
15     that the staff themselves went around the
16     stations and told people that I voluntarily
17     retired.
18  Q.  Did you just pull the $100,000 out of the air,
19     or is that based on a computation of something?
20  A.  No.  I've got lawyer fees.  I've got back pay.
21  Q.  What lawyer fees?
22  A.  Huh?
23  Q.  What lawyer fees?

---

**72**

1  A.  Lawyer fees if this goes to trial and also some
2     lawyer fees that I've already paid to the firm.
3  Q.  The hundred thousand, is that based on a
4     computation?  Did you add something up to get it
5     or oh, it looks good, six figures?
6  A.  No.  That's about what I think I deserve for it.
7  Q.  I understand that.  But did you add stuff up to
8     get to a hundred thousand, or did you just --
9  A.  No.
10  Q.  -- say that looks good?
11  A.  Added stuff up.
12  Q.  Okay.  Let's add it up.
13  A.  Back pay.
14  Q.  Okay.  What --
15  A.  The pay that they lost -- that I lost.
16  Q.  Okay.  Hang on.  I don't write that fast.
17        Back pay.  What pay have you lost?
18  A.  Roughly around 18,000 from the time that I
19     wasn't accommodated, and I had to use my own
20     leave time to go home because I was hurt and I
21     hadn't been diagnosed.
22  Q.  Instead of back pay, are you talking about
23     vacation pay?

---

18  (Pages 69 to 72)

Jay Hawthorne                                                      August 7, 2019

---

73

1  A.  The vacation pay that I had to use my own time.
2  Q.  Well, back pay is a legal word.
3  A.  You're correct.
4  Q.  I'm just inquiring what you're saying so we're
5      on the same page.
6  A.  Yeah.
7  Q.  Vacation time used.
8  A.  Yes.
9  Q.  And you say that you shouldn't have had to use
10     that?
11 A.  Correct.
12 Q.  And that's how much?
13 A.  I estimate around 18,000.
14 Q.  Okay.  What's next in the $100,000 computation?
15 A.  Loss of benefits.
16 Q.  What benefits have you lost?
17 A.  I've lost, like, the difference in -- it used to
18     be like $240.  Now it's 340, I believe, or
19     336.80, those kind of figures.
20 Q.  I don't understand what that means.
21 A.  Insurance.  Insurance.
22 Q.  Your insurance costs more?
23 A.  It costs more now.

---

74

1  Q.  Does it cost more for everybody?
2  A.  No.
3  Q.  Why does it cost more just for you?
4  A.  It costs more -- when you go on temporary total
5      disability, it's costing more for me.
6  Q.  What charge is higher to you than anybody else?
7  A.  If you're on shift, it's like $240.  I'm paying
8      $336.80.
9  Q.  Is that for anybody that goes on workers' comp?
10 A.  I don't know.  I've never been on workers' comp
11     until now.  I don't know.
12 Q.  Can we agree if everybody is treated that way,
13     then that's not part of your damages?
14 A.  Agreed.
15 Q.  I'll put a question mark by that, and I'm sure
16     Lisa will get a question on that.
17 A.  Sure.
18 Q.  What other part of the $100,000?
19 A.  I've got mental pain and anguish.  I've never
20     even been on Lexapro until this.  I started
21     going to a counselor, this Baker guy, last year
22     on 5/23, and I've been going to him for anxiety
23     and depression, Lexapro -- I've even been given

---

75

1      some Ativan.
2  Q.  Do you have to pay for that, or is it covered by
3      insurance or workers' comp?
4  A.  You're talking about the visits?  BlueCross
5      BlueShield.  That's covered on insurance.
6  Q.  So we're just talking about cash worth of mental
7      suffering?
8  A.  Yes.
9  Q.  How much is that?  What number?
10 A.  Well, I mean, if it's 18, you take 18 away from
11     that.  I would say what's the math on that?
12     82,000 then in mental anguish.
13 Q.  So there's only --
14 A.  Pain and humiliation and suffering.
15 Q.  Okay.  There's only two elements in the
16     $100,000, and one is loss of vacation time and
17     the mental pain suffering for 82,000; is that
18     correct?
19 A.  Can I see?
20 Q.  Oh, sure.
21 A.  I'm just saying.  That will help me out here.
22 Q.  Part of my job is figuring out all of your
23     claims.

---

76

1  A.  No.  I understand, sir.
2  Q.  Yeah.  Anything else in the hundred thousand
3      other than loss of vacation and mental pain?
4  A.  No, sir.
5  Q.  And possibly the 240 versus the
6      300-and-something?
7  A.  Yes.
8  Q.  I don't know that I specifically asked this
9      question, but you might have told me already.
10     What statements were made by the people in
11     your initial disclosures that pertains to the
12     case?  Have you told me about all that, or --
13     maybe we just need to go through the list again.
14     I don't know.
15 A.  I'd prefer to go through that for me screwing up
16     the record or something.
17 Q.  I'm not going to ask you about Lisa Thrash
18     because I know you've had conversations with
19     her --
20 A.  Yes.
21 Q.  -- and we'll get into that.  But I don't think
22     the mayor has made any statements about this to
23     you.

19  (Pages 73 to 76)

Jay Hawthorne                                            August 7, 2019

---

77

```
1   A.   No.
2   Q.   Has Terry Brown made any statements to you?
3   A.   About this actual event, no.
4   Q.   The issues in your complaint or filing the
5        complaint.
6   A.   No.  I had that conversation with him on April
7        11 that -- we talked about it -- where I went --
8        but other than that, no.  Nothing about the
9        complaint.
10  Q.   I just want to make sure that I've covered all
11       statements that have been made.
12            Has Michael Whaley made any statements?
13  A.   No.
14  Q.   I guess he spoke to you and said here's your
15       list of items that you can do?
16            MR. GUILLOT:  Restrictions.
17  Q.   Restrictions.
18  A.   Yes, sir.
19  Q.   Any conversation about that that we haven't
20       spoken about?
21  A.   No.  There was something in one of the exhibits
22       where it said that Whaley, when I was sent home
23       on the 15th when I found out because -- Josh
```

---

78

```
1        Brown told me to check my email, and I said,
2        what does it say?  And he said, check your
3        email, because that's when I got TTD'd.  And I
4        said I don't understand.
5   Q.   For the record what does that mean?
6   A.   Temporary total disability.
7   Q.   Okay.
8   A.   When they sent me home for the second time, I
9        said, what does this mean, Josh?  He said, I
10       can't talk to you about it.  And I said, well,
11       you're my boss.  Why can't you tell me about it?
12       I said, I'm going to call Whaley.
13            So then I had a talk with Chief Whaley about
14       it, and he had made some kind of statement.  I
15       said, well, I don't think this is right, because
16       I didn't even understand TTD at the time.  I
17       said, well, I don't want to use my time right
18       now, this and that, and he had made some kind of
19       comments that I had said something about, well,
20       I'm going to talk to the powers to be or
21       something like that that I don't remember.  I
22       don't recall that exact conversation.  However,
23       I could see saying something like that as
```

---

79

```
1        being sent home for the second time and knowing
2        what that means for my career and I hadn't even
3        been diagnosed.  Maybe I did say some unchoice
4        words.
5   Q.   Anything else about Whaley?
6   A.   No.
7   Q.   How about Assistant Chief Allen Owens?
8   A.   No, sir.
9   Q.   Any statements made by him?
10            Have you made any statements to him about
11       this?
12  A.   No.
13  Q.   Dallis Johnson?
14  A.   No.
15  Q.   Josh Bingham?
16  A.   No.
17  Q.   You're claiming Josh Bingham was promoted and he
18       shouldn't have been or was younger than you,
19       correct?
20  A.   Correct.
21  Q.   Do you have any animosity toward Josh, or do you
22       just think that's what happened to him?
23  A.   No.  I think Josh Bingham is an employee, and I
```

---

80

```
1        think the system just allowed him, you know, to
2        have that waived and go through the system.
3   Q.   Do you think Josh Bingham has done anything to
4        put you down or keep you down?
5   A.   No.
6   Q.   How about Josh Brown?  Have you told me all the
7        statements that Josh Brown has told you or
8        you've told him?
9   A.   Yes.
10  Q.   Rickey Roberts?
11  A.   Yeah.  I haven't had any contact with him.
12  Q.   We talked about Lisa, Jade, and Michelle.  They
13       are kind of all the same in human resources?
14  A.   (Witness nods head positively.)
15  Q.   What brought you to Alabama?
16  A.   I got a baseball scholarship to AUM.
17  Q.   Who was the coach there?
18  A.   Q. V. Lowe.
19  Q.   Do you have any connection with the baseball
20       program now?
21  A.   No, sir.  None whatsoever.
22  Q.   Do you know the coach now?
23  A.   Sir?
```

20  (Pages 77 to 80)

Jay Hawthorne                                                    August 7, 2019

---

81

1   Q.   Do you know the coach now?
2   A.   Marty.
3   Q.   Do you have any relationship with Marty?
4   A.   No, sir.
5   Q.   How about his family?  Do you know his family?
6   A.   No.  I know that his son is going to
7        Jacksonville State where he -- where my son
8        played for four years for Coach Case.
9   Q.   Cam is a good kid.
10            One of the questions that I asked you in
11       your interrogatories was describe each and every
12       injury or damage that you contend that you
13       sustained, and one of the things is lost income
14       due to being placed on workers' compensation
15       versus full pay.
16            I need you to explain that.
17  A.   Well, there's a third differential if I have an
18       accommodation.  I'm losing a third on workmen's
19       comp.  I get 1686 biweekly.  If I was on shift
20       on an eight-hour admin position, that's a third
21       difference in pay that I would get, so I've been
22       losing that income too.
23  Q.   Okay.  So by being on workers' comp, you get

---

82

1        two-thirds of your salary?
2   A.   Yeah.
3   Q.   And if they create a job for you, you get the
4        full salary?
5   A.   Correct.
6   Q.   While you were out and you could not work,
7        you're not claiming the two-thirds versus full
8        salary as damages, are you?
9   A.   Just the third.  The difference.
10  Q.   I understand.  The one-third when you were
11       having surgery, you couldn't work accommodated
12       or not, correct?
13  A.   Correct.
14            Oh, you're talking from before.
15  Q.   Yeah.  I'm just trying to --
16  A.   No.  I -- yes.
17  Q.   -- narrow it in and get detailed.
18            You're not claiming as damages being injured
19       under workers' comp because that's something
20       that happened outside of work, correct?
21  A.   You're talking about the injury before the
22       on-duty injury?
23  Q.   Yes.

---

83

1   A.   Yeah, I'm not claiming it.  Yeah.
2   Q.   So as far as this goes, it's just from the PT --
3   A.   Yes.
4   Q.   -- neck injury --
5   A.   It's -- yes.
6   Q.   -- forward?
7   A.   It's from -- 5/2 to 5/20 I went on TTD the first
8        time, and then it would be from 8/15 to present.
9        Well, I guess till I got MMI'd, and that
10       would -- because the last check I got MMI'd was
11       7/28 is what I was told.
12  Q.   And we're going through all that.
13  A.   Oh, okay.
14  Q.   Right now this morning I'm just trying to get an
15       overview, and then we're going to get really
16       specific this afternoon.
17            Elevated blood sugar, what did the City do
18       to increase your blood sugar?
19  A.   Well, stress and injury only exacerbates blood
20       sugar, and my sugar has gone up.  My A1C used to
21       be really good:  six, six and a half.  Now it's
22       up near -- in the low sevens.
23  Q.   What was --

---

84

1   A.   And I'm on insulin now which I had never been on
2        before either.
3   Q.   Are you diabetic?
4   A.   Yeah.  Been diabetic for about 12 years, but
5        it's been going out of control since all this
6        has been going on.
7   Q.   The car accident started it?
8   A.   No.  The car accident I still pretty much had it
9        under control.  It's basically since the injury
10       on work.
11  Q.   Your car accident, I understand that you filed
12       an insurance claim.
13  A.   Yes.  That's with Chuck Thomas.  That was
14       settled.
15  Q.   Okay.  Did you actually file a lawsuit for that?
16  A.   No.
17  Q.   Did you make any statements to the insurance
18       company about the accident?
19  A.   No.
20  Q.   Who is your insurance carrier?
21  A.   Travelers.  And Geico was the original.
22       Travelers picked up some of it too.
23  Q.   Your insurance company is Travelers, correct?

---

21 (Pages 81 to 84)

Jay Hawthorne                                          August 7, 2019

85

1   A.   The other people's was Geico.
2   Q.   So you got the liability part and some UM part
3        from yours, if you understand what that means.
4   A.   I got what Geico paid, and then I got the rest
5        from Travelers, yes, sir.
6   Q.   How much did Geico pay you?
7   A.   I don't know exactly.  I believe it was 17, 18,
8        but the total that I knew that I got was --
9        after expenses was $55,553 roughly.
10  Q.   Do you know what the total amount was?
11  A.   I think it was 105-something.
12  Q.   What did your wife get?
13  A.   She got -- she was at a hundred and her
14       settlement, because everything had capped out,
15       was around 50.
16  Q.   So you and your wife walked away with a little
17       over a hundred thousand in cash basically?
18  A.   Yeah.  Well, 105, yes.
19  Q.   What injuries did you receive in the car
20       accident?
21  A.   I had a neck injury which resulted in having
22       anterior fusion, C-6 and C-7, on my vertebrae.
23  Q.   Who was your doctor for that one?

86

1   A.   Swaid.
2   Q.   Any other injuries from the car accident?
3   A.   No.
4   Q.   Injuries from the PT test on May 2?
5   A.   Well, I had, of course, neck and shoulder pain,
6        but then it materialized that my neck was fine.
7        In my shoulder I had what was called a SLAP
8        tear, sub glenoid labrum interior posterior
9        tear, and then I had two follow-up surgeries.
10  Q.   Who did your shoulder surgeries?
11  A.   Buggay, both.
12  Q.   Other than your neck from the accident and your
13       shoulder from the PT, any other injuries?
14  A.   No, sir.
15  Q.   Have you been deposed in the homeowner's
16       association lawsuit?
17  A.   No.
18  Q.   Who is your attorney in that case?
19  A.   Kyle Shirley.
20  Q.   Who is your attorney in your quest for
21       disability?
22  A.   The last one was John McElheny in April prior to
23       that.  In June of 2018 was Alan Bellenger, and

87

1        the original in June of 2017 was Kay Dansby.
2   Q.   Is Dansby, Bellenger, and McElheny all at the
3        same firm?
4   A.   Negative.  Dansby is here down the street,
5        Bellenger is in Homewood, and McElheny is in
6        Homewood.
7   Q.   Are McElheny and Bellenger at the same firm?
8   A.   No.
9   Q.   You had three firms trying to get your
10       disability.
11           It seems to indicate that you applied for it
12       in 2018 and then again in April of 2019.  Could
13       that be correct?
14  A.   Applied for it again?
15  Q.   Well, here's --
16  A.   I had one hearing.
17  Q.   Here's what your answer says.  Applied in June
18       of 2017, Kay Dansby.  Then Bellenger in 2018 and
19       then in 2019.
20  A.   No.  It just got signed over from one attorney
21       to the next to the next, yeah.  They just
22       forward the food chain.  I just filled it out
23       once in June of 2017.  I didn't do anything

88

1        anymore.
2   Q.   After you were denied, did you ever apply again?
3   A.   No.
4   Q.   I need you to list all the doctors that have
5        treated you for a mental disorder.
6   A.   Let's see.  LPC James Baker, my private
7        physician Dr. Kenny Nichols.  And around nine or
8        ten years ago, I got some Ambien from
9        Dr. Charles Cloutier who is now retired.  That
10       stuff didn't do anything.
11  Q.   Which pharmacies do you use?
12  A.   Jones.  Jones Pharmacy.
13  Q.   In Prattville?
14  A.   Yes, sir.
15  Q.   Where is it located?
16  A.   Main and Memorial.
17  Q.   Have you received all of your prescriptions from
18       Jones in the last ten years?
19  A.   Yes.  You might want to throw in CVS, Walgreens.
20       I mean, I can tell you right now, which I know
21       you've got to verify everything, but if you want
22       to know any and all the meds that I take.
23  Q.   Of course.  What meds do you take?

22 (Pages 85 to 88)

Jay Hawthorne                                          August 7, 2019

89

1   A.   I take Metformin.
2   Q.   What's that for?
3   A.   A thousand milligrams BID, which means twice a
4        day.  I take 2,000 milligrams of Metformin for
5        diabetes.  Then I take a drug called Tradjenta,
6        which is 25 milligrams, and then I also use --
7   Q.   What's that for?
8   A.   Diabetes.
9             And then I also use a sliding scale of
10       NovoLog, which is a short-lasting insulin,
11       because of my spikes in my sugar.  So I do that.
12       I check my sugar three, four, five times a day,
13       sometimes more.  I also was prescribed Lexapro,
14       which I take 20 milligrams a day, and then I
15       have gotten -- I take occasionally some
16       Ativan, and that's .5, to help with anxiety.
17  Q.   Has your doctor told you that your diabetes will
18       worsen with age?
19  A.   Yes.  The doctor also told me that -- I just
20       went to a UAB medical specialty clinic.  Nina
21       Hibbard is the doc.  She also told me that the
22       stress I'm under and what I'm going through can
23       kill, so I need to stay on top of it.

90

1   Q.   Why don't you retire?
2   A.   I'm 51 years old.  I have ten more years.  I
3        still have a kid who is 15.  Why would I retire?
4        The City only allows five years of insurance --
5        five years of health insurance, and then I'm on
6        my own.  I'm a diabetic.
7   Q.   Is it like that for everybody?
8   A.   It's getting more like that, yes.
9   Q.   What do you mean by that answer?
10  A.   Well, a lot of municipalities such as Hoover,
11       other --
12  Q.   Oh, just Prattville.  Is it like that for
13       everybody in Prattville?
14  A.   Yes, sir.
15  Q.   Could you go to a different fire department with
16       your experience?
17  A.   Not with my restrictions.  You've got to be
18       heavy-duty rated.
19  Q.   So the City of Prattville should just shoulder
20       the burden for your disability rating?
21  A.   I believe that they could use my expertise and
22       my senior leadership and also even the kind
23       comments that Lisa put in her email

91

1        congratulating me on my 25-plus years.
2   Q.   Is that shouldering the burden of your
3        disability?
4   A.   Not in my opinion.
5   Q.   You think they should benefit by your mental
6        operations?  Do you know the answer to that?
7   A.   Yes.
8   Q.   Okay.  I want to go through some parts of your
9        complaint.  It's 10:30.  We've been going for a
10       while.
11  A.   I'm good.
12  Q.   Okay.
13            MR. GUILLOT:  I wouldn't mind taking a
14       break.
15            MR. HOWARD:  That's fine.
16            (Brief recess.)
17            MR. HOWARD:  We're back on the record.
18  Q.   (Continuing by Mr. Howard) Everybody is under
19       the same policy manual in Prattville, correct?
20  A.   Yes.
21  Q.   And there are no senior or junior BCs?
22  A.   To the best of my knowledge, correct.
23  Q.   I mean, if you're a BC, you're a BC?

92

1   A.   Correct.
2   Q.   No distinction between how long you've been
3        coming through the door?
4   A.   Yes.
5   Q.   I want to talk to you about some things in your
6        complaint that I just need clarification on, and
7        you're welcome to see your complaint.  You may
8        have a copy, or you can see mine.
9   A.   What page, sir?
10  Q.   Page 2.
11  A.   Yeah.
12  Q.   You say you're the fifth highest ranking officer
13       in the department.  Who are those five along
14       with you?  It's in paragraph 6.
15  A.   Yes, sir.  First would be Chief Brown, Deputy
16       Chief Whaley, the fire marshal, Johnson, and
17       then Assistant Chief Owens, and then myself.
18  Q.   What is the corporate structure?  Who is above
19       who and who reports to who?
20  A.   I report -- Chief Whaley reports to Chief Brown.
21       Owens basically reports to Chief Brown, and
22       battalion chiefs report to operations, who is
23       Deputy Chief Whaley, and training also

                                        23 (Pages 89 to 92)

Jay Hawthorne                                                    August 7, 2019

---

93

1    reports -- they kind of cross a little bit.
2    Battalion chief of training, he kind of goes
3    through everybody because, you know, training
4    encompasses the whole department.
5  Q.  So there's four BC positions plus yours,
6    correct?
7  A.  Yes, sir.
8  Q.  And they all report to who? Well, let me back
9    up because Rickey reports to everybody.
10 A.  Correct.
11 Q.  Let's just kind of keep him out of the mix
12    because he's the training guy.
13        The four positions -- three or four, who do
14    they report to?
15 A.  Deputy Chief Whaley.
16 Q.  In paragraph 9 you talk about -- Hawthorne asked
17    his supervisor Terry Brown to allow him to
18    transfer into an administrative battalion
19    position that was supposed to be opening up in
20    the department.
21        Tell me about that conversation.
22 A.  On April 4 around --
23 Q.  What year?

---

94

1  A.  Oh, what was it?
2  Q.  I hate to keep asking you about that, but when
3    we go back and read it a year from now, it's got
4    to be clear.
5  A.  Let's see. I had my wreck in '17. This would
6    be '18. Okay. April 4, 2018. I went to the
7    chief and I asked him --
8  Q.  This was over a year after your accident,
9    correct?
10 A.  Yes.
11 Q.  Okay.
12 A.  Actually, you have to correct the date. April 4
13    was when I received her email. It's -- April 11
14    is when I had the conversation --
15 Q.  This conversation mentioned in paragraph 9?
16 A.  -- with Chief Brown. Yes, sir, April 11.
17        I told him that why can't I just switch with
18    Bingham who was the captain in training who was
19    teaching paramedic school. Put me in as an
20    admin battalion chief position since we had had
21    one before --
22 Q.  But --
23 A.  -- years past. But at that time there was

---

95

1    not --
2  Q.  Okay. And the captains -- would that have been
3    a demotion if you were made a captain?
4  A.  Yes, it would have been.
5  Q.  Would you have accepted that?
6  A.  Yes.
7  Q.  Even the less pay?
8  A.  Yes. I did tell him, however, though, that the
9    way the structure is that they could put me at
10    captain because there was still plenty of
11    brackets left, and I would still probably be
12    around my pay. I would just be topped out
13    because of the years that I've had where I made
14    a battalion chief. He told me that he couldn't
15    do that because the budget wouldn't allow for an
16    additional battalion chief.
17 Q.  Okay. Tell me what you know about the budget.
18 A.  I know that the budget, per what the chief told
19    me -- this year's budget showed -- I believe the
20    2018-2019 budget that I read in one of the
21    exhibits or paperwork you provided, it showed
22    four battalion chiefs, but right now with me we
23    have five. And so I didn't even show up

---

96

1    anywhere in there, and I thought that that was
2    kind of ...
3  Q.  How do you know that you're not one of the ones
4    mentioned?
5  A.  Well, there's a total of five, so which one is
6    not?
7  Q.  Why do you think you're not?
8  A.  I just assumed, because I was being told by
9    everybody that I had retired. I was told
10    management was going around saying I quit.
11 Q.  Who told you that management said you quit?
12 A.  A good bit of firefighters and personnel.
13 Q.  Did management ever say you had quit?
14 A.  No, management never told me that.
15 Q.  And somebody could encourage you to retire all
16    day, but the retirement decision is up to you.
17 A.  Yes. Correct.
18 Q.  Part of paragraph 9, I guess Brown told you that
19    you could not transfer in that position because
20    it was not going to be filled.
21        Are you referring to the captain's position
22    that was not going to be filled or --
23 A.  No. I was talking about the admin battalion

---

24 (Pages 93 to 96)

Cite, LLC
205.545.5155

Jay Hawthorne                                          August 7, 2019

---

97

1    chief's position, because he said there wasn't
2    one and they didn't have one in the budget.
3  Q.  Okay.  And the budget does not list the names of
4    who fills those positions.
5  A.  No.  That's correct.
6  Q.  He also was told the department only had three
7    battalion chiefs and could not add another one.
8         Who held those three battalion chief
9    positions?
10 A.  Yeah.  That was the three shift battalion chiefs
11    at that time.
12 Q.  A, B, C?
13 A.  Yeah, A, B, C.  Let me remember.  I believe it
14    was Ellison on A, Rogers on C, and then I was on
15    B.  No.  Actually, I wasn't on B at that time
16    because that's not when I went back to shift.  I
17    don't know who the other one was.
18 Q.  This statement does not include Rickey on -- the
19    training BC, correct?
20 A.  Uh-huh (positive response).
21 Q.  So Rickey was not included in this conversation
22    at all.
23 A.  No.  Correct.

---

98

1  Q.  What I understand in paragraph 9 is when Brown
2    told you that he only had three battalion
3    chiefs, he was not including Rickey Roberts, the
4    training BC.
5  A.  Correct.  That would be the assumption that I
6    would -- yeah.
7  Q.  And part of my job is to figure out what you're
8    saying and --
9  A.  I know it's confusing.
10 Q.  Paragraph 10, Josh Bingham was acting as the
11    training captain.  He was functioning in an
12    administrative capacity.
13        What does that mean?
14 A.  His primary job at that point in time was he was
15    teaching paramedic school, basically an
16    eight-to-five-type thing, and that's what he was
17    doing.
18 Q.  Is this the BC training?
19 A.  No.  That's not Roberts.
20 Q.  I'm sorry.  This is captain.
21 A.  Yes, captain training.
22 Q.  But as the captain you still have to be able to
23    function and train people.  We've already

---

99

1    answered that question.
2  A.  Yes.
3  Q.  When this conversation took place, did you
4    believe that you were coming back full-time
5    ready to go, no restrictions?
6  A.  No.  That was on the 11th.  I didn't get until
7    the 13th -- I got that same status of 75-pound
8    light/heavy duty status rating, so I didn't know
9    what was going to transpire.
10 Q.  In your history with the restrictions, what is
11    light duty, light/heavy duty, and heavy duty
12    restrictions?
13 A.  All I know is heavy duty is what you've got to
14    be at at the fire department to be a shift
15    personnel, and I wasn't at that level.
16 Q.  I notice in your complaint it's got light
17    duty/heavy duty, and that's straight from a
18    medical record.
19 A.  Yeah.
20 Q.  I don't know -- do you know what -- I don't know
21    how you can be light duty and heavy duty at the
22    same time.  Do you?
23 A.  No.  Because -- I don't.  I just know there's a

---

100

1    medium, a light heavy at 75 and a hundred, and
2    then they have a sedentary.  There's like five
3    stages.
4  Q.  That's a doctor thing.  I thought you might have
5    learned that since --
6  A.  No.  No.
7  Q.  So in April 2018 you were not sure if you could
8    go back to heavy duty.
9  A.  Correct.
10 Q.  And then in paragraph 11, you subsequently
11    learned that the department was waiting for him
12    to retire.
13 A.  Yes.
14 Q.  And they were going to promote Josh Bingham to
15    the administrative chief position.
16 A.  Yes.
17 Q.  Did you think they were going to create that
18    administrative battalion chief position?
19 A.  Yes.  I was told that afternoon by Assistant
20    Chief Owens that they were going to create that
21    position once I retired, and the request was
22    made from Deputy Chief Whaley because Bingham is
23    such an asset to them with training and all the

---

25 (Pages 97 to 100)

Jay Hawthorne                                                    August 7, 2019

101

1      administrative duties that he can perform down
2      there so that they were going to hold that job
3      or create one once I retired.
4   Q. If you can never go back to being a battalion
5      chief, would Bingham be the next one in line?
6   A. Yes.
7   Q. So when they needed an acting battalion chief,
8      Bingham was the next one in line.
9   A. And he didn't go.  He stayed in the admin
10     building.  They made Brown my acting battalion
11     chief.
12  Q. Why did they do that?
13  A. I don't know.  You'll have to ask them.  I don't
14     know.
15  Q. Did Bingham turn it down?
16  A. I don't know.  I don't ...
17  Q. How old is Brown?
18  A. I believe, sir, he's 44, 45.
19  Q. How old are you?
20  A. 51.
21  Q. White male.  That's just for the record.  When
22     you're reading this later on --
23  A. Yes.

102

1   Q. -- the judge will need all that.
2   A. Yes.
3   Q. And there's that light/heavy duty status lifting
4      no more than 75 pounds.  That's in paragraph 13?
5   A. Yes.
6   Q. On April 4 you got a letter from Lisa Thrash.
7      Did you have any conversations with her that's
8      not mentioned in some memo somewhere?
9   A. I remember from the car injury in 2017 I had
10     gone, and I believe even my wife had even gone
11     and spoken to Lisa about options about
12     retirement.
13        See, my wife had the same surgery I had
14     March 6 of 2018.  It's not fun to have two
15     surgeries in the same household.  Mine was in
16     September and hers was March 6.  So we were
17     looking at all avenues of possibilities as HR is
18     the facilitator to take care of employees.  And
19     if that was an option, that I couldn't perform
20     my duties, then I might have to retire.
21  Q. Did you entertain the idea of retiring?
22  A. Everybody entertains the idea.
23  Q. Well, just stick to you.

103

1   A. Yes.
2   Q. Did you change your mind about retirement when
3      you found out that you could only get five years
4      of insurance?
5   A. No.  But it did make me question when I looked
6      at my financial situation and my wife's
7      financial situation if that would be wise,
8      especially with my medical conditions.
9   Q. Is insurance coverage a big part of this lawsuit
10     or the driving force behind it?
11  A. No.  Because I do get five years of it, and it's
12     nice for the City to do that.  But I'd like to
13     be like everybody else and get to Medicare if
14     possible.
15  Q. In paragraph 16 there's this last sentence:
16     Because of this restriction, he was ordered to
17     report to one of the fire stations to do 24-hour
18     shifts.
19        How many fire stations are there in
20     Prattville?
21  A. Three, sir.
22  Q. Where are they located?
23  A. McQueen Smith Road we have one, Main and

104

1      Memorial, and down on Fourth Street.  I think
2      that's 163 West Fourth right across from the
3      courthouse.
4   Q. Do you remember what date you were told you can
5      go back to full duty?  Was that April 4, 2018 or
6      somewhere about that time frame?
7   A. April 4, 2018, that I could go back -- you're
8      talking about from the doctor?
9   Q. Yes.
10  A. No.  I believe I was cleared on April 19.
11  Q. So April 2018 you had planned to go back full
12     time?
13  A. Yes.
14  Q. And then there was a PT test in May?
15  A. Yes.
16  Q. Okay.  Tell me about the PT test.  What do you
17     do?  Who does it?  Are they required?  How
18     often?
19  A. Quarterly PT test first day back after 13 months
20     from an off-duty wreck.  Test was at one.  We
21     had a 25-plus year pinning ceremony that day, so
22     I went --
23  Q. What did you get?

26 (Pages 101 to 104)

Jay Hawthorne                                              August 7, 2019

---

105

1   A.   I got a little plastic pin from the City for
2        25-plus years of service.
3   Q.   Tell me about the test.
4   A.   The test consisted of planks.
5   Q.   What is that?
6   A.   It's where you get on all fours.  It's a core
7        exercise.  Put your elbows down.  I can't show
8        you.  Then my legs -- it's kind of like doing a
9        sit-up.  And next is then we do a
10       mile-and-a-half or two-mile run, and then we do
11       push-ups.  I completed everything and passed the
12       other two no problem.  On my 28th push-up, I
13       felt pain and a pop on my left side, and I
14       complained later -- I thought maybe it was a
15       stinger.  I hadn't done much in 13 months, so I
16       kind of shook it off.  Deputy Chief Whaley was
17       there.  He took the PT test with me.  I went up
18       to him approximately ten minutes later and said,
19       hey, I've got to get checked out.  I'm hurting.
20       So then I went and filled out paperwork and went
21       to the workmen's comp doctor.
22  Q.   What had you been doing for the City for the
23       past year?

---

106

1   A.   I was doing pretty much whatever Chief Brown
2        told me.  I was actually under the guise --
3        Chief Owens.  I was doing some inventory, just
4        basically clerical, running gear around from
5        station to station, whether it be dive gear,
6        extra sets of PPE, personal protective
7        equipment, stuff like that.
8   Q.   From May 2018 -- I'm sorry.  Let me back up.
9             From the accident until --.
10  A.   May 2?
11  Q.   -- February 2018, were you pretty much
12       restricted to light/heavy duty status?
13  A.   From --
14  Q.   I'm just confused.
15  A.   I had a surgery on my neck on September 14.
16  Q.   That was a bad question.
17            When you were restricted, were you
18       restricted to light/heavy duty?  Was there any
19       times when --
20  A.   Yeah.  It was lower, like -- I believe.  Like
21       from October to maybe December, I was, like,
22       maybe like at 25 pounds or a lower rating.
23  Q.   What were you doing for the City then, or were

---

107

1        you even working?
2   A.   No.  I was just doing clerical -- basic clerical
3        work.
4                 MR. GUILLOT:  Excuse me.  Is that '17
5             you're talking about then?
6             THE WITNESS:  Yeah.  The --
7             MR. HOWARD:  It would be the end of
8             '17.
9             MR. GUILLOT:  Make sure for the
10            record.
11            MR. HOWARD:  He's right, because we're
12            going to get six months with ten
13            other cases going on, and we're
14            not going to know what dates are
15            what, so we need to be careful
16            about that.
17  Q.   From the time that you were cleared to go back
18       to full duty until the PT test, what did you do
19       for the City?
20  A.   Repeat -- repeat the question.
21  Q.   From the time that you were cleared to go back
22       to full duty until the PT test, what did you do
23       for the City?

---

108

1   A.   I used my own accrued time because my
2        accommodation ended on April 22, 2018.
3   Q.   Why did you have to use any time if you were
4        ready to go back full duty?
5   A.   Because the doctor didn't have me able to come
6        back originally until May 10, and then it got
7        switched to April 30.
8   Q.   Who switched it?
9   A.   I asked the doctor's office if they could switch
10       that because my time was being used.
11  Q.   So were you still on light duty using part days
12       of vacation or just off the whole day?
13  A.   I was just off.
14  Q.   I still don't understand why we did that or why
15       that happened.
16            You were cleared to go back full-time, but
17       yet the doctor hadn't given you the clearance?
18       I don't understand that.  I'm sure I'm missing a
19       date somewhere in there.
20  A.   No.  My job ended on the 22nd.
21  Q.   Which job?
22  A.   The light duty accommodation ended.
23  Q.   And the doctor told you not to go back until

---

27 (Pages 105 to 108)

Jay Hawthorne                                             August 7, 2019

109

1          April 30?
2     A.   Yes.  Correct.
3     Q.   And then the PT test was probably the following
4          Monday or something?
5     A.   Actually, I believe it was a Wednesday.  I
6          believe.
7     Q.   And you just took a week or a couple days off
8          vacation or something?
9     A.   I had to use my time.
10    Q.   So, yes, you were off?
11    A.   Yes, I was off.
12    Q.   Okay.  The day of the PT test you're back
13         full-time, full duty on May 2.
14    A.   Yes.
15    Q.   What was going on there?  You were coming
16         back -- let me back up.
17              The plan was for you to come back as the BC
18         full-time?
19    A.   That was it.
20    Q.   Who was the acting BC then?
21    A.   Josh -- Captain Brown.  Josh Brown.
22    Q.   Were you on eight-hour shifts or 24-hour shifts
23         at that time?

110

1     A.   When I went back on May 2?
2     Q.   Bad question.
3              Prior to May 2 when you were working --
4     A.   Eight.
5     Q.   Eight-hour shifts?
6     A.   Yes, sir.
7     Q.   Any particular location?
8     A.   Public Safety Building.
9     Q.   Josh Brown was the acting BC.
10             Now, I need for you to describe the living
11         arrangements on the 24-hour shifts as it stood
12         on May 2, 2018.  We've talked about an office.
13         We've talked about beds or we're going to talk
14         about beds.  I need you to describe that for me.
15    A.   Well, May 2, 2018 I was hurt, so I never even
16         completed that.
17    Q.   I understand.
18    A.   Okay.
19    Q.   And I'm just trying to get some background
20         because we're going to come up.
21    A.   I've got you.
22    Q.   So how did it exist on May 2, living
23         arrangements for a 24-hour shift firefighter and

111

1          commanders?
2     A.   Every officer at the fire department has their
3          own office with its own bed, its own computer,
4          its own TV.
5     Q.   When you say every officer, what rank are we
6          including in that?
7     A.   We're including even sergeants that fill in for
8          captains or captains and battalion chiefs.
9     Q.   So everybody has their own office?
10    A.   Everybody has their own office.  If you're an
11         officer and you're on a 24-hour shift, every
12         officer has their own private office with their
13         own bed.
14    Q.   Does every person have an office or does every
15         rank have an office?
16    A.   Only people with rank have their own office.
17    Q.   Are there four separate offices for BCs or just
18         one?
19    A.   No, just one.
20    Q.   So if you're a captain and you're on shift, you
21         have an office.
22    A.   And then you would share it with A shift, B
23         shift, yeah.

112

1     Q.   There's one office for three different people
2          with the same rank --
3     A.   Correct.
4     Q.   -- or four different people?
5     A.   Correct.
6     Q.   How many people on a shift?
7     A.   24 roughly, last time.  I haven't seen a roster.
8     Q.   I understand this is just general.  I'm just
9          trying to get an overall picture.
10             How many firefighters and how many officers,
11         or -- I guess they are all firefighters, but
12         divide that up for me like rank.
13             MR. GUILLOT:  I guess a clarification.
14                  When you're saying officers,
15             that does not mean firefighters,
16             right?
17             THE WITNESS:  Right.
18    Q.   And I guess my next question, I need you to tell
19         me about who is there and what their rank is and
20         who is comprised of officers.  Just the general
21         situation.
22    A.   Okay.  Do you want me to tell you each
23         station?  because there's three stations.

28  (Pages 109 to 112)

Jay Hawthorne                                                    August 7, 2019

---

**113**

1   Q.   That's fine.

2   A.   Station 2 has a captain and has a sergeant that

3        rides an ambulance.  They both have their own

4        offices with their own bed.  Station 1 has three

5        officers consisting of two captains and the

6        battalion chief.  Station 3 has a captain and a

7        sergeant at that station.

8             So either you're -- if you're a supervisor

9        or an officer, you get your own office.  You get

10       your own bed.  You get your own TV.  You get

11       your own computer so you can do your work.  And

12       the bells aren't in there like they are in the

13       back where the firefighters sleep in basically a

14       dorm situation with dividers so that they do

15       have some privacy.

16  Q.   You say three stations, correct?

17  A.   Yes, sir.

18  Q.   Do all 24 employees stay at the same station, or

19       are they spread out over three?

20  A.   Spread out over three.

21  Q.   How many at one station?

22  A.   Six, roughly, at Station 1, I believe; seven at

23       Station 3, so that's 13; then the rest would

---

**114**

1        be 11 at Station 1.

2   Q.   How are the captains and BCs spread out?

3   A.   There's a captain at each station -- outlying

4        station which is Station 2 and 3.  And the

5        offices are a battalion chief office and two

6        captains at Station 1 that are pretty much right

7        next to each other.

8   Q.   There's four captains on -- there's two captains

9        on shift, right?

10  A.   There's actually three -- actually two and

11       two -- there's four.

12  Q.   What is the bed arrangement?  What about the

13       eating?  Just go through a day of --

14  A.   Usually --

15  Q.   -- firefighting.

16  A.   Usually you come in.  You check your equipment.

17       You make sure the truck -- all the gear is ready

18       to go.  Make sure your PPE is good and clean.

19       You're dressed.  You're ready.

20  Q.   What's a PPE?

21  A.   Personal protective equipment.

22  Q.   Okay.

23  A.   Make sure you've got all that going.

---

**115**

1             So once you check that out, then you usually

2        have training.  And if you don't have calls

3        going on -- we're required two hours of training

4        every day.  Then on top of that you might have

5        to go test hydrants.  There's all kinds of other

6        things.  They have to do building inspections,

7        stuff like that that fill the day.

8             Then say it's lunchtime.  Then after

9        lunch -- they usually all eat together.  Put

10       their money together.  One guy goes to the store

11       and gets the food.  Comes back.  They eat lunch.

12       Then after lunch, if they're not making calls,

13       then they will go ahead and do some other -- if

14       there's something that's missing like another

15       aspect of training or something -- some kind of

16       yard duty or something for the day, they'll take

17       care of that.

18  Q.   What is a yard duty?

19  A.   Yard duty like cut the grass.  Cut the grass on

20       Wednesdays.  Thursday might be wash off the pad,

21       you know.

22            Then later in the day, then they'll PT.  And

23       then after they PT, then they clean up, and then

---

**116**

1        they usually eat dinner.  And then they shut

2        down and -- for the evening and ...

3   Q.   What time would a shift report to work?

4   A.   A battalion chief reports at seven.  The rest of

5        the shift reports at eight.

6   Q.   Okay.  Eight in the morning to eight the next

7        day?

8   A.   24.

9   Q.   Okay.  You got injured in the PT.  What happens

10       after that injury?  You tell somebody about it.

11       You go to the doctor.  What happens?

12  A.   He put me on TTD until I got a restrictive duty

13       status from Chief Whaley on May 14, and I was

14       told to report to Station 1.  And I would report

15       on May 20, and I would report to Acting

16       Battalion Chief Brown.

17  Q.   What were your hours at that time?

18  A.   24.

19  Q.   What were you allowed to do on the 24-hour

20       shifts?

21  A.   Well, I wasn't allowed to drive a vehicle.  I

22       was allowed to leave for a whole two hours, one

23       hour one part of the day and one hour another,

---

29 (Pages 113 to 116)

Jay Hawthorne                                        August 7, 2019

---

117

1       to go eat.  So I was able to drive and do that,
2       but primarily clerical duties.
3   Q.  Were the other firefighters allowed to leave
4       during the day at any time they wanted to?
5   A.  If they had a reason, sure, because we -- every
6       station has two vehicles, you know.  The
7       battalion chief has one, and then even the other
8       stations, they'll have a station vehicle.
9   Q.  Are you upset because you had to use your
10      gasoline?
11  A.  No, I'm not concerned about gasoline.
12  Q.  You just wanted to drive the firefighter truck?
13  A.  No.  I just didn't understand why I couldn't --
14      they had another truck there.  If I wanted to go
15      get something to eat or I wanted to go to the
16      store --
17  Q.  Is that the backup truck for the BC?
18  A.  Yeah, they do have a backup truck for the BC.
19  Q.  Prior to being put on a 24-hour shift, when was
20      the last time that you worked -- well, that was
21      another bad question.
22          In May of 2018 you were put on a 24-hour
23      shift?

---

118

1   A.  Yes.
2   Q.  Prior to that when was the last time that you
3       worked a 24-hour shift?
4   A.  I went to work -- I reported to work after my
5       neck injury 3/31.  I went back to work because
6       Dr. Townsley (phonetic) had given me a rating of
7       only 50 pounds.  So I still went back to work,
8       and I had turned it in.  When Chief Whaley
9       realized I was only 50-pound rated, he called me
10      to the Public Safety Building and he said,
11      you're not heavy-duty rated.  We can't have you
12      out there.  So we both mutually agreed that I
13      get on FMLA and figure out what the heck is
14      going on so I could work to get back.
15  Q.  Prior to your accident, you were on 24-hour
16      shifts, correct?
17  A.  Yes, sir.
18  Q.  How often did you have someone to cover your
19      24-hour shift because you didn't want to be
20      there 24 hours?
21  A.  I would say a good -- I would say a good bit
22      that last year.  I would say roughly 50 percent.
23  Q.  And we're talking about before you were ever

---

119

1       injured.
2   A.  Yes.
3   Q.  Why did you not want to be there 24 hours?
4   A.  Well, number one, I had three elderly parents to
5       help take care of.  Number two, as long as I'm
6       there in the daytime making sure that the
7       training and all the clerical work and
8       supervising the guys -- everybody else that
9       comes and does the duty -- because nighttime
10      is -- all you're doing is basically managing
11      scenes.  As long as all the other work gets -- I
12      had been there 25 years.  I had some family
13      obligations.  And on top of that, we had what
14      was called a swap policy.  And I had the Deputy
15      Chief Whaley himself and Owens, and I had
16      numerous battalion chiefs, such as retired Mike
17      Rogers.  I also had captain -- demoted BC
18      Ellison.  I had about four or five other people,
19      they begged to do it so that they could make
20      some money, and it was a policy that was
21      allowed.  I was never reprimanded for it, so ...
22  Q.  So a year before the accident you didn't work 50
23      percent of the 24-hour shifts?

---

120

1   A.  I was at 50 percent, but between my accrued time
2       and between swaps -- that was allowed.  My
3       training was always maintained, and I even got
4       favorable reviews.
5   Q.  That's good.  I'm just comparing the 24-hour
6       shifts before the accident with the 24-hour
7       shifts after the accident.  And the year before
8       the accident you missed 50 percent of the
9       24-hour shifts' completion, correct?
10  A.  I would say probably of total shifts, close to
11      that.
12  Q.  What did you use for that time:  vacation? or
13      how did you work that out?
14  A.  Vacation.  And we had what was called a cash
15      swap policy.
16  Q.  What is a cash swap policy?
17  A.  It was a policy that has been amended where
18      somebody of equal rank in training can work for
19      you.  It's common in the fire service.
20  Q.  Just get somebody to cover for you?
21  A.  Yes.  And you pay them cash.  And, believe me,
22      it's still done very much so at the Prattville
23      Fire Department to this day.  It's just not as

---

30 (Pages 117 to 120)

Jay Hawthorne                                                          August 7, 2019

---

121

1      enforced as it was.
2   Q.  Could you list all the reasons in the year
3       before the accident -- your car accident that
4       you did not want to complete a 24-hour shift?
5   A.  No, I couldn't -- I couldn't list them. I mean,
6       I had family obligations. I also enjoyed
7       getting a good night's sleep, you know, being
8       with family, having a normal schedule after
9       being on a shift for 25-plus years.
10  Q.  Did you just make the decision, look, I'm too
11      old for this 24-hour shift; I can only do it
12      half the time?
13  A.  No.
14  Q.  When did you get Ambien prescribed to you?
15  A.  I believe that was nine or ten years ago, and it
16      was only one script, and I think I took it once
17      or took it half at the most, and I haven't had
18      that since.
19  Q.  Have you ever had any sleep studies?
20  A.  No.  No apnea -- no sleep apnea studies, nothing
21      like that.
22  Q.  What about in the two years prior to your
23      accident?  Was it still I'll only complete 50

---

122

1       percent of my 24-hour shifts?
2   A.  I can't recall.
3   Q.  Was there one big event in the year before your
4       accident that you said, look, I'm only going to
5       be here 50 percent of the time on the 24-hour
6       shifts?
7   A.  No.  I just know that I had worked so many hours
8       and so hard so many years for the fire service
9       in the city of Prattville that it was time to
10      take some family obligations and to have more of
11      a normal schedule.  I thought that that would be
12      good.
13  Q.  If you wanted a normal schedule, why didn't you
14      try to get the assistant chief's position?
15  A.  Because at the time that was an eight-to-five
16      job, and my mama has Stage 5 Parkinson's, and my
17      father-in-law has a rejection refractory rate of
18      less than 18 percent, so we have a lot of
19      obligations, and I wouldn't be able to leave.
20      When you're eight to five, you've got to be
21      there every day.  With a 24 on, 48 off, it gives
22      flexibility more -- that is bonus to that
23      schedule -- of helping your family.

---

123

1   Q.  So you just decided you needed two or three days
2       off work?
3   A.  Well, that's what the schedule allows.
4   Q.  I know.  But that's the decision you were making
5       for your family and --
6   A.  At that --
7   Q.  -- so many years that you had been in
8       Prattville.
9   A.  At that point in time.  At that point in time.
10  Q.  You did not want an eight-hour shift because it
11      interfered with your off days.
12  A.  To do what was important for my family, correct.
13  Q.  Is that "yes," you just wanted off days?
14  A.  Yes.
15  Q.  Okay.  And the 24-hour shift allowed you
16      flexibility during the week because you would
17      work 12 hours for two days and swap or take
18      vacation time?
19  A.  Yes.
20  Q.  The days in the year before the accident, were
21      you averaging 20 hours a week at work?
22  A.  20 hours?  Let's see.
23  Q.  Well, I got that -- you said you were working 50

---

124

1       percent of the 24-hour shifts, and I --
2   A.  If you're doing 120 hours in two weeks, half
3       that would be 60.  That would be 60 hours on a
4       120.
5   Q.  Let's figure it up.  How many hours in two
6       weeks?
7   A.  It's 120.  The way it works is you have a long
8       check.  You have 220-hour checks.
9   Q.  Tell me what a check is.  Remember, I'm not a
10      firefighter.
11  A.  Two weeks.
12  Q.  Okay.
13  A.  It's five shifts.  24 times five is 120.  And
14      then it will go another 120, and then you'll
15      have a short check which is called a 96.
16  Q.  What is that 96?  The hours?
17  A.  Yeah.
18  Q.  In a two-week period?
19  A.  Correct.
20  Q.  As a firefighter how many hours a night do you
21      get to sleep on average?  I know you've got
22      calls, and some nights it's probably crickets.
23      What's the average?

31 (Pages 121 to 124)

Jay Hawthorne                                                    August 7, 2019

125

1  A.   You know, I don't know.  I haven't done it in a
2       long time.  I'll say this.  I still listen to
3       them on broadcast if I -- they are busy.  They
4       average 20 calls a day, so I don't know the
5       exact breakdown.
6  Q.   Let's go back two years before the accident.
7       The first year -- the year prior to the
8       accident, you only worked half the time.  We
9       don't know what it was two years prior to the
10      accident.
11           What was the average hours that you slept a
12      night?
13 A.   Four.
14 Q.   Total or go somewhere and come back and go to
15      bed?
16 A.   I would say both.  And normally what that would
17      be is battalion chief, you know, doesn't go on
18      all the calls.  Goes on very few calls in
19      actuality.  But when the bells go off or you
20      hear the trucks or you can smell the diesel,
21      that kind of stuff, and the guys banging the
22      doors and stuff, you get awakened, you know.
23 Q.   And as commander you probably should be awake,

126

1       correct?
2  A.   You can hear it, yeah.  You can hear it.  Stay
3       in tune with the troops.
4  Q.   What calls would a battalion commander not go
5       on?
6  A.   Like falls and accidents, resuscitation, gas
7       leak, fire investigation, you know.  Basically
8       what they go on is all structure fires, hazmat
9       and multi-casualty-type calls, and entrapments.
10      That's what they primarily take command of.
11 Q.   I need to go back and ask you a question about
12      the structure.
13           Who does the fire marshal report to?  Where
14      is he in the chain?
15 A.   Chief.
16 Q.   Anybody under him or above him?
17 A.   Yeah.  He has an assistant fire marshal.
18 Q.   I know that was out of order, but I forgot to
19      ask you that while ago.
20           After the neck injury, you come back on the
21      24-hour shifts.  Why did you not want to work
22      the 24-hour shifts after you came back?
23 A.   I only had one chance to come back and work the

127

1       24-hour shift.  I got hurt the very first day
2       back on May 2.  So then I went back to the
3       24-hour shift, but that's not doing battalion
4       chief work that I had done prior to all those
5       years.
6  Q.   Yeah.  But you couldn't be a battalion chief
7       because of your injury, right?
8  A.   I understand.  But I also didn't have any
9       accommodations at all that could have been
10      provided --
11 Q.   We're going to get there.
12 A.   Okay.
13 Q.   When you came back after the PT injury and you
14      were put on 24-hour shifts, what made you decide
15      I'm not going to work all these 24-hour shifts?
16 A.   Because I was hurting, the pain that I had.  It
17      hurts when you have a torn labrum, and it hadn't
18      been diagnosed.  And I'm in an old bed which
19      felt like a cot, but it was a twin bed.
20 Q.   One of your medical records says a cot.  Did you
21      ever tell the doctor you had a cot?
22 A.   I don't recall, but, however, I could see me
23      saying that it felt like a cot.  But ...

128

1  Q.   Well, it wasn't a cot, was it?
2  A.   No.  No, it was not.
3  Q.   What was the difference, if any, between the
4       BC's bed and a firefighter's bed?
5  A.   Officers' beds are better.  They are usually
6       swapped out more.  Just a better quality.
7       That's bad to say.
8  Q.   Who has got the Murphy bed?
9  A.   All the officers have Murphy beds.
10 Q.   And a Murphy bed is better than a bed frame?
11 A.   The Murphy beds that we have with that memory
12      foam mattress and all that kind of stuff, that
13      stuff's nice.
14 Q.   Everybody has got memory foam, don't they?
15 A.   I don't know what the others have right now.
16 Q.   Well, during this time that you were on the
17      24-hour shift after your PT, isn't it a fact
18      that every firefighter and every officer had
19      memory foam on their bed?
20 A.   Very well may have been.
21 Q.   Are you saying you don't know?
22 A.   I didn't know.
23 Q.   The bed that you were going to sleep on had

                                    32 (Pages 125 to 128)

Jay Hawthorne                                             August 7, 2019

---

**129**

1    memory foam on it, correct?
2  A.  I believe so because that's the one I slept on.
3    I knew that one pretty good.
4  Q.  Did you ever sleep there?
5  A.  Where?
6  Q.  At the fire department on the 24-hour shifts.
7  A.  Yeah. Many nights.
8  Q.  After your injury?
9  A.  Yes. Yes, I slept there. But then I had to use
10    my accrued time because it was hurting all the
11    darn time because my shoulder was killing me,
12    and my neck was still even sore.
13      MR. GUILLOT:  Why did you have to use
14        accrued time?
15      THE WITNESS:  Huh?
16      MR. GUILLOT:  Why did you have to use
17        accrued time?
18      THE WITNESS:  Yeah.
19  Q.  The day of your PT test, Brown was the acting
20    BC, correct?
21  A.  Brown?
22  Q.  Yes.
23  A.  Yes.

---

**130**

1  Q.  Did you tell him don't worry about cleaning out
2    your office?
3  A.  That was after I filled out paperwork for
4    workmen's comp.
5  Q.  Before the injury did you tell him don't worry
6    about cleaning out your office?
7  A.  No.
8  Q.  Did he ever clean out his office?
9  A.  It wasn't clean when I got there. And I
10    reported at seven in the morning, and it wasn't
11    cleaned out. So how could I clean his office
12    when it wasn't even cleaned out?
13  Q.  No. Did he clean it out, not you clean it out.
14    Did he take his stuff out of your office and
15    put it somewhere else?
16  A.  No, sir. Not that I recall.
17  Q.  Did you have a conversation about his stuff
18    being in your office?
19  A.  I don't recall.
20  Q.  Did you get the stuff out of your car at seven
21    o'clock in the morning and take it inside?
22  A.  No, I didn't.
23  Q.  Why not?

---

**131**

1  A.  Because I didn't have anywhere to put it. I got
2    it out later when I changed for PT -- for the PT
3    test. You have to have somewhere to put your
4    stuff.
5  Q.  So there's not a place to put anything in that
6    building?
7  A.  No. Not all your linen and anything. I didn't
8    even --
9  Q.  Nowhere in the building?
10  A.  I didn't even have a locker when -- I didn't
11    even have the accommodation. I was the only
12    person in the department, whether it be a
13    firefighter or an officer, that didn't even have
14    a locker because I moved around from bed to bed.
15  Q.  When you moved around from bed to bed, did all
16    those beds have memory foam on it?
17  A.  I would assume. You told me that.
18  Q.  No. I'm just asking about your knowledge.
19  A.  You told me they do. I take your word for it.
20  Q.  Paragraph 19, I want to talk about that one.
21      Mr. Hawthorne learned that Josh Brown was to
22    be his superior even though Hawthorne is a
23    battalion chief and Josh Brown was a captain.

---

**132**

1      Was Josh Brown a captain what he was acting
2    as BC, or was he a BC?
3  A.  He was an acting BC.
4  Q.  And that's a BC, right?
5  A.  He's an acting BC.
6  Q.  He had the full duties of any other BC?
7  A.  Yes.
8  Q.  The next sentence: Hawthorne's only duties were
9    what Captain Brown directed him to do.
10      Did he give you any type of minute-by-minute
11    direction, or did he just give you that form and
12    say here's what you can do; go do it?
13  A.  I got that form from Chief Whaley, and that's
14    basically what it was.
15  Q.  How much interaction did you have with Brown
16    during this time?
17  A.  Other than just -- I was in the radio room, and
18    he was busy being a battalion chief as he needs
19    to be, being out in the field and being at the
20    stations -- other stations. I don't think we
21    had a lot of interaction.
22  Q.  Would it be crazy to say that you had just about
23    zero interaction?

---

33 (Pages 129 to 132)

Jay Hawthorne                                          August 7, 2019

---

133

1   A.   I said I don't remember having a lot of
2        interaction.
3   Q.   Yet he was essentially on lockdown on 24-hour
4        shifts as a form of harassment.
5             Tell me about that.
6   A.   Well, everybody else -- there's never been a
7        restrictive duty status until me in the fire
8        department.
9   Q.   Wait.  Nobody has ever been -- you were the
10       first one to ever have restrictive duty?
11  A.   On shift.  Somebody from an on-duty shift
12       injury, I was the first one on shift.
13  Q.   And when you say on shift, what are you talking
14       about?
15  A.   I'm talking about to be, you know, either
16       rehabilitated from an on-duty injury -- usually
17       you get to go to the Public Safety Building or
18       you go to training and you do clerical work
19       where you help in some form or fashion.
20  Q.   I just need to clarify what you're -- when you
21       say on-duty shifts, what do you mean by that?
22       You're the first one that had --
23  A.   Any personnel that are on duty, that's a 24-hour

---

134

1        schedule.
2   Q.   Okay.
3   A.   Okay.  If they get hurt on duty, they go to an
4        eight-hour adjusted accommodated schedule.  I
5        was hurt on duty, and then I was the first
6        one -- the guinea pig so to speak -- that would
7        be kept at the station under this kind of
8        restrictive duty status.
9   Q.   I want to make sure I -- you're saying that you
10       were the first one or restrictive duty that was
11       told to serve a 24-hour shift?
12  A.   And did, yes.
13  Q.   Has anybody since been told that?
14  A.   I don't know.  I believe the policy now is that
15       they are doing that, just not to the extent that
16       they did with me.
17  Q.   What do you mean by not to the extent?
18  A.   Not being able to drive a city vehicle.  Not
19       being able to assist, you know, even in
20       nonemergency things.
21  Q.   Well, I get it.  And you're saying all these --
22       that person is on the 24-hour shift and
23       restrictive but he can drive.

---

135

1             In order to compare you to them, what is
2        their restriction?  Do you know?
3   A.   Well, I know --
4   Q.   And you may not.  I don't know.
5   A.   From the exhibit that you showed me, I know that
6        Brett Johnson -- and I know this personally from
7        Brett because we saw him at Academy Sports
8        because he was out shopping on duty.  And I
9        said, what are you doing? because I knew he was
10       a shift guy.  And he said, well, I went and got
11       checked out for a questionable cardiac
12       condition.
13            So I'm thinking to myself -- I even told
14       him -- I said, cardiac?  And they are letting
15       you drive?  And he said yeah.  I said, man, they
16       didn't even let me drive, and you got a cardiac
17       condition?
18  Q.   Let me stop you there.  I guess it's -- what are
19       the restrictions from the doctor?  Did the
20       doctor tell Johnson he couldn't drive or could
21       drive or tell you you could drive or not drive?
22  A.   The doctor didn't -- obviously if I'm driving to
23       work, I had been cleared to drive to work.

---

136

1   Q.   What about -- did the doctor say you couldn't
2        work fire equipment?
3   A.   I would assume -- yes.  And Johnson had that,
4        too, in his.
5   Q.   How do you know?
6   A.   I believe if you read that exhibit, it will show
7        his limitations as well, especially with a
8        potential cardiac condition.
9   Q.   Would the BC car be fire equipment?
10  A.   Everything is fire equipment.  If you have a
11       cardiac condition and you're running Code 3, you
12       don't want anything to go wrong because that's a
13       stressful situation, especially if you're under
14       a cardiac condition.
15  Q.   What's Johnson's first name?
16  A.   Brett.
17  Q.   Is there anybody else after you that's had the
18       restriction that's worked a 24-hour shift?
19  A.   I know of Fire Medic Jason Ogletree, left heel
20       injury.
21  Q.   And these are some of the ones we listed before,
22       correct?
23  A.   Yeah.

---

34  (Pages 133 to 136)

Jay Hawthorne                                                    August 7, 2019

137

1   Q.   Now we're kind of narrowing them down.
2   A.   Right.
3   Q.   Just because you were the first one doesn't mean
4        it's harassment, correct?
5   A.   Yes.
6   Q.   Ogletree had a heel.
7             Anybody else who has had some type
8        restriction and then was sent to a 24-hour
9        shift?
10  A.   There may have been another one.  Captain Phil
11       Burdett, he had a knee injury.  He got scoped,
12       and he went and -- until he got better, he
13       stayed in his office.  And he's an officer, and
14       he was able to stay in his office during his
15       recuperation on 24-hour shift.
16  Q.   What's his rank?
17  A.   Captain.  Senior captain.
18  Q.   Now, on captains are there seniors and juniors?
19  A.   It's like you would say -- if I'm a senior
20       battalion chief and there's four other battalion
21       chiefs and I have more rank on them, then guess
22       what?  That's when rank comes into play.  I can
23       tell another battalion chief what to do.

138

1   Q.   What are the duties of a senior BC and a junior
2        BC?
3   A.   On paper the same.
4   Q.   What are the duties of a senior captain and a
5        junior captain?
6   A.   The same.
7   Q.   The only difference is when you're standing in a
8        group or room at a party, you outrank them
9        because you've been through the door more?
10  A.   Yeah.
11  Q.   Anybody else that you can think of that has been
12       on restriction and a 24-hour shift after you
13       were placed on a 24-hour shift?
14  A.   No.  Those are the only three I know of.  I'm
15       sure there have been others.  I don't know.
16  Q.   We have a scoped knee, a heel, and Brett was
17       heart?
18  A.   Yeah.  Potential cardiac.  And I believe he got
19       it evaluated at American Family Care.
20  Q.   In the next paragraph, 20, Josh Brown is
21       younger.
22            He was over 40, correct?
23  A.   Yes, that's my understanding.

139

1   Q.   This paragraph -- and I could be wrong, but it
2        looks like I guess you're going after the same
3        position you talk about he was younger
4        and not disabled.
5             You were already the battalion chief, right?
6   A.   Yes.
7   Q.   And he was the acting battalion chief?
8   A.   Yes.
9   Q.   This paragraph says even though that you were
10       the senior battalion chief.
11  A.   Yes.
12  Q.   But the duties were the same, right?
13  A.   Yes.
14  Q.   You're just upset because Josh Brown was made
15       acting battalion chief?
16  A.   No.
17  Q.   Why were you upset about that?
18  A.   No.  I was upset because the accommodation that
19       I had and I could have at the Public Safety
20       Building was what I didn't have.  And guess
21       what?  I was the first one.  We don't even have
22       a city manual that says anything like this.  It
23       just came out of restrictive duty status.

140

1   Q.   How has Brown been given more favorable
2        treatment than you?  That's a sentence in here.
3        He has been given more favorable treatment than
4        Mr. Hawthorne.
5             How so?
6   A.   Well --
7   Q.   I mean, what position were you both trying to
8        get?
9   A.   I'll take for -- well, only one can be in charge
10       of a shift, for one.  And I was deferred to
11       when accommodation could have been made at the
12       Public Safety Building.  Number two, on June 11
13       and June 3, my name was placed directly under
14       acting battalion chief, and at the time it said
15       Captain Brown, and I'm a BC.
16            Do you know how kind of hurtful and the
17       laughter and the scorn that I got from the guys
18       that I report to a captain?
19  Q.   List the ways that your feelings were hurt that
20       you reported to a captain.
21  A.   Okay.
22  Q.   Well, let's go back to my question.  He's been
23       given favorable treatment over you.

35 (Pages 137 to 140)

Jay Hawthorne                                              August 7, 2019

---

141

```
 1            How was Brown treated favorably over you?
 2   A.   Number one, he took my office.
 3   Q.   But you couldn't do all the duties, correct?
 4   A.   Yes.  But --
 5   Q.   What's next?
 6   A.   We have an officer here in Burdett.  He kept his
 7        office and he was hurt.
 8   Q.   This paragraph focuses on Brown, and I want to
 9        keep it focused on your complaint.  I need to
10        know why Josh Brown or how he was treated more
11        favorably than you.
12   A.   Because he was put over me.
13   Q.   He was full duty and you were not, correct?
14   A.   Correct.
15   Q.   Any other ways that he was treated differently
16        than you?
17   A.   No.
18                MR. HOWARD:  I think it's time to eat.
19                   Is this a good stopping place for
20                   us?
21                THE WITNESS:  If you've got to eat.
22                (Brief lunch recess.)
23                MR. HOWARD:  We can go back on.
```

---

142

```
 1   Q.   (Continuing by Mr. Howard)  When we left off, we
 2        were talking about the 24-hour shifts the year
 3        before the accident.
 4            Did you abuse the swap policy?
 5   A.   No, sir.
 6   Q.   Have you ever been accused of abusing the swap
 7        policy?
 8   A.   No, sir.
 9   Q.   Has anybody ever made fun of you for using the
10        swap policy the way you did?
11   A.   The only person who I had heard had made fun of
12        me but not to my face was battalion chief in
13        training Rickey Roberts.  I had numerous other
14        people because -- he came to me and said that
15        his family could really -- he sends his kid to
16        Edgewood.  Our kid went to Edgewood as well.
17        And he said he would like to get some of that
18        weekend action because he could use the extra
19        money.  Well, the guys on my shift had
20        apprehensions because he's been in training all
21        his life, and they wanted somebody who has, you
22        know, been in the field.  So I actually had
23        other people on my shift.  He's the only person
```

---

143

```
 1        that I've ever not allowed that did not meet the
 2        requirements for a swap --
 3   Q.   Did you ever hear of anybody refer to the policy
 4        as the Hawthorne swap policy?
 5   A.   Yes.
 6   Q.   Who said that?
 7   A.   I've heard a good people say that.  But what's
 8        ironic to me is if it's even people that say the
 9        swap policy -- like I stated before, I had
10        Deputy Chief Whaley who did it.  I had Assistant
11        Chief Owens do.  I had about every captain and
12        every battalion chief that we had.  Cory Russell
13        today, Josh Brown, who are both battalion
14        chiefs.
15   Q.   Did these guys --
16   A.   They would come to me, or I would even call them
17        and say, hey, do you want to work for me?
18   Q.   They were working for you.  They did not choose
19        not to work 50 percent of the time; is that
20        correct?
21   A.   Say what?
22   Q.   They were the ones working for you.  They were
23        not the ones leaving work 50 percent of the
```

---

144

```
 1        time.
 2   A.   That's correct.
 3   Q.   In paragraph 21 you say, the temporary light
 4        duty accommodation Mr. Hawthorne was given by
 5        the Prattville Fire Department was rescinded
 6        without valid reason.
 7            What reason were you given?
 8   A.   On the 12th of 2018 -- well, the email that I
 9        saw that -- it stated that it was not the City's
10        wishes to do it, but it was per legal counsel,
11        because I had been complaining about my shoulder
12        and my pain.  But I had originally complained on
13        May 31, 2018 through my LPC James Baker.
14   Q.   What is LPC?
15   A.   Licensed professional counselor.
16   Q.   Okay.
17   A.   Lisa Thrash then sent me an email back.  And I
18        said, hey, did you get the letter?  And she said
19        yes.  She's like, you need to go through the
20        workmen's comp doctor if you want anything to
21        change.  And that was, I believe, 6/5 she sent
22        me that.  On 6/13/18, then Dr. Carpenter had
23        sent in and said that I should be able to sleep
```

---

36 (Pages 141 to 144)

Jay Hawthorne                                              August 7, 2019

---

145

1    at home, if possible, due to the pain in my
2    upper extremity. And she replied -- Ms. Thrash
3    replied on June 19 that they weren't going to
4    listen to the doctor's wishes basically and that
5    I would have to use my own accrued time. So for
6    a two-month period, I was finally sent home for
7    a reason I didn't know except I guess they had
8    too many battalion chiefs on shift.
9    Q.   In paragraph 21 you say the temporary light duty
10        accommodation was rescinded.
11             I need you to identify the exact temporary
12        light duty accommodated that was rescinded.
13   A.   That would be the restrictive duty status.
14   Q.   Eight-hour shifts or 24-hour shifts?
15   A.   24. I was doing 24.
16   Q.   What was rescinded about that?
17   A.   I was put on temporary total disability for the
18        second time.
19   Q.   In paragraph 22 you talk about other senior
20        level firefighters and similarly-situated staff
21        members.
22             I need the names of those people.
23   A.   Other senior level firefighters, BC Strock. He

---

146

1    got an accommodation after his tragic wreck and
2    so did BC Ellison who then was demoted to
3    captain. He got helped with his accommodation,
4    too, for his PTSD.
5    Q.   Are these the ones that we listed before?
6    A.   Yes.
7    Q.   Okay. Have you thought of any more people that
8        should be added to the list?
9    A.   No, not at this time.
10   Q.   In paragraph 22 you say, Hawthorne's medical
11        providers should have allowed him to receive
12        workplace accommodations.
13             What part of that notice, if you remember,
14        mandated that you should receive workplace
15        accommodations?
16   A.   I don't understand the question, sir.
17   Q.   Well, it says you -- your medical providers'
18        notice should have allowed him to receive
19        workplace accommodations.
20             What part --
21   A.   Oh, what specific workplace accommodation?
22   Q.   Well, what part of the medical notice should
23        have made them do this and, then, yes, what

---

147

1    workplace accommodations?
2    A.   Well, any request I would think by the workmen's
3        comp doctor who was coordinating my case who
4        requests a change of venue, the way that I can
5        go home and sleep in a comfortable bed after my
6        clerical duties are completed for the day is to
7        be able to go back to an eight-hour schedule.
8        That would be the proper accommodation in my
9        opinion.
10   Q.   Paragraph 23 you're talking about return to the
11        previous accommodation position.
12             What position is that?
13   A.   That would be the one that I came back prior to
14        the injury on May 2 when my light duty admin
15        accommodation job had ended on April 22 at the
16        Public Safety Building.
17   Q.   Is that the eight-hour shift?
18   A.   Yes, sir.
19   Q.   Did it come down to the fact that you didn't
20        like the 24-hour shift and you wanted the
21        eight-hour shift?
22   A.   No, sir. I will say this. I did prefer the
23        eight-hour shift. I had never done it in my

---

148

1    whole career. But I also understand that I have
2    to do what the job description says. But that's
3    why I also wanted to work to get back because it
4    was quite clear that they weren't going to let
5    me back, so -- but I hadn't even had my injury
6    diagnosed or treated. I was working to get
7    better.
8    Q.   You say you hadn't had your -- I guess you're
9        talking about you hadn't had your shoulder
10        diagnosed at that time.
11   A.   No, I hadn't.
12   Q.   Does that make a difference?
13   A.   For -- to be able to get back to a battalion
14        chief's job that you're talking about, not for
15        an admin position, but since I have to get to
16        where I need to be for that --
17             You're talking about for the accommodation?
18   Q.   Well, you put in your answer, and they did this
19        and they didn't even know the diagnosis. And
20        I'm saying does that really matter.
21   A.   I would think it would.
22   Q.   Why?
23   A.   Well, because when you have a workmen's comp

---

37 (Pages 145 to 148)

Jay Hawthorne                                                    August 7, 2019

149

```
 1        doctor and a licensed professional counselor
 2        where everybody else -- I know the City and I
 3        know Ms. Thrash would listen to medical for most
 4        personnel.  I don't know why I wouldn't be
 5        accommodated with that as well.  And so for two
 6        months -- so from August 13 to when I was sent
 7        home back to June 13 where there was an email
 8        requesting from the medical provider workmen's
 9        comp doctor himself -- so for two months I'm in
10        that pain for this torn labrum and I'm
11        complaining to folks and, you know -- and then
12        on top of that, everybody is kind of laughing
13        and giggling -- oh, is it your neck Hawthorne,
14        or is it your shoulder?  That stuff kind of --
15        I've been there a long time.  I didn't need to
16        be put through that kind of a harassment.
17   Q.   Do you think people thought you were just making
18        this up because you didn't want to sleep at the
19        fire department?
20   A.   Very well may be.
21   Q.   I mean, it was apparent you didn't want to sleep
22        there from the year before the accident, right?
23   A.   Well, at that point in time, that year before
```

150

```
 1        the accident, I had a lot of other issues to
 2        take care of, so guess what?  That's correct
 3        what you're saying.
 4   Q.   In paragraph 25 you say your name was not on the
 5        duty roster.
 6             Is that the one that could have been a
 7        mistake as not listed?
 8   A.   Very well could be.
 9   Q.   I mean --
10   A.   I've never seen a mistake like that in -- by
11        then this 26-plus years.
12   Q.   What I remember is the duty roster, it's got the
13        lines of people's names.
14   A.   Yes, sir.
15   Q.   And if you're on any type of restriction, your
16        name goes to the top in a little -- it's not a
17        separate category, but it just goes at the top
18        close to the heading.
19             Do you know what I'm talking about?
20   A.   I'll be honest with you.  It's like I said
21        earlier.  Everybody says I'm in the cloud.
22        That's the joke at the fire department
23        because I --
```

151

```
 1   Q.   Why do they say that?
 2   A.   Huh?
 3   Q.   Why do they say that?
 4   A.   They say I'm in the cloud.  They say I
 5        disappear, and then all of a sudden I reappear.
 6        I reappear in different positions.  I can be
 7        under a secretary.  I can be under a demoted
 8        captain.  I can be under an acting.  I just move
 9        around the roster.
10   Q.   Well, where do you think you should have been
11        placed?
12   A.   I think that I should have been placed on B
13        shift, and you could have had Acting Battalion
14        Chief Brown right under there.  But I don't
15        think I needed to be under secretaries.  I don't
16        think I needed to be under a demoted captain.  I
17        don't think I needed to be under a retired or a
18        future retired battalion chief.
19   Q.   Do you think you should have been placed there
20        as ready to go?
21   A.   We've had a lot of people that are injured --
22   Q.   I'm talking about you.  Do you think you should
23        have been placed on that thing as if you were
```

152

```
 1        ready to go?
 2   A.   Yes.
 3   Q.   I think I know what you're talking about in 26.
 4        You say, according to the duty roster, his job
 5        was given to Mr. Josh Bingham who is
 6        substantially younger than Mr. Hawthorne.
 7             Just clarify for me what you mean by the
 8        duty roster and what Josh Bingham being on there
 9        makes you believe that he's taking your job.
10   A.   You're talking about -- did it not under that as
11        well have Brown under him?  Do you have that
12        duty roster?
13   Q.   I don't.  I just --
14   A.   Okay.  There's a duty roster that came out on
15        the -- I actually believe it's even the 12th and
16        the 26th.  It would have been the same.  But
17        basically it had Bingham, and then it had the
18        acting Battalion Chief Brown who then was a
19        captain under him, and I was nowhere on the
20        roster.  But I had an email from Deputy Chief
21        Whaley on August 10 to report to work, and he
22        told me that I would be under Bingham and Brown
23        and to report to work on Sunday, the 12th, and I
```

38 (Pages 149 to 152)

Jay Hawthorne                                                    August 7, 2019

---

153

1    did.  And then I got TTD'd on the 15th, and I
2    didn't know why.
3    Q.   When you say TTD'd --
4    A.   Back to temporary total disability.
5    Q.   What does that mean as far as -- you can work?
6         Can you work part-time?  What do you do?  I just
7         need to get all that on the record.
8    A.   That meant they sent me home.
9    Q.   That means you are not invited to work here
10        right now?
11   A.   Correct.
12   Q.   Until you get things fixed?
13   A.   Yes.
14   Q.   So there's a difference between having a
15        restriction and TTD'd?
16   A.   Yeah.
17   Q.   Restriction is you're working doing whatever
18        light duty part-time, and TTD'd is you're not
19        physically able to work?
20   A.   Yes.
21   Q.   Paragraph 27, two police officers at the gas
22        station, who were those officers?
23   A.   Gentry and Dakota Davis.

---

154

1    Q.   Do you believe anything Gentry says?
2    A.   Well, it was actually true when I -- most of the
3         time when I see him at Winn Dixie, no.  But ...
4    Q.   Okay.  That's all I have to say.
5         They don't make policy for the City of
6         Prattville, do they?
7    A.   No.
8    Q.   Did it seem like they were just kind of running
9         their mouth?
10   A.   No.  They were being cool.  They said that they
11        had, I guess, gone to the ceremony and -- no.
12        They were normal.  Nice guys.  Good cops.
13   Q.   In paragraph 28 you say, Bingham's promotion to
14        battalion chief actually made four chiefs for
15        the City when Mr. Hawthorne had been told there
16        would only be three.
17   A.   That's right.  That's four shift chiefs instead
18        of three.
19   Q.   I'm trying to figure out how the training BC
20        fits into this.  There were three BCs that work
21        A, B, and C shift and one training.
22   A.   Correct.
23   Q.   Okay.  Bingham's promotion to battalion chief

---

155

1    actually made four.  Who were the four battalion
2    chiefs?  Bingham, according to this paragraph.
3         Who else?
4    A.   Bingham, Ellison, Rogers, and myself.
5    Q.   I just want to make sure that I understand
6         paragraph 29.  You were told to report to work
7         and then you checked your email.
8         What did the email say?
9    A.   It says the accommodation was ended and that I
10        would have to go home on workers' compensation.
11   Q.   Do you have any idea why you were placed on TTD?
12   A.   Per discovery exhibit, it said that due to me
13        complaining of my pain and discomfort, that
14        legal counsel thought it was time for me to go
15        home back on TTD.
16   Q.   Do you question that judgment?
17   A.   No.
18   Q.   I mean, you were hurt, correct?
19   A.   Yes.
20   Q.   In pain?
21   A.   Yes.
22   Q.   And if you were at work, it might make it worse?
23   A.   That's correct.  I was asking for relief two

---

156

1    months prior.
2    Q.   And the last part of 29, being on workers'
3         compensation meant a loss of approximately
4         one-third of your income.
5    A.   Yes.
6    Q.   Are you blaming that on the City in any way?
7         You were injured, correct?
8    A.   Yes.
9    Q.   You're not -- I'm trying to make a distinction.
10        I understand your other part, but at some point
11        of that you were injured and you should have
12        been at home making two-thirds.
13   A.   Yes.
14   Q.   Could you shed any light on that at all as when
15        you think it's part of your damages and when you
16        think yes, I was hurt; I should have been on
17        TTD?
18   A.   The time I was there and I wasn't on TTD -- I'm
19        confused.
20   Q.   Well, I am, too, and I'm just trying to -- at
21        some -- I know you -- well, I don't know whether
22        you agree that you should have been on or not.
23        Do you agree with that?

---

39 (Pages 153 to 156)

Jay Hawthorne                                                    August 7, 2019

157

1   A.   Yes.
2   Q.   If you're on TTD, then you're entitled to
3        two-thirds of your salary.
4   A.   That is correct.
5   Q.   Do you blame that on the City as part of your
6        damages in this case, or is that yes, I was
7        injured and I only deserved two-thirds of my
8        salary because it was workers' comp?
9   A.   No.  Obviously I was injured on duty, so I
10       should be compensated.
11  Q.   At two-thirds or full?
12  A.   I think I should be compensated for the full
13       amount.  The difference.
14  Q.   You do understand that workers' comp pay is
15       two-thirds statutorily?
16  A.   Yeah.
17  Q.   The City has nothing to do with that.
18  A.   Right.  I know you can't, like, double dip, but
19       the other third that I lost, I would think that
20       I could get that.
21  Q.   How or why or both?  Is it your belief that if
22       you're on workers' compensation and you're
23       getting those benefits that the City of

158

1        Prattville should have just ponied up the
2        one-third you were missing out on?
3   A.   No.  That's true.  That's not workmen's comp.
4        You're correct on that.
5   Q.   Well, I'm just trying to clarify because --
6   A.   Yeah.  I was all confused and everything.
7   Q.   Okay.  Being on workers' compensation you get
8        two-thirds?
9   A.   Yeah.
10  Q.   And then --
11  A.   It's tax free.  And then the other --
12  Q.   The other one-third you just don't get because
13       you're injured?
14  A.   Correct.
15  Q.   Are you saying the City should have paid you
16       that?
17  A.   No.
18  Q.   In paragraph 30, Michael Rogers retired in
19       January 2019 and you returned.
20            Is there any correlation with those things,
21       or did it just happen to be at the same time?
22  A.   Just merely stating the fact that Deputy Chief
23       Whaley said that Rogers was going to retire in

159

1        2019, and he retired September 30, 2018.
2   Q.   Is the fact that he retired is what brought you
3        back from your injury, or did that just seem to
4        happen at the same time?
5   A.   I haven't -- I didn't come back.  I haven't been
6        back to work since August 15, 2018.
7   Q.   I understand.  And I'm just trying to figure out
8        what this means.
9            Deputy Chief Whaley told Hawthorne that
10       Bingham was promoted so that the staff would be
11       full when another battalion chief, Mike Rogers,
12       retired in 2019 and Mr. Hawthorne returned from
13       his injury.
14            You never returned or haven't yet, have you?
15  A.   That's correct.
16  Q.   And now that we have the MMI, we're expecting it
17       to be some kind of partial impairment?
18  A.   Yes.
19  Q.   If it's a partial impairment, what do you think
20       the City should do from here?
21  A.   I would hope that they would try and
22       accommodate.
23  Q.   Until you're 65?

160

1   A.   No.
2   Q.   Until when?  How do we end this thing in your
3        opinion?
4   A.   I would say at least, you know, 55.
5   Q.   Have you told me every possible way that you
6        believe that you've been discriminated against
7        based on any type of disability?  I'm looking at
8        paragraph 32.  And we've gone over all those
9        other ones, and I just want to make sure I've
10       got everything covered.
11  A.   Are we going to go through the rest of these on
12       page 7?
13  Q.   Well, no.  I was thinking that we already had,
14       but if I'm incorrect -- that's what I'm asking
15       you is if I'm incorrect.
16            Have we talked about all that?
17  A.   No.  I don't believe we've talked -- at 33 --
18  Q.   We can go through.  33, request should be
19       accommodated.
20            What was your specific request?
21  A.   To be placed into an administrative battalion
22       chief position.
23  Q.   Do you think the City had a duty to just create

40 (Pages 157 to 160)

Jay Hawthorne                                                      August 7, 2019

---

161

1       an administrative battalion chief position?
2   A.  Yes.
3   Q.  Why?
4   A.  They've done it before.
5   Q.  And who filled that administrative battalion
6       chief's position?
7   A.  I would fill the administrative battalion chief
8       position.
9   Q.  No.  I'm sorry.  Who filled it when you say they
10      had it?
11  A.  It still has not been filled to this day, but it
12      was going to be filled by Captain Josh Bingham.
13  Q.  When did you believe that this was put into the
14      budget for a new administrative battalion chief
15      position?
16  A.  It wasn't.  It wasn't in this year's budget.
17  Q.  Was it in any year's budget?
18  A.  I believe when Chief Owens was there, which was
19      up until 2016, and budgets past it had been
20      there, but not in the last three years, I
21      believe.
22  Q.  What makes you think they were going to put
23      Bingham in an administrative battalion chief's

---

162

1       position?
2   A.  I was told that by Assistant Chief Allen Owens
3       on April 11.  He came to my office.  We were
4       just talking shop, and I said, why don't they
5       just go ahead and flip-flop me and Bingham?  And
6       he said, well, they're waiting for you to
7       retire.  And then what they are going to do
8       is -- Chief Whaley wants him to become an
9       administrative battalion chief because he does
10      such good work for us down here and that he had
11      asked Chief Brown to do that.
12  Q.  Have we talked about everything there is to know
13      about in paragraphs 33 and 34?  You wanted them
14      to create an administrative position and they
15      denied it, in paragraph 33 and 34.
16  A.  Yes.
17  Q.  In 35 you say your request is denied to force
18      you to retire so the department could give the
19      administrative battalion chief position to a
20      younger nondisabled man, namely Josh Bingham.
21      That did not happen, did it?
22  A.  No, it did not.
23  Q.  We've talked about 36, correct?

---

163

1   A.  Yes.  We talked about how the workmen's comp
2       doctor and the LPC, their recommendations
3       weren't heeded, yes.  That's correct.
4   Q.  And 34, that's just saying that -- alleging
5       discrimination.
6           MR. GUILLOT:  34?
7           MR. HOWARD:  I'm sorry.  37.  37 is
8               just an allegation paragraph.
9   Q.  39:  Because of the disability, Mr. Hawthorne is
10      no longer able to perform the duties of a
11      battalion chief.
12      Do we now know that you can never go back
13      and perform the duties of a battalion chief?
14  A.  Yes.
15  Q.  What is your specific disability?
16  A.  Well, the only one that I have is I'm not going
17      to be able, it appears, to be heavy-duty rated,
18      to have the full requirements that I can fulfill
19      as a basic firefighter, and that's what a
20      battalion chief has to be at as well.
21  Q.  And we both agree that Josh Bingham is not
22      disabled, but he can fill the position of BC,
23      correct?

---

164

1   A.  Correct.
2   Q.  And we've already talked about paragraph 40.
3       And that's exactly what paragraph 28 says, I
4       think.  We talked about 41.
5       Age discrimination in paragraph 44, have we
6       talked about all of your allegations of age
7       discrimination?
8   A.  45.
9   Q.  Have we talked about that one?  And I understand
10      that that's the one that --
11  A.  Yes, we talked about that.  Yes, that is
12      correct.  I'm just looking at it.
13  Q.  That's fine.  Take your time.  I just want to
14      make sure that I completely understand what
15      you're alleging.
16      It seems to be that --
17  A.  46 is correct.
18  Q.  Okay.  We've spoken about that?
19  A.  Yes.
20          MR. GUILLOT:  It says here you covered
21              it.  Yeah.
22  Q.  Yeah, we covered all of it.
23      Have we completely talked about everything

---

41 (Pages 161 to 164)

Jay Hawthorne                                                    August 7, 2019

                                                                      165

1        you know about it, paragraph 46?
2     A.   Yes.
3     Q.   Is it the promotion given to Josh Bingham you're
4        claiming was discriminatory, and are you
5        claiming that Acting Chief Brown -- BC Brown was
6        also discriminatory?  Those seem to be the two
7        acts that you're complaining about.
8            We talked about Brown.  You said that he was
9        acting, but you were still ranked above him.
10       And then the one that's given to Josh Bingham is
11       another one that you're complaining about; is
12       that correct?
13    A.   That's correct.
14    Q.   Did you apply for the captain position?
15    A.   No, I did not.
16    Q.   Was it ever open?
17    A.   It was later I found out on May 2 from Assistant
18       Chief Owens.  And I also found out from Acting
19       Battalion Chief Brown that they were going to
20       offer from then BC Ellison -- they were going to
21       offer him to do a flip where he could then
22       become demoted and become a captain and have
23       Bingham's position, and then Bingham would

                                                                      166

1        become a battalion chief.  And I was told that
2        Ellison turned that down.
3     Q.   Who all did you request to be demoted to
4        captain?
5     A.   To the captain, if need be?
6     Q.   Yes.  Who --
7     A.   That would be Chief Brown.
8            (Brief off-the-record discussion.)
9     Q.   Can you look over the remainder of that
10       complaint, paragraphs 45 through the end of it,
11       and determine if there's anything that we have
12       not addressed and you have fully discussed?
13    A.   It looks good --
14           MR. GUILLOT:  Are you going over --
15    A.   -- up to 50.
16           MR. GUILLOT:  -- the retaliation claim
17              too?
18           MR. HOWARD:  Well, let me ask about
19              that.
20    Q.   Do you feel like you were retaliated against?
21    A.   Yes.
22    Q.   How so?
23    A.   When I don't even get heard for my condition and

                                                                      167

1        the pain that I'm in from the workmen's comp
2        doctor because management or the City has
3        decided that they are now the workmen's comp
4        doctor and they won't even listen to my licensed
5        professional counselor who I have never been to
6        before.  And I'm even on Lexapro being treated
7        for depression and anxiety, and then for two
8        months I'm in pain and guys are even scoffing
9        and laughing looking at me in the schedule or
10       oh, what's wrong today, Hawthorne, like, you
11       know, I'm a cripple or something like that.  And
12       that's not really quite fair because what we
13       found out is, through further determination,
14       that I had a hurt shoulder.  And guess what?  I
15       had to get it fixed, and that happened on duty.
16       It's pretty humiliating.
17    Q.   What happened after May 25 -- 23 or 25 that you
18       claim that you were retaliated against?  That is
19       the date that your lawyer sent a letter to the
20       mayor.
21           What happened since then that you claim was
22       retaliation?
23    A.   Since then?

                                                                      168

1     Q.   Or after that time.  That's the act that you're
2        saying -- it looks like you're saying I did
3        this, and then they retaliated against me.
4            How did they retaliate against you for
5        filing an EEOC complaint?
6     A.   Well, for example, if you're not going to listen
7        to the workmen's comp doctor's recommendations
8        for the patient and you're not going to listen
9        to the licensed professional counselor's
10       recommendations of care --
11    Q.   Let me stop you.
12           Didn't that happen before you sent the EEOC
13       complaint?
14    A.   What?
15    Q.   Not listening to the doctor.
16    A.   No.  I believe the EEOC complaint --
17           When was that?
18    Q.   It was May 23, 2018.
19    A.   No.  Actually, I sent my first email to Lisa on
20       5/31, and then I did a follow-up on -- excuse
21       me -- on 6/13, and Carpenter did too.  And then
22       she responded on 6/19 saying she wouldn't
23       accommodate and that my own accrued leave time

                                                42 (Pages 165 to 168)

Jay Hawthorne                                           August 7, 2019

169

1      would have to be used.  So, no, that was after.
2      And I've never seen that been done before in all
3      my years there.  They always listen to medical,
4      and they also listen nowadays to mental, and I
5      had both.
6    Q.   Have you now told me all the ways that you've
7      been retaliated against?
8    A.   Mental pain, anguish.
9    Q.   Anything.
10   A.   Being teased, scoffed at.
11   Q.   Who scoffed at you?
12   A.   Numerous people.
13   Q.   Well, which city official scoffed at you?  I
14     understand employees do it.
15   A.   It's just common -- employees -- I have not had
16     anybody from the council or even the mayor -- I
17     haven't had any public official come up to me.
18     I have had people that have been politicians and
19     ex-employees of the City come up and even
20     lawyers and stuff in town that have said, you
21     know, hey, I heard you retired, similar to what
22     I heard from the shift guys that had been said.
23     I said, no, I haven't retired.  They said, we

170

1      heard you retired.
2    Q.   It looks like we have everything covered in your
3      complaint; is that correct?
4    A.   What page -- I don't want to miss anything.
5    Q.   Page 10 to the end.  I know there's a lot of
6      paragraphs, but it looks like in some fashion
7      we've discussed everything that's in there, if
8      I'm correct.
9    A.   57, could you ask me that again?
10   Q.   You did not want to sleep at the city's fire
11     department, correct?
12   A.   That is correct.
13   Q.   And you blame that on your neck and shoulder
14     condition?
15   A.   That is correct.  And I also just wanted to have
16     the workmen's comp doctor's wishes as well as my
17     LPC counselor's wishes which I even requested
18     many times and even per Ms. Thrash's email when
19     they sent me home on the 15th that I had been
20     complaining of incessantly.
21   Q.   In the year before your accident where you did
22     not want to sleep at the city's fire department
23     also, did you ever say I'm not going to sleep

171

1      here because my neck and shoulder hurts?
2    A.   Year prior?  Let's see.
3    Q.   We established that in the year prior to your
4      accident --
5    A.   Year prior to the accident, that wasn't because
6      of any kind of pain and suffering or injury.
7    Q.   Oh, I know.
8    A.   Okay.
9    Q.   And I agree with you.  You've testified to that.
10   A.   Okay.
11   Q.   I was just asking in the year before when you
12     only stayed there 50 percent of the time, did
13     you ever say I'm not going to work this shift
14     because my neck and shoulder hurt?
15   A.   Not that I can recall.
16   Q.   Any other paragraphs that you think we haven't
17     talked about?
18   A.   Well, in 58 my duties were assigned by Captain
19     Brown, and --
20   Q.   Did he give you the sheet of paper?
21   A.   No.  That was Deputy Chief Whaley, so that was
22     kind of confusing, too, because Deputy Chief
23     Whaley, if I'm still a battalion chief, he's

172

1      still who I answer to too.  And then that's part
2      of the problem that I'm answering to a captain.
3      I understand he's an acting battalion chief, but
4      that was kind of confusing.  And I had a lot of
5      guys that laughed and even scoffed at that and
6      said, man, we ain't never seen a dadgum senior
7      battalion chief answer to a captain.
8    Q.   Well, you were not answering to a captain.  You
9      were answering to a battalion chief, correct?
10   A.   I was answering to an acting battalion chief who
11     was a captain.
12   Q.   But he was also battalion chief, right?
13   A.   At that point in time, yes.
14   Q.   Anything else that you -- let me back up.
15     In paragraph 58 you say Captain Brown.
16     That's Josh Brown, correct?
17   A.   Yes, sir.
18   Q.   We've got two Browns and two Joshes.
19   A.   It's tough.
20   Q.   Got to make sure we're straight.
21     Anything else after paragraph 58?
22   A.   59.  There had never been -- I'm sure maybe I
23     covered it, but I want to reiterate that there

43 (Pages 169 to 172)

Jay Hawthorne                                                    August 7, 2019

173

1   have never been four battalion chiefs at the
2   stations before what happened to me.
3   Q.  Okay.  Well, are you including yourself in that
4       one?
5   A.  Huh?
6   Q.  Are you including yourself as one of the four?
7   A.  I'm including myself as one of the four.
8   Q.  But if you don't include yourself as one of the
9       four, then nothing's changed; is that correct?
10  A.  But I'm still a battalion chief, so there's
11      four.
12  Q.  But if you don't include yourself --
13  A.  True.  Then it's true.
14  Q.  I guess it could be saying nothing has changed
15      if you include only the individuals who are
16      qualified and able to be a battalion chief.
17  A.  Okay.
18  Q.  Is that correct?
19  A.  Yes.
20  Q.  Anything after 59?
21  A.  Yeah.  60.  When I was working under an
22      accommodation and working doing administrative
23      duties, it says here he was not having to use

174

1   accrued leave time; however, after beginning May
2   20, if he went home to sleep in a comfortable
3   bed, he had to use his leave time to do so.
4       So yes, I did have to use my accrued leave
5   time per Ms. Thrash's email on June 19 because
6   they wouldn't adhere to the workmen's comp
7   doctor's wishes or the counselor's wishes.
8   Q.  You calculated that as $18,000 in damages.  How
9       did you make that calculation?
10  A.  That's just a number that I had based on my
11      hourly and the estimated hours lost.  Of course,
12      we know that's not an exact figure.
13  Q.  And I'm just -- I'm not challenging you --
14  A.  Oh, no.  You're fine.
15  Q.  -- on how -- what the number is.  I'm just
16      asking you what your formula is.  I figure it's
17      I get paid this many dollars per day and I had
18      to use --
19  A.  Yes.
20  Q.  -- half a day or something.
21  A.  That's right.
22  Q.  Do you know what those numbers are?
23  A.  No.  No.  Not offhand.

175

1   Q.  Anything else after paragraph 60?
2   A.  When they sent me home on the 15th because an
3       accommodation wasn't given, that meant that I
4       lost a third of my income, which, you know,
5       reduced my pay.
6   Q.  Well, we're back to that -- does the City have
7       to pay the one-third of workers' comp that
8       you're not getting, and I still don't know if I
9       have a clear answer to that.
10  A.  I understand.  But basically my contention is
11      that, you know, an accommodation could have and
12      should have been made, and it wasn't.
13  Q.  You said they should have made up an
14      administrative BC so you would have kept
15      one-third of your income?
16  A.  Well, at least until my injuries and everything
17      gets settled, yes.  That's the only fair thing
18      to do.  That's how -- they've always been very
19      kind to employees.  Now, maybe because I was
20      over 50 and I was a 26-plus-year person, maybe
21      that changed.  But people that didn't have
22      retirement, they've always treated them with kid
23      gloves.

176

1   Q.  And those are the names that you gave me before?
2   A.  What names, sir?
3   Q.  The names that you gave me before that we're
4       going to compare your situation to:  Strock,
5       Shaw, Ogletree.
6   A.  Oh, no.  You could compare me to Strock, but he
7       was technically -- he was short of his
8       retirement.
9   Q.  Who should we compare you to in paragraph 61?
10      Who have they -- are you similarly situated with
11      that got treated better that's not over 40 and
12      does not have a disability?
13          MR. GUILLOT:  Do you know what
14              similarly situated means?
15          THE WITNESS:  No.
16  A.  Could you explain that?
17  Q.  Sure.  You said they've always done it this way
18      or they've always been good to people.
19      Who is in this position substantially
20      similar to yours that they treated better that
21      was under the age of 40?
22  A.  I don't know.
23  Q.  Who is similarly situated with you that they

44  (Pages 173 to 176)

Jay Hawthorne                                              August 7, 2019

177

```
1    treated better who did not have some type of
2    disability?
3  A. Shaw would be one.
4  Q. Anybody else?
5  A. He's the only one I know of offhand.
6  Q. And what was his disability?
7  A. He had an accident where he was shot.
8  Q. Gunshot.  Okay.  Got ya.
9        Now have we -- well, 62 and 63, those are
10   just lawyer words.  Okay.  I want to go through
11   some things.
12       Your automobile accident happened on March
13   31, 2017; is that correct?
14 A. Yes, sir.
15 Q. Do you have any photographs from that automobile
16   accident?
17 A. I can probably get them on the phone.  I have
18   like four.
19 Q. Just "yes" or "no"
20 A. Yes.
21 Q. Okay.  Give those to your lawyer because I'll
22   probably include those in the questions that
23   I've already asked.  I'm just building a story.
```

178

```
1    Here's where we were and here we are now.
2        Can you briefly describe how that accident
3    happened?  I understand it might have been a
4    four-car accident or something.
5  A. Four car.  We're car number three.  Car number
6    four rams us from behind.  Hits us.  We hit car
7    two and then car two hits car one.
8  Q. Who did you sue or whose insurance did you claim
9    against?
10 A. It was Geico, I believe.
11 Q. Car four?
12 A. I believe, yeah.
13 Q. The one that was behind you?
14 A. Yeah.
15 Q. Are you familiar enough with your work documents
16   that you can authenticate them or say that they
17   are true or not?  And I say work documents.  I
18   mean restrictive work documents.
19       Do you know -- do you keep any of your
20   medical records; or did you just turn them into
21   the City?
22 A. No.  I kept a good bit.
23 Q. Okay.
```

179

```
1  A. But I'm sure there's some I don't have because
2    there's so many.
3  Q. Yes, there's a lot.
4        (Defendant's Exhibit 1 marked for
5         identification.)
6  Q. Let me show you what I've marked as Defendant's
7    Exhibit 1.
8        Do you know the approximate date on that --
9  A. I would go --
10 Q. -- where that comes in the time frame?
11 A. I think it's around June 20, 23rd maybe.
12 Q. Write that on there.  That's good.
13 A. 23rd, I think.
14 Q. Okay.  I mean, I didn't see a date on it.  I'm
15   just trying to --
16 A. No.  I believe it was June.
17 Q. You say June or July?
18 A. I put 7.  I'm sorry.  Put 6.
19 Q. Okay.  Based on my records, that's pretty much
20   close to the time frame, but I was not sure.
21 A. That's about right.
22 Q. What date did you have surgery on your neck?
23 A. On my neck from Dr. Swaid was September 14,
```

180

```
1    2017.
2  Q. Was there a time in that -- before your neck
3    surgery that they wanted you to do rehab?
4  A. No.  I did a ton of rehab.  What they did was --
5  Q. Let me back up.
6        Before your neck surgery, did they request
7    that you do rehab to fix your neck?
8  A. No, sir.
9  Q. When did you have rehab?
10 A. I did it before.  I did it at Drayer.
11 Q. That's what I was asking.
12       Before you did surgery did they try rehab?
13 A. Yes.
14 Q. Did the doctor then say no, you should not have
15   been doing rehab?
16 A. No.  I went to Dr. Faulkner first, the one that
17   you had, and what he advised was 90 days of
18   rest.  He thought that the PT had aggravated and
19   to let it rest.  And then after that I went to
20   Swaid, my wife and I both did, and got checked
21   out.  He took a picture of both of our necks,
22   and he said you guys have a disc issue and we'll
23   fix it.
```

45 (Pages 177 to 180)

Jay Hawthorne                                              August 7, 2019

181

1   Q.   Do you know what your net income was prior to
2        the workers' comp?
3   A.   Yes.  Roughly 74, 75 a year.
4   Q.   Do you know what -- well, is that gross or net?
5   A.   Oh, gross.  I'm sorry.  Net is around 60, I
6        believe.
7   Q.   Do you know what your take-home pay was per week
8        or per two weeks?
9   A.   No.  I forgot.
10  Q.   Okay.  After your surgery on your neck, how long
11       was it before you could try to come back to work
12       and do anything?
13  A.   I believe I had the surgery on the 14th, and I
14       believe I got a light duty accommodation which
15       the City granted on October 23, 2017.
16  Q.   And that was lifting no more than 20 pounds?
17  A.   I believe, yes.  Correct.
18  Q.   Did anything happen from the time that you got
19       your light duty work until February of the next
20       year?  Did everything go smoothly with your
21       light duty?
22  A.   Yes.
23  Q.   And then in February you got may return to work

182

1        for light/heavy duty lifting no more than 75
2        pounds.
3   A.   Yes.
4   Q.   Is that correct?
5   A.   Correct.
6   Q.   That was about February 27, 2018?
7   A.   Correct.
8   Q.   Tell me about the meeting with Lisa Thrash.  You
9        said she was in that meeting attempting to force
10       you to go to retirement.
11            Is that what you said?
12  A.   No.  No.  That was just an email correspondence.
13  Q.   No.  No.  No.  Don't look at my stuff because it
14       will throw you off.
15            Earlier you said the City was trying to
16       force you into retirement.  Did you get that
17       from your meeting with Lisa Thrash?
18  A.   No.  I just got that from the email on April 4,
19       2017.
20  Q.   Did you have a meeting with Lisa Thrash?
21  A.   I don't remember her at any time ever telling me
22       to choose -- I've had numerous meetings with
23       her, you know, checking about benefits or

183

1        options or something like that.
2   Q.   Did you have a meeting with Lisa Thrash where
3        you came in and said, I'm thinking about
4        retirement; this is no longer -- this is a young
5        man's game?
6   A.   I remember telling her -- when you're 50 --
7        "Yes" or "no."  Did you have that meeting?
8   A.   Did I have a meeting with her?  Yes, I had a
9        meeting.
10  Q.   Tell me about that meeting where you said this
11       is a young man's game.
12  A.   It's true.  A 25-year-old can do things a
13       50-year-old cannot.  That is true, and I said
14       it's a young man's game.
15  Q.   Now, tell me about the meeting where you said
16       that.
17  A.   I believe that that was after -- actually before
18       I even had the surgery or right after.  I don't
19       know the exact timeline on it where I went in --
20       and who wouldn't -- because I didn't know the
21       outcome of what was going to happen with the
22       condition of my neck and getting back to work,
23       so I inquired about, you know, retirement.

184

1   Q.   In an email that you received on April 4, she
2        makes a statement:  You have indicated that you
3        do not desire to return or desire to go back on
4        shift as a battalion chief and are looking at
5        retirement options.
6            Did you make that statement?
7   A.   Oh, I was looking at retirement options.
8   Q.   Okay.  What about the first part?  You have
9        indicated you do not desire to go back on shift
10       as a battalion chief.
11  A.   I don't remember it exactly being said like
12       that.  I did tell her that the eight-to-five, it
13       was nice doing that kind of work.
14  Q.   Well, is it fair to say by April 4, 2018, you
15       decided I am not going to work those 24-hour
16       shifts anymore?
17  A.   No.
18  Q.   When did you make that decision?
19  A.   What decision?
20  Q.   I'm not going to work those 24-hour shifts
21       anymore.
22  A.   Well, obviously, I did.  I worked to get back to
23       work to full duty, to get back, because that's

46 (Pages 181 to 184)

Jay Hawthorne                                        August 7, 2019

185

```
1       what I had to do because it was clear that I
2       wasn't going to be accommodated.  So I had to
3       get back, because the only job that I could do
4       that she stated in that email was to be a
5       battalion chief, and that's all I could do.  And
6       if I couldn't perform that, then I needed to go
7       ahead and retire.
8    Q.  What else do you remember from that meeting with
9       Lisa Thrash where you said it's a young man's
10      game?
11   A.  I don't remember.
12   Q.  So you've told me everything that you remember
13      about that meeting, correct?
14   A.  About that meeting, yes.
15   Q.  So everything in her email you can't challenge
16      because you don't remember; is that correct?
17   A.  Can I see the email?
18   Q.  Sure.
19   A.  Thanks.
20   Q.  Wait.  What number is on that?
21   A.  17.
22   Q.  Okay.  I've got us both copies.  I just haven't
23      given it to you.
```

186

```
1    A.  There are two parts.  I mean, all this other
2       stuff looks good, the first three paragraphs.
3    Q.  Wait a minute.  Are you saying that you now do
4       remember more about that?
5    A.  No.  This doesn't say -- this just talks
6       about -- what has transpired through my timeline
7       is what these three paragraphs say.
8    Q.  When you say -- what three paragraphs?  Put a
9       one, two, three by them, and we'll just mark
10      that.
11           (Defendant's Exhibit 2 marked for
12                identification.)
13   A.  Now, down here, that caught my attention because
14      the email came out on April 4, so that meant 18
15      days later, effective April 22, 2018, the
16      temporary accommodation in fire department
17      administration will no longer be available.
18      Please contact your medical provider for a new
19      work plan.  If you're released to regular duty
20      without restrictions, you will go back to your
21      position as battalion chief on shift.  That work
22      plan must be received in the human resources
23      department by April 13.  Okay.  So I have 18
```

187

```
1       days.
2           But then after that it says, if you choose
3       not to return to your regular position of
4       battalion chief on shift by April 22, you will
5       need to pursue your option to retire.
6           I think that speaks volumes.
7    Q.  What volumes does it speak?
8    A.  That the accommodation was taken away for no
9       reason.  And then on top of that, she's saying
10      that basically I've been fired --
11   Q.  Well, if you look --
12   A.  -- I will be fired if I can't meet that
13      standard.
14   Q.  Well, if you can't do the job, should you be
15      paid to do the job?
16   A.  I had an accommodation before --
17   Q.  No.
18   A.  -- and I was being paid.
19   Q.  Full?
20   A.  There -- yeah.  I had an eight-to-five job
21      there.
22   Q.  And you think the accommodation should just last
23      forever or until you no longer need it?
```

188

```
1    A.  No.  Or at least let me work through my
2       injuries, especially with a 25 --
3    Q.  Is that the only -- do you remember anything
4       else about the meeting with Lisa Thrash --
5    A.  No.
6    Q.  -- other than what you've told me?
7    A.  Yes.
8    Q.  You do remember?
9    A.  No, I don't remember anything else.
10   Q.  Do you challenge any of her facts in this email
11      in Defendant's Exhibit 2?
12   A.  No, I don't challenge her factual account.
13   Q.  On April 22, 2018 you were planning to come back
14      full-time, correct?
15   A.  Yes.  I believe I was cleared on the 19th to
16      come back, yes.
17   Q.  In April of 2018 you're thinking I'm going back
18      full duty BC.
19   A.  Yes.
20   Q.  Then why did you go to her asking about
21      retirement?
22   A.  When was the exact date of the meeting?
23   Q.  The 4th?
```

47 (Pages 185 to 188)

Jay Hawthorne                                                    August 7, 2019

```
                                189
 1   A.   I said on the 4th.  I don't believe -- I believe
 2        it was around that timetable of the 4th, but why
 3        wouldn't that be something -- I had never even
 4        really talked to her in-depth about that being
 5        an option anyways.  My wife had had surgery on
 6        March 6.
 7   Q.   We're not talking about the same thing.
 8             In April of 2018, at some point in that
 9        month, you're thinking or you had no indication
10        that you could not go back to work full duty; is
11        that correct?
12   A.   I was cleared to go back to work --
13   A.   Right.
14   A.   -- on April 19.
15   Q.   And the weeks leading up to that, you're
16        thinking I'm getting better.  I'm heading back
17        to BC.
18   A.   Well, I was close, I think, on the February 21
19        in there.  I'm at 75 pounds light/heavy duty
20        status.
21   Q.   Getting better.  Going.
22   A.   Yes.
23   Q.   Then why did you go to her in April of 2018 to
```

```
                                190
 1        talk about retirement?
 2   A.   I had never talked -- I've never talked about it
 3        before, and I thought it was something that you
 4        could inquire about.  That's what human
 5        resources does.
 6   Q.   Okay.  And she noted you've experienced a
 7        medical situation that's rendered you unable to
 8        perform the job duties of battalion chief on
 9        shift, and that's what you two discussed, right?
10   A.   Yes.
11   Q.   So you know that you're about to go back full
12        duty, but apparently there's some type of
13        hesitation that maybe you don't want to; is that
14        correct?
15   A.   It wasn't -- I would say it wasn't a hesitation.
16   Q.   Well, what was it?
17   A.   It was an inquiry.  It's human resources.
18        That's their job.
19   Q.   Okay.
20   A.   You can go ask them questions about retirement.
21   Q.   What prompted you to go ask the question about
22        retirement?
23   A.   Just to see exactly, you know, what's all
```

```
                                191
 1        entailed in it, what do you have to do, because
 2        I had never even been down that road.
 3   Q.   So you're just walking to your car one day.  I
 4        haven't talked to Lisa about retirement.  I've
 5        got to go do it.
 6   A.   I'm sure people go to her all the time.
 7   Q.   No.  We're talking about you.  What prompted you
 8        to go to her?
 9   A.   Just wanted to go and talk to her.
10   Q.   Is it your testimony that nothing special
11        prompted you to talk about retirement?  It's
12        just hey, I haven't talked to Lisa about
13        retirement in my life, so here I go?
14   A.   Considerations can be made at any time --
15   A.   I know.  And I'm asking --
16   A.   -- for somebody to earn retirement.
17   Q.   I'm asking you what made you consider that.
18   A.   I don't remember exactly what made me consider
19        it.
20   Q.   Could it be the medical situation that you
21        experienced in March of 2017?
22   A.   I don't recall.
23   Q.   Did you ever go talk to Lisa Thrash about
```

```
                                192
 1        retirement before your automobile accident?
 2   A.   Whenever we have -- like every year you can go
 3        up -- we have -- I forget what it is.  Every
 4        November everybody gets together, and you go
 5        redo your benefits and stuff like that.  I was
 6        on an insurance committee.
 7   Q.   I just simply asked, before your accident in the
 8        automobile --
 9   A.   Have I ever talked about retirement with Lisa
10        Thrash?
11   Q.   Let me finish just so we're not talking over
12        each other.
13             Before your automobile accident off duty
14        March 2017, did you ever go specifically to Lisa
15        Thrash's office to talk about retirement?
16   A.   Not that I recall.
17   Q.   And after your automobile accident in March of
18        '17, you went to talk about retirement with Lisa
19        Thrash?
20   A.   Yes.
21   Q.   And as a matter of fact, you were already at 75
22        percent healthy when you went to talk to her
23        about it.
```

                                        48  (Pages 189 to 192)

Jay Hawthorne                                          August 7, 2019

---

193

1   A.   That was the rating, yes.
2   Q.   Anticipating I'm about to go back full-time,
3        correct?
4   A.   Yes.
5   Q.   And you made that statement:  This is a young
6        man's game.
7              MR. GUILLOT:  Did you say '17 or '18?
8              MR. HOWARD:  The meeting was in '18.
9                   That wreck was in '17.  If I said
10                  it differently, I apologize.
11  A.   Yes.
12  Q.   I don't know that you've ever seen this document
13       other than through discovery, so I just want to
14       check the date.
15            This is the workers' compensation
16       information right there.  I'll show it to you.
17       I believe that's when you hurt your shoulder
18       doing PT.
19  A.   That is correct.
20  Q.   By that time had you already applied for your
21       disability?
22  A.   Disability?
23            MR. GUILLOT:  For social security?

---

194

1              MR. HOWARD:  Yes.
2   A.   Yes.  Social security, yes.
3   Q.   Did you apply for disability before or after you
4        got your 75 percent rating?
5   A.   Before.
6   Q.   Did you apply for social security disability
7        when you were on light duty?
8   A.   No.  I applied for social security originally in
9        2017.
10  Q.   Okay.
11  A.   In June of 2017.
12  Q.   That was before your surgery, correct?
13  A.   Yeah.  That was the car wreck.
14  Q.   There's some point in June of 2017 that you
15       decided I'm not going back to work.  I'm going
16       to get disability and go to the house.
17  A.   That wasn't the case.
18  Q.   It was the case that you decided to try to get
19       disability.
20  A.   I did because I didn't know what the outcome
21       would be because -- I knew at that point in
22       time, especially with my job, I had to be
23       heavy-duty rated, and I hadn't even been

---

195

1        diagnosed.  I didn't have surgery until
2        September.
3   Q.   If you had got the social security disability,
4        what was your plan?
5   A.   Well, if you get social security disability,
6        you've got to do what social security does, I
7        guess.
8   Q.   Well, what was your plan?
9   A.   My plan was to make sure that my family and my
10       neck and my body are good in case something did
11       catastrophically happen, because it wasn't even
12       diagnosed until --
13  Q.   Had you got disability, you were going to
14       retire.
15  A.   If I got disability?
16  Q.   If you got social security benefits, you were
17       going to retire.
18  A.   Yes.
19  Q.   Is that correct?
20  A.   Yes.
21  Q.   But you got denied?
22  A.   I got denied --
23  Q.   And then you decided --

---

196

1   A.   -- April of -- no.  No.  No.  I got denied --
2             Oh, originally got denied.
3   Q.   You got denied.
4   A.   Yeah.
5   Q.   And then you decided I've got to stop thinking
6        about this retirement because I'm not going to
7        get disability benefits; is that correct?
8        So I worked to get back.
9   Q.   Was that correct?  You went from the retirement
10       mind-set with disability to this ain't going to
11       happen; I've got to go back to work mind-set.
12  A.   Yes.
13  Q.   When did that happen?
14  A.   As soon as I knew what was wrong with my neck
15       and I got my neck fixed, then I knew that I
16       would be able to get back to work and be at full
17       duty -- make a full recovery.
18  Q.   By that time the government said you're not
19       going to get any money; is that correct?
20  A.   That's correct.
21  Q.   Who is -- what is a field case manager?
22  A.   That is Cindy Powell.
23  Q.   I've seen her name in that, and I just need you

---

49 (Pages 193 to 196)

Jay Hawthorne                                          August 7, 2019

197

1      to explain that for the record.
2   A.  A field case representative or manager is an RN,
3      and she follows -- she works for workmen's comp.
4      This company happens to be Millennial Risk, and
5      she is their -- basically their eyes and ears
6      for the insurance company as well as the
7      municipality that they represent.  And they also
8      make sure that the workmen's comp patient is
9      supposed to get the care that they are supposed
10     to have.
11  Q.  Earlier you said that the City disregarded some
12     doctor that said that you needed to sleep in
13     your own bed.
14         Did I remember that correctly?
15  A.  Yes.
16  Q.  Did that doctor say you needed to sleep in a
17     regular bed or needed to sleep in your own bed?
18  A.  Sleep at home, I believe.
19  Q.  What date?
20  A.  5/31 was the counselor email to Ms. Thrash, and
21     6/13 would be workmen's comp.
22  Q.  Who is Swiney Bellenger?  Is that your workers'
23     comp guys?

198

1   A.  Yes.
2   Q.  You say that medical record that says sleep at
3      home is 5/31?
4   A.  Yeah.  From the counselor.
5   Q.  What about the doctor?
6   A.  I believe 6/13.
7         THE WITNESS:  Hey, while you look for
8            that, can I pee?
9         MR. HOWARD:  Sure.
10        (Brief recess.)
11  Q.  (Continuing by Mr. Howard) Do you know which
12     doctor said that you had to sleep at home?
13  A.  I believe it was Carpenter.
14  Q.  Have you ever seen a medical record that says
15     that?
16  A.  I believe it said for him to sleep at home if
17     possible.
18  Q.  Well, there's a city document that says that in
19     written notes, but I'm looking for a doctor's
20     note that says that.
21  A.  What do you have?  Maybe it's something -- I
22     mean ...
23  Q.  Well, you're welcome to see this.  I don't have

199

1      anything on June 13.  I've got May 24.
2      Dr. Carpenter says sleep on regular bed and not
3      cot while on duty.  And we talked about the
4      cots.
5   A.  Yeah.
6   Q.  And that was per Dr. Jones.  But I just haven't
7      seen a medical record that says sleep at home,
8      and I'm not saying that there's not one.
9   A.  No.  I understand.
10  Q.  You've got quite a collection of medical
11     records, so ...
12  A.  I know.
13  Q.  But we'll have those soon.
14         While I've got you, I want to make sure I
15     have all of your doctors listed so we can get
16     your medical records.
17  A.  Yes, sir.
18  Q.  We've got Baker, Nichols, and Cloutier as far as
19     emotional distress.
20  A.  Mental, yes.
21         MR. HOWARD:  Do you have a medical
22            record?
23         MR. GUILLOT:  I see here the City of

200

1            Prattville's workers' comp report.
2         MR. HOWARD:  Right.  You showed me
3            that one.  I'm just wondering is
4            there a medical record or what's
5            that based on.  I'm not saying
6            there's not one.
7         THE WITNESS:  That's the signature --
8   Q.  Whose signature is on it?  The doctor?
9   A.  I believe it's Carpenter.
10  Q.  It may be.  It may be.  I just hadn't seen it.
11     Okay.
12         And that's what, June 13?
13  A.  Yes.
14  Q.  Okay.
15         MR. GUILLOT:  I believe that's
16            Carpenter's signature on it.
17         MR. HOWARD:  Okay.
18  Q.  Is Carpenter the workers' comp doctor from the
19     City?
20         MR. GUILLOT:  Uh-huh (positive
21            response).
22         MR. HOWARD:  Okay.
23  Q.  Name all of your doctors that you sought

50 (Pages 197 to 200)

Jay Hawthorne                                         August 7, 2019

201

1       treatment from for your neck and your shoulder.
2    A.   Neck first, I started out with Townes Leigh with
3         the Lemak Group.  Then Dr. Faulkner and then
4         Swaid Swaid.  And for the shoulder was workmen's
5         comp Dr. Buggay.
6    Q.   Is that all of them?
7    A.   Uh-huh (positive response).
8    Q.   Is that a "yes"?
9    A.   Yes.
10   Q.   Can you define for me what you mean by
11        administrative work?  And that's pretty much job
12        duties and things like that.
13   A.   That would be like the position then BC Owens
14        had where he was in charge of things such as --
15   Q.   Well, I understand.  Just how do you define it?
16        Not this person did it.
17        When you say administrative work or clerical
18        work for the fire department as a BC that's got
19        a restriction, what do you mean by that?
20   A.   Are you talking about like what jobs can I
21        perform?
22   Q.   Yes.  And what duties can you perform.  One of
23        the things in your complaint says I wanted to be

202

1         an administrative BC.
2         What do you mean by that?  What are the
3         duties that you wanted to perform?
4    A.   I could have come up with new rules and regs.
5         Could have come up with a fire department
6         handbook.  I could have assisted the chief with
7         future planning as well as budgets.  I could
8         assist at a clerical level the training division
9         as well as the operations division with new
10        standard operating guidelines and rules and regs
11        which are evolving constantly.  Examples such as
12        those kind of things I could be able to do and
13        contribute to with my education and years of
14        experience.
15   Q.   Earlier we mentioned that Whaley gave you a list
16        of tasks.
17   A.   Yes.
18   Q.   Is that what he gave you?
19   A.   Yes.
20             MR. HOWARD:  I'm going to mark that so
21             we'll know what we're talking
22             about.
23        (Defendant's Exhibit 3 marked for

203

1             identification.)
2    Q.   Have we talked about all of your claims of
3         discrimination?
4    A.   Yes.
5    Q.   Have we talked about all your claims of
6         retaliation?
7    A.   Yes.
8    Q.   Have you told me about everything that you're
9         claiming as damages?
10   A.   Yes.
11   Q.   When is your next doctor's visit?
12   A.   I don't have a next doctor's visit.  I have a
13        counselor's appointment next week.
14   Q.   Do you consider a counselor to be a doctor?
15   A.   Mental health professional is different than a
16        doctor.
17   Q.   When is your next medical visit?
18   A.   I don't have one right now.
19   Q.   You said you do have a counselor's visit?
20   A.   Yes, sir.
21   Q.   Those are weekly?
22   A.   As much as possible can be, yes.
23   Q.   When do those come to an end?

204

1    A.   I don't know.
2    Q.   Do you have any medical procedure planned for
3         the future?
4    A.   No, none that I know of.  Because the doctor
5         says that my shoulder -- the workers' comp
6         doctor says he won't do any kind of
7         manipulation, because my shoulder, he would just
8         break it and ruin it forever.  And my wife has
9         an MRI for a shoulder injury that she's having
10        looked at.  Other than that I have nothing
11        planned.
12   Q.   Have you been told that you may have to have
13        surgery in the future?
14   A.   Dr. Buggay told me he wouldn't do surgery on
15        this shoulder again.
16   Q.   And that's the one that was injured?
17   A.   Yes, sir.
18   Q.   Have you made any further plans for retirement?
19   A.   Not as of yet, no.
20   Q.   Have you inquired -- well, let me ask you this:
21        If your MMI comes back with a rating of
22        impairment, what have you got planned?
23   A.   Then I'll have to retire because I don't have

51 (Pages 201 to 204)

Jay Hawthorne                                              August 7, 2019

---

205

1     any income.  I don't have workmen's comp.  I'll
2     have to retire.
3  Q.  Could you not do something else?
4  A.  In the fire department?
5  Q.  No.  To make a living.
6  A.  Yeah.  But why would I forfeit my retirement
7     check?  How about get a retirement check and
8     then go and try and find another job?  But it's
9     kind of hard to be retrained after something
10    you've been doing for 27 years.
11 Q.  That's what I was talking about.  Get your
12    retirement check and work.  Could you do that?
13 A.  Yes.
14 Q.  What did the disability folks say that you could
15    do?
16 A.  They said I could be a widget maker, and they
17    said I could be a greeter at Walmart.  And the
18    judge said I don't think Mr. Hawthorne would be
19    a very good greeter at Walmart, and the room
20    laughed.
21 Q.  But he still denied your claim?
22 A.  Yes.
23 Q.  Have you had any type of training other than as

---

206

1     a firefighter?
2  A.  No, sir.  It's the only job I've had other than
3     being a beverage salesperson for Alabama Crown
4     when I got out of AUM.
5          MR. HOWARD:  I think we're about
6              through.  Let me look over my
7              notes.  I don't anticipate any
8              more, but I'm sure there's
9              something I forgot.
10         MR. GUILLOT:  I was going to ask him a
11             few.
12         MR. HOWARD:  Okay.  Go ahead and ask
13             those and then I'll --
14         MR. GUILLOT:  Okay.
15             EXAMINATION
16 BY MR. GUILLOT:
17 Q.  Earlier Mr. Howard asked you a question about
18    Bingham and whether one of the requirements for
19    promotion to I think it was captain had been
20    waived.
21         Do you recall that question?
22 A.  Yes.
23 Q.  Okay.  Do you know if that requirement is waived

---

207

1     forever, or was it just waived for Josh Bingham?
2  A.  I don't know.
3  Q.  Okay.  So as far as you know, is it still a
4     requirement for people who are testing or --
5  A.  To the best of my knowledge, yes.
6  Q.  And you testified -- I think you were asked by
7     Mr. Howard about how much time that you were off
8     shift in the year prior to your accident.  You
9     said 50 percent.
10        Is that an estimate?  Could it have been
11    less than 50 percent?  More than 50 percent?
12 A.  It was an estimate.
13 Q.  Okay.  Describe why you believe you were being
14    harassed and having to work 24-hour shifts at
15    Station 1.
16 A.  Well, since it -- I had never seen it happen to
17    anybody who was injured on duty.  And then on
18    top of that, have to answer to subordinates.
19    And on top of that, then have to be taken out --
20    all officers of the fire department that are on
21    shift -- on a 24-hour shift, they all have
22    privileges.  They still have the use of an
23    automobile.  They have their own office.  They

---

208

1     are away from the bells.  They are away from the
2     guys getting up and making the calls.  And since
3     I was injured and I was hurting all the time
4     and then -- for two months, then I finally get
5     sent home on temporary total disability for the
6     second time, even against the wishes, you know,
7     of the workmen's comp doctor who had said the
8     prior -- over two months ago on June 13 that I
9     should be able to go home and sleep at night.
10 Q.  What do you feel the City could have done better
11    or different to accommodate you after you were
12    injured on the job?
13 A.  I think they could have put me back at my prior
14    position that I was down there, and they could
15    have even allowed me to switch with Captain
16    Bingham and do his duties because they were even
17    considering doing that for Battalion Chief Andy
18    Ellison to help him during his difficulties.
19    And I just think that that would just have been
20    the fair thing to do.
21 Q.  Okay.
22 A.  And he is also, I believe, 44 or 45, so he's
23    younger than me.

---

52 (Pages 205 to 208)

Jay Hawthorne                                                                August 7, 2019

|  | 209 |
|---|---|
| 1 | Q.  Such an accommodation would have meant |
| 2 |     eight-hour shifts? |
| 3 | A.  Yes, sir. |
| 4 | Q.  Would have meant sleeping at home at night? |
| 5 | A.  Correct. |
| 6 |          MR. GUILLOT:  I think that's all the |
| 7 |             questions I have. |
| 8 |          EXAMINATION |
| 9 | BY MR. HOWARD: |
| 10 | Q.  I've still got to look at my notes.  But just to |
| 11 |     follow up on what he said, when you gave us your |
| 12 |     knowledge that a class was waived for Bingham, |
| 13 |     was it waived for everybody that was trying out |
| 14 |     for that position? |
| 15 | A.  I don't know. |
| 16 | Q.  Do you know if it was waived because the |
| 17 |     prerequisite for that position wasn't provided, |
| 18 |     and that was a clerical error or a mistake? |
| 19 | A.  No.  I know none of the details. |
| 20 | Q.  Back to this subordinate thing again, are you |
| 21 |     talking about Brown -- answering to a |
| 22 |     subordinate that was Brown? |
| 23 | A.  Yes, sir. |

|  | 210 |
|---|---|
| 1 | Q.  He was the acting BC? |
| 2 | A.  Yes, sir. |
| 3 | Q.  And you were not acting as a BC, correct? |
| 4 | A.  No, sir. |
| 5 | Q.  Am I correct? |
| 6 | A.  Yes, sir, you're correct. |
| 7 |          MR. HOWARD:  Let me look over my |
| 8 |             notes, and I think we're about |
| 9 |             finished. |
| 10 |          (Brief recess.) |
| 11 |          MR. HOWARD:  I just have a few |
| 12 |             follow-up questions. |
| 13 |          EXAMINATION |
| 14 | BY MR. HOWARD: |
| 15 | Q.  Do you know anybody at the City of Prattville |
| 16 |     who has had a permanent accommodation? |
| 17 | A.  No. |
| 18 | Q.  Do you know if Tony Shaw was released to full |
| 19 |     duty in 2009? |
| 20 | A.  Repeat the question. |
| 21 | Q.  Do you know if Tony Shaw was released to full |
| 22 |     duty in 2009? |
| 23 | A.  No. |

|  | 211 |
|---|---|
| 1 | Q.  Mayor Gillespie, did he become mayor after 2009? |
| 2 | A.  I don't know the exact date, '10 or '11.  I |
| 3 |     don't know what it ... |
| 4 | Q.  You indicated that you wanted the captain's job |
| 5 |     that Bingham had, correct? |
| 6 | A.  I inquired about it. |
| 7 | Q.  What did you want them to do with Bingham? |
| 8 | A.  He was going to flip with me because he was next |
| 9 |     on the list, and he would become the BC. |
| 10 | Q.  And now you want the administrative BC job, |
| 11 |     correct? |
| 12 | A.  Correct. |
| 13 | Q.  If there was one. |
| 14 | A.  If there was one. |
| 15 | Q.  When you say administrative job, are you asking |
| 16 |     to take Rickey Roberts' job? |
| 17 | A.  No, sir. |
| 18 | Q.  Will you agree with me that the training BC |
| 19 |     still has to be able to completely perform his |
| 20 |     duties? |
| 21 | A.  Yes.  In every which way, yeah. |
| 22 |          MR. HOWARD:  That's all the questions |
| 23 |             I have. |

|  | 212 |
|---|---|
| 1 |          THE WITNESS:  Okay. |
| 2 |          (Deposition concluded at approximately |
| 3 |             2:17 p.m.) |
| 4 | |
| 5 |     * * * * * * * * * * * * * * |
| 6 |          FURTHER DEPONENT SAITH NOT |
| 7 |     * * * * * * * * * * * * * * |
| 8 |          REPORTER'S CERTIFICATE |
| 9 | STATE OF ALABAMA: |
| 10 | MONTGOMERY COUNTY: |
| 11 |     I, Pamela Wilbanks Owens, Registered |
| 12 | Professional Reporter, ACCR #391, and Commissioner for |
| 13 | the State of Alabama at Large, do hereby certify that I |
| 14 | reported the deposition of: |
| 15 |          JAY HAWTHORNE |
| 16 | who was first duly sworn by me to speak the truth, the |
| 17 | whole truth and nothing but the truth, in the matter of: |
| 18 |          JAY HAWTHORNE, |
| 19 |          Plaintiff, |
| 20 |          Vs. |
| 21 |          CITY OF PRATTVILLE, AL, |
| 22 |          Defendant. |
| 23 |          In The U.S. District Court |

53 (Pages 209 to 212)

Jay Hawthorne                                                    August 7, 2019

213

1            For the Middle District of Alabama
2            Northern Division
3            2:19-CV-139
4 on Wednesday, August 7, 2019.
5            The foregoing 212 computer printed pages
6 contain a true and correct transcript of the examination
7 of said witness by counsel for the parties set out
8 herein.  The reading and signing of same is hereby
9 waived.
10           I further certify that I am neither of kin nor
11 of counsel to the parties to said cause nor in any
12 manner interested in the results thereof.
13           This 20th day of August 2019.
14
15
16
17
18       _Pamela W. Owens_
         Pamela Wilbanks Owens, ACCR #391
19       License Expires:  9/30/2019
         Registered Professional Reporter
20       and Commissioner for the State
         of Alabama at Large
21
22

54 (Page 213)