# Deposition of Terry Brown

August 7, 2019

Hawthorne v. City of Prattville, Al

2:19-CV-139

Pages 1 through 53



205.545.5155
info@citedepos.com
www.citedepos.com



DEFENDANT'S EXHIBIT 14

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JAY HAWTHORNE,
       Plaintiff,
Vs.                          CIVIL ACTION NO.
                             2:19-CV-139
CITY OF PRATTVILLE, AL,
       Defendant

* * * * * * * * * *

DEPOSITION OF TERRY BROWN, taken pursuant to stipulation and agreement before Pamela Wilbanks Owens, Registered Professional Reporter, ACCR #391, and Commissioner for the State of Alabama at Large, in the Law Offices of Holtsford, Gilliland, Hitson, Higgins & Howard, 4001 Carmichael Road, Suite 300, Montgomery, Alabama, on Wednesday, August 7, 2019, commencing at approximately 2:22 p.m.

* * * * * * * * * * * *

Page 2

APPEARANCES

FOR THE PLAINTIFF:
Mr. Rick A. Howard
HOLTSFORD, GILLILAND, HIGGINS, HITSON & HOWARD
Attorneys at Law
4001 Carmichael Road, Suite 300
Montgomery, Alabama

FOR THE DEFENDANT:
Mr. Joseph C. Guillot
MCPHILLIPS SHINBAUM
Attorneys at Law
60 Commerce Street
Montgomery, Alabama

* * * * * * * * * * *

EXAMINATION INDEX

BY MR. GUILLOT . . . . . . . . . . . . . . . . . . 4
BY MR. HOWARD . . . . . . . . . . . . . . . . . . 50
BY MR. GUILLOT . . . . . . . . . . . . . . . . . 51

* * * * * * * * * * *

PLAINTIFF'S EXHIBIT INDEX

1   Composite exhibit of emails between Lisa       22
    Thrash and Jay Hawthorne
2   Return-to-work plan for Jay Hawthorne from     23
    Dr. Swaid
3   5/15/18 email from Lisa Thrash regarding Jay   26
    Hawthorne's restrictive duty status along
    with the letter and a restrictive duty task
    list

Page 3

PLAINTIFF'S EXHIBIT INDEX CONTINUED
4   Composite exhibit regarding restrictive duty   32
    status and task lists for Brett Johnson and
    Jason Ogletree
5   Workers' compensation doctor report along      34
    with several emails between Jay Hawthorne and
    Lisa Thrash
6   6/3/18, 6/11/18 and 8/1/18 Prattville Fire     39
    Department Duty Rosters

* * * * * * * * * * *

STIPULATION

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of TERRY BROWN is taken pursuant to the Alabama Rules of Civil Procedure and that said deposition may be taken before Pamela Wilbanks Owens, Registered Professional Reporter, ACCR #391, and Commissioner for the State of Alabama at Large, without the formality of a commission, that objections to questions other than objections as to the form of the question need not be made at this time but may be reserved for a ruling at such time as the said deposition may be offered in evidence or used for any other purpose by either party provided for by the

Page 4

It is further stipulated and agreed by and between counsel representing the parties in this case that the filing of said deposition is hereby waived and may be introduced at the trial of this case or used in any other manner by either party hereto provided for by the Statute regardless of the waiving of the filing of the same.

It is further stipulated and agreed by and between the parties hereto and the witness that the signature of the witness to this deposition is hereby waived.

* * * * * * * * * * *

TERRY BROWN

The witness, after having first been duly sworn to speak the truth, the whole truth and nothing but the truth testified as follows:

EXAMINATION
BY MR. GUILLOT:
Q.  Good afternoon, Chief Brown.
    Do you go by Chief Brown?
A.  Yeah. Terry Brown. Chief Brown.
Q.  Would you state your name for the record?
A.  Terry D. Brown. D is for Darryl.

Terry Brown                                                                          August 7, 2019

### Page 5

1  Q.  And we're here to take your deposition this
2      afternoon in Mr. Hawthorne's case.
3      Mr. Hawthorne has filed a complaint of
4      disability, age, and retaliation discrimination
5      against the City of Prattville for the way he's
6      been treated in his job at the Prattville Fire
7      Department. That's kind of it in a nutshell.
8      And so we're going to ask you some questions
9      concerning his case. Okay? I assume you're
10     familiar with his case that he has filed the
11     lawsuit.
12 A.  Yes.
13 Q.  Okay. Chief, have you ever had your deposition
14     taken before?
15 A.  Yes.
16 Q.  Okay. When have you taken your deposition
17     before?
18 A.  Under two arson criminal cases and one employee
19     case.
20 Q.  Okay. Where someone filed a complaint against
21     the Prattville Fire Department --
22 A.  Yeah.
23 Q.  -- just like Mr. Hawthorne?

### Page 6

1  A.  Similar. Different. But it was filed against
2      the fire department and the mayor.
3  Q.  When was that?
4  A.  I don't remember. I'll have to look back. I
5      mean, I really don't remember. 2011 or '12. I
6      was the fire chief.
7  Q.  All right. Give me a little bit of background.
8      What's your educational level?
9  A.  Associate's degree.
10 Q.  Associate degree?
11 A.  Uh-huh (positive response).
12 Q.  In what?
13 A.  Fire science.
14 Q.  Okay.
15 A.  Applied science.
16 Q.  And any other degrees you have?
17 A.  No other degrees. No.
18 Q.  What about specialties, licenses, that type of
19     thing?
20 A.  Inspections. Fire inspections, arson
21     investigation, fire origin investigation, codes
22     and standards. There's numerous that can be
23     provided.

### Page 7

1  Q.  Okay. And as far as -- what are your duties as
2      the Prattville fire chief?
3  A.  Manager.
4  Q.  Okay.
5  A.  From budgeting to staffing. Just the overall
6      management.
7  Q.  Okay. How long have you known Battalion Chief
8      Hawthorne?
9  A.  Oh, shoot. 26 --
10         MR. HAWTHORNE: 27.
11 A.  -- 27 years almost.
12 Q.  So you've been with the fire department as long
13     as he's --
14 A.  Yeah. I've been with the fire department 32
15     years.
16 Q.  So you were there before him?
17 A.  Yes, sir.
18 Q.  Okay. And were you -- as the fire chief, you
19     were supervisory over Battalion Chief Hawthorne?
20 A.  At one time I was. Not as a fire chief. For a
21     little while I was, and then we had a deputy
22     that filled my position and then the deputy
23     handled them. Ultimately he worked for me.

### Page 8

1  Q.  But as supervisor you are the top of the fire
2      chain.
3  A.  I am.
4  Q.  And he's under you somewhere?
5  A.  Yes.
6  Q.  Like second level supervisor? third level?
7  A.  It would be about the fourth level.
8  Q.  Okay.
9  A.  There's a deputy under me and there's an
10     assistant chief, and then there's the battalion
11     chiefs.
12 Q.  Okay. And so who is the assistant chief?
13 A.  Right now it's Allen Owens.
14 Q.  And where does Mike Whaley fit in?
15 A.  He's the deputy fire chief over operations and
16     training.
17 Q.  Okay. So technically isn't Whaley Battalion
18     Chief Hawthorne's immediate supervisor?
19 A.  Yes, sir.
20 Q.  As far as seniority, are there any other
21     battalion chiefs that would be senior to
22     Hawthorne?
23 A.  No. Not right now.

```
                                    9
 1   Q.   Are you aware of his age -- approximate age?
 2   A.   I'd be guessing. I don't know. I'm 55, so I
 3        would assume Jay is pushing it, you know.
 4   Q.   Okay. What about Josh Bingham? Would you have
 5        any idea how old Josh Bingham is?
 6   A.   No. He's younger than I am, you know.
 7   Q.   Is he younger than Jay?
 8   A.   Yes.
 9   Q.   Okay. What about Josh Brown? Are you aware of
10        his age?
11   A.   I'm not truly aware of his age. I know he's
12        younger than I am, and I don't know -- I don't
13        know how old Jay is to be honest with you. I
14        don't know -- Josh is older than Bingham. Brown
15        is.
16   Q.   Now, you're aware that Mr. Hawthorne was in an
17        off-duty motor vehicle accident back on March 31
18        of '17.
19   A.   The dates I would have to look up, but, yes, he
20        was in a -- advised us of a motor accident that
21        he was in.
22   Q.   And I guess he was out of work for an extended
23        period of time because of that accident?
```

```
                                   10
 1   A.   Yes.
 2   Q.   And let's see. I think -- did he come to you at
 3        some point and ask about being placed in an
 4        administrative battalion chief position?
 5   A.   I'm not -- I don't remember. I don't have an
 6        administrative battalion chief's position.
 7   Q.   But did he ever ask you about being placed in
 8        one, an administrative -- even though there may
 9        not be one on the books?
10   A.   I don't ever remember a conversation about
11        administrative battalion chief or anything. I
12        do remember we were trying to accommodate for
13        the automobile accident at that time and then a
14        workmen's comp later, continue on.
15   Q.   How did you accommodate Mr. Hawthorne for the
16        vehicle accident?
17   A.   It went on for a good bit of time staff. He
18        assisted Chief Owens, and he may have assisted
19        somebody else on some reports, getting -- maybe
20        review some equipment, I believe, out there and
21        some turnouts and stuff like that, just to try
22        to help him -- accommodate him, you know.
23   Q.   Right. I understand.
```

```
                                   11
 1        Was that done at one of the fire stations,
 2        or was that at the headquarters or main office?
 3   A.   His reporting assignment was headquarters, but
 4        he went out to the stations to get the
 5        information he needed.
 6   Q.   Okay. Back to the administrative battalion
 7        chief issue, isn't it true that at some point in
 8        the past, maybe around 2016, there had been an
 9        administrative battalion chief position?
10   A.   There could have been a battalion chief -- yes.
11        We had -- this goes back to 2008.
12   Q.   Okay.
13   A.   It started off with a ton of division chiefs,
14        four of them. And during that time we
15        started -- as they retired out, we did away with
16        the number of chiefs we had and narrowed it down
17        to one assistant chief eventually and then had
18        lower ranks break up those assignments to keep
19        the top -- to save money.
20   Q.   Sure.
21   A.   And, yes, I think -- I'm trying to think of the
22        ones that probably could have been in it.
23        Whaley could have been in it, as far as I know,
```

```
                                   12
 1        or Owens, but that's been a while back, you
 2        know.
 3   Q.   Okay. Now, isn't it true about the time that
 4        he -- he says he came to you on April 11 of 2018
 5        and talked to you about that. Isn't it true
 6        that there was someone occupying an
 7        administrative captain position at that time?
 8   A.   I have several captains, administrative. I
 9        mean, I have a captain over EMS training. I
10        have a captain over fire training. I have a
11        captain over public education, and I have a
12        captain over EMS credentialing, licensing, and
13        supply. Make sure I didn't miss anybody.
14   Q.   Was Josh Bingham one of those captains at that
15        point in time?
16   A.   In April? Yes. He was an EMS captain on
17        training division.
18   Q.   Could you have placed Hawthorne in that position
19        instead of Bingham?
20   A.   I mean, I don't understand. Why would I? I
21        mean, I'm trying to figure out what you're
22        saying. It's occupied by Captain Bingham.
23   Q.   Right. He's asked for an administrative
```

3 (Pages 9 to 12)

### Page 13

1  battalion chief is what he's told us but that
2  there was no such position at the time or that
3  the City's budget didn't have but four, I
4  think --
5  A. Yes, sir. Four.
6  Q. -- battalion chiefs.
7     Well, if you had an administrative captain
8     position, then did he ask you for that position
9     instead?
10 A. I don't remember that. Not saying he didn't. I
11    just don't remember it. But, I mean, it's not a
12    battalion chief's position. It's a captain.
13 Q. Right. Right.
14 A. Yeah.
15 Q. Was the plan to promote Josh Bingham to
16    battalion chief?
17 A. We had --
18    MR. HOWARD: Object to the form.
19         When?
20    MR. GUILLOT: Around April, May 2018.
21 A. I don't know when he got promoted to be honest.
22    I'll have to look back. I think it was in '18.
23    We had a vacancy on shift, and we promoted the

### Page 14

1  next one on the list, which was Bingham. Well,
2  he was the first one on the list. It was a new
3  list basically.
4  Q. So could you not have put Hawthorne in the
5     administrative captain position if he asked you
6     for that and then moved Bingham on up to the
7     battalion chief position?
8  A. I can't do that. I would have to ask -- we have
9     to go through the process. I don't get to make
10    decisions on what ranks are in budgeting. I
11    present a budget, and the budget is voted on by
12    the council, so I can't say that I'm going to
13    put a battalion chief acting as a captain, if
14    that's what you're asking me.
15 Q. Right. But you would not have been adding a
16    battalion chief position. You would have had
17    the same number of battalion chiefs. You would
18    have just been swapping Bingham from captain to
19    battalion chief and Hawthorne from battalion
20    chief to captain.
21 A. Oh, he was going to take a demotion to go to
22    captain?
23 Q. That's what he says he asked for.

### Page 15

1  A. If that was the case, I would have had to go
2     through the proper process.
3  Q. But you say you don't know if he asked you that
4     or not.
5  A. I don't remember it. I just don't.
6  Q. But you don't deny that he did?
7  A. Oh, no, sir. I just don't remember it.
8  Q. Okay. If Mr. Hawthorne or Battalion Chief
9     Hawthorne came to you and asked for such a
10    transfer or such an accommodation, would it have
11    been within your purview or responsibility to
12    help him get that accommodation?
13 A. I would have done anything, just like I do for
14    everybody, just like I tried to help Chief for
15    over two years now.
16    MR. HOWARD: When you say Chief, who
17         are you referring to?
18 A. Chief Hawthorne, over two years, in
19    accommodating him for his injury. If he would
20    have come to me about that, we would have moved
21    the process. But I just don't remember him ever
22    coming to me about Captain Bingham's captain
23    position.

### Page 16

1  Q. Okay. Back in that time frame around April of
2     2018, did the City of Prattville have a policy
3     about disability discrimination and
4     accommodating people for disabilities?
5  A. Through HR -- we refer everybody through our
6     human resources. And our the policies and the
7     federal government, I think, tells what we do on
8     accommodations, if you're talking about if
9     somebody is hurt.
10 Q. Yes, sir.
11 A. If they bring a doctor's excuse, they turn it
12    into us. We turn it into HR. And if we can
13    accommodate on their restrictions, we
14    accommodate them. And it's basically off the
15    doctor's -- whatever the doctor says a person
16    can do.
17 Q. Okay. So you're familiar with the term -- if I
18    say request for accommodation, you're familiar
19    with that? You've had people approach you --
20 A. Light duty request, yeah. If they are being
21    restricted by a doctor for some treatment or
22    something like that, if that's your question.
23 Q. Do you know if the City of Prattville receives

Terry Brown									August 7, 2019

```
                                            17
 1      federal funding?
 2   A. Yeah.  We receive grants, you know.  The fire
 3      department has received federal money.
 4   Q. And is that to buy more fire trucks or
 5      something?
 6   A. The fire department's side of it is to support
 7      two teams we have -- a swift water and a heavy
 8      rescue team -- that deploys throughout --
 9      wherever they are needed.
10   Q. Okay.  All right.  I'll ask this question:  If
11      he came up to you and said, hey, Chief, I'd like
12      to be put in an admin position, either
13      administrative battalion chief or administrative
14      captain, would you have told him or did you tell
15      him that doing so would be an undue burden for
16      the Prattville Fire Department or the City of
17      Prattville?
18          MR. HOWARD:  Object to --
19   A. I've never said that.
20          MR. HOWARD:  -- the form.
21              You can answer.  When I
22          object to the form, it's just
23          something lawyers do to preserve
```

```
                                            18
 1          for later.
 2          THE WITNESS:  Okay.
 3   Q. If he does that, you can still answer the
 4      question if you understand it.
 5          Were you, sir, or was the City of Prattville
 6      waiting for Battalion Chief Hawthorne to retire
 7      medically and then be able to put Captain
 8      Bingham or now Battalion Chief Bingham into his
 9      position?
10   A. No.
11   Q. When he asked or he says he asked about an
12      administrative position, did you consider the
13      possibility of putting him into one of the four
14      administrative captain positions you say you
15      have?
16          MR. HOWARD:  Object to form.
17   A. I don't remember him asking.
18   Q. When he was injured in the motor vehicle
19      accident back in March of '17, he went on FMLA
20      leave for some period of time, correct?
21   A. Yeah, I'm sure.
22          THE WITNESS:  That's right, isn't it,
23          Lisa?
```

```
                                            19
 1   Q. Is that --
 2          THE WITNESS:  Filed for FMLA?
 3          MR. HOWARD:  She can't --
 4          THE WITNESS:  Oh, I'm sorry.
 5          MR. HOWARD:  She's going to get sworn
 6          in.
 7          THE WITNESS:  My bad.
 8          MR. HOWARD:  Just tell him what you
 9          know.
10   Q. That's a better question probably for --
11          MR. HOWARD:  There's no tag team
12          depositions.  If you don't know,
13          say I don't know.  I don't have a
14          clue.
15          MR. GUILLOT:  That's a fair answer if
16          you didn't know.
17   Q. Once his FMLA was exhausted, which would have
18      been around July 7 of '17, do you recall him
19      having to use personal leave after that
20      expiration?
21   A. I don't know if it was for that reason.  He has
22      used personal leave, yes.  I can remember the
23      duty rosters, the daily activities that are
```

```
                                            20
 1      filed daily where he's using time or whatever it
 2      is.
 3   Q. Are others allowed to be on personal time
 4      without having to take personal leave if they
 5      are injured?
 6   A. Say that again.
 7   Q. Are employees -- Prattville Fire Department
 8      employees allowed to be off of work without
 9      having to use personal leave?
10   A. If they have sick leave, they have to use it.
11      If they don't have any leave, they are off on a
12      no pay status.
13   Q. Have you ever donated leave to someone who was
14      unable to return to work?
15   A. Yes.
16   Q. Did you ever donate any leave to Battalion Chief
17      Hawthorne?
18   A. No.
19   Q. Okay.  You were copied along with Mayor
20      Gillespie and I think Deputy Chief Whaley --
21   A. Uh-huh (positive response).
22   Q. You were copied on messages from Ms. Thrash to
23      Battalion Chief Hawthorne on a number of emails.
```

5 (Pages 17 to 20)

Terry Brown                                                                August 7, 2019

**Page 21**

1   Do you recall receiving one dated April 4 of '18
2   in which she was telling him if he couldn't
3   return to work full duty by, I think it was, the
4   22nd of April, that he would have to pursue his
5   options to retire?
6   A.   (Witness nods head negatively.) I don't recall.
7       I get hundreds of emails a day. You would have
8       to further --
9              MR. HOWARD:  It's okay. You can't
10                 shake your head. You've got to --
11             THE WITNESS: Oh, yeah.
12             MR. HOWARD: -- verbalize it. I
13                 thought you were going to go
14                 huh-uh.
15  A.   You'll have to refer to the record. I get tons
16       of emails.
17  Q.   I'll show you that email.
18  A.   Okay.
19             MR. GUILLOT: This is one of your
20                 exhibits, and I just kept them all
21                 together, but the main thing I'm
22                 looking at is the first page.
23             MR. HOWARD: Okay.

**Page 22**

1              MR. GUILLOT: I'm going to mark that
2                  as Exhibit 1.
3              (Plaintiff's Exhibit 1 marked for
4                  identification.)
5   Q.   Do you see your name up there in the cc's?
6   A.   I do.
7   Q.   The part I'm referring to is the fourth
8       paragraph down.
9   A.   Yes, sir.
10  Q.   And then the fifth also.
11  A.   Yes, I'm aware of the email.
12  Q.   And so were you supportive of that plan: if he
13       couldn't come back to work by April 22, then he
14       should retire?
15  A.   I think that in other situations, which I'm not
16       going to say -- I can't recall names, but that
17       just seemed like an obvious option -- you know
18       what I mean -- if he's not to return full
19       status.
20  Q.   Okay. Is there some reason why he could not
21       continue on being accommodated?
22  A.   Accommodations in my opinion are temporary, and
23       we've done a lot in this situation to

**Page 23**

1       accommodate Chief Hawthorne, above and beyond in
2       my opinion. The goal was to continue to
3       accommodate him until he -- my goal was for him
4       to return to work. I needed him.
5   Q.   And isn't it true that he was really trying to
6       do that?
7   A.   He was going through -- my understanding, he was
8       doing everything he was -- by his doctors and
9       keeping us updated.
10  Q.   Right. And then indeed he was able to get his
11       doctor to clear him to return to work.
12  A.   Yes.
13  Q.   I'll show you what I'm marking as Exhibit 2.
14             (Plaintiff's Exhibit 2 marked for
15                 identification.)
16  A.   Yes.
17  Q.   So he was trying to get back to work, and he was
18       cleared to come back to work.
19             Do you recall when he finally did come back
20       to work?
21  A.   Yes.
22  Q.   May 2, right?
23  A.   I don't know the date. I don't when he came

**Page 24**

1       back.
2   Q.   Do you recall what happened on May 2?
3   A.   If it's May 2, we had a pinning ceremony that
4       morning at City Hall. I talked to Chief
5       Hawthorne a little bit that morning. We had a
6       scheduled PT test, and Chief Hawthorne was
7       injured during the PT test. I was notified by
8       Deputy Chief Whaley.
9   Q.   Okay. Since he returned to full duty, I guess
10      you expected him to continue and do what he was
11      required to do, the PT test included, right?
12  A.   Yes. He didn't -- I mean, the PT test is not
13      punitive or -- you just -- if you don't want to
14      do any part of it, you don't have to. That's
15      explained at the beginning of any PT test as far
16      as ...
17  Q.   So if he didn't want to, he didn't have to do
18      it?
19  A.   No. He can walk it or portions of it. It's not
20      punitive. It's just trying to initiate exercise
21      for the people on shift.
22  Q.   Oh. So it's just exercise. It's not like an
23      evaluation you have to --

6 (Pages 21 to 24)

## 25

1  A.   We evaluate them for them to let them know where
2       they are at through a peer fitness program, and
3       it's basically for their health.
4  Q.   And so he was injured that day?
5  A.   He was.
6  Q.   Okay. And ended up going on workers' comp?
7  A.   Yes, sir.
8  Q.   And I guess Deputy Chief Whaley is the one that
9       handled the workers' comp paperwork and so
10      forth?
11 A.   Yes.
12 Q.   So that was May 2.
13      May 7, do you recall the workers' comp
14      doctor, Dr. Carpenter, said he could come back
15      to work light duty?
16 A.   If that's the date. He came back light duty,
17      yes.
18 Q.   And then he was told by Chief Whaley -- he was
19      given a memo by Chief Whaley that gave him some
20      restrictions.
21 A.   Yes.
22 Q.   Did Chief Whaley put that restrictions letter
23      through you before he gave it to Hawthorne?

## 26

1  A.   It's reviewed by me and HR. Any light duty
2       restrictions are approved by the fire chief and
3       the human resources department.
4           MR. GUILLOT: I'm going to mark this
5              as Exhibit 3.
6           (Plaintiff's Exhibit 3 marked for
7              identification.)
8  Q.   This is an email from Ms. Thrash. It's a cover
9       email that was sent to Mr. Hawthorne, and it has
10      the restrictions letter on the back on the
11      second page.
12      Do you recognize that document?
13 A.   Yes.
14 Q.   Okay. And were you cc'd on the document as
15      well?
16 A.   Yes, I am.
17 Q.   Okay. Down in the -- I guess in the bullets on
18      the second page -- second page -- I'm sorry.
19 A.   Yes.
20 Q.   That's the third page. There you go.
21      In the bullets where it says unless
22      otherwise approved by the fire chief, it's got
23      dress. It says no operation of department

## 27

1       vehicles.
2       Do you know why that was put in there?
3  A.   Either we decided on his restrictions or -- I
4       can't remember was he eight to five or 24 hour
5       at this time.
6  Q.   This was actually a 24-hour restriction, I
7       believe.
8  A.   One of the reasons -- there was no need -- we
9       were trying to accommodate him to keep receiving
10      pay, and he was reviewing reports and helping
11      them with time, and there was no need for a
12      vehicle. And, really, there's not but one
13      vehicle up there the battalion chief runs. We
14      have some primary pullers that are used to pull
15      boats and stuff, but this restriction here,
16      there's no need for him to have a vehicle.
17 Q.   Okay. As a battalion chief -- and I know he was
18      not -- technically not acting at a battalion
19      chief on shift capacity at that time, but what
20      would have been the problem with allowing him to
21      use a vehicle if he needed one?
22 A.   I don't see why he would need one. I didn't
23      want him responding to emergency calls. He's on

## 28

1       a restricted duty. Can't pick up but 15 pounds,
2       so I don't see a need of him having a vehicle.
3       We're trying to accommodate him, and we were
4       trying to figure out -- he was going to help
5       them with reports.
6  Q.   And in the last bullet at the bottom there, it
7       says, you will be allowed to leave one hour for
8       lunch and one hour for dinner on each shift.
9  A.   Yes.
10 Q.   So he's expected to be there 24 hours, and he
11      can leave an hour for lunch and an hour for
12      dinner, basically a captive for 22 hours?
13 A.   Everybody works 24 hours. You're there 24
14      hours.
15 Q.   Okay. Everyone who is there are firefighters or
16      battalion chiefs or captains or sergeants who
17      can respond to fires and emergencies, right?
18 A.   Yes.
19 Q.   Could Hawthorne have responded to an emergency?
20 A.   No. I didn't want him to.
21 Q.   Could Hawthorne have gone to a fire?
22 A.   There was no need in him to go to a fire.
23 Q.   So what was the need of him being there 24 hours

## Page 29

1  and only leaving two hours a day?
2  A.  Just trying to accommodate Chief Hawthorne in a
3      light duty status.
4  Q.  Could he not have been put at the same job he
5      had when he was accommodated before he was
6      injured in a PT test?
7  A.  When we accommodate somebody -- basically there
8      was not much work for him to do when he was
9      eight to five down there helping us. We were
10     finding him stuff to go around and just do
11     mainly to accommodate him, to help him get
12     through this. And we do that for anybody on
13     accommodations, and we just didn't -- I mean,
14     the 24 hour -- I really thought he was getting
15     ready to transition back. It was an injury to
16     his shoulder. But it still doesn't matter. We
17     were accommodating him. I was accommodating him
18     on his time.
19 Q.  And in that letter in the top part of it, it
20     says that the fire chief, that's you, has
21     decided to accommodate his condition by allowing
22     him a restrictive duty status. It begins May
23     20, 2018, which is the start of the next pay

## Page 30

1      period. Please report to Station 1 under the
2      direction of Acting Battalion Chief Josh Brown.
3  A.  Yes.
4  Q.  Okay. An acting battalion chief, isn't that a
5      captain?
6  A.  No. It's a battalion chief.
7  Q.  Acting battalion chief?
8  A.  Yes. He's getting paid as a battalion chief.
9  Q.  Okay. But is there some kind of rank insignia
10     that's worn by --
11 A.  Yes.
12 Q.  What rank insignia did he wear?
13 A.  He's wearing his captain bars, and he moved up
14     as an acting BC.
15 Q.  During your tenure as chief, has any other shift
16     employee been put on the same type of
17     restrictive duty accommodation before Battalion
18     Chief Hawthorne?
19 A.  About not driving a vehicle or ...
20 Q.  Yes, sir.
21 A.  Depends on what the injuries are and depends on
22     what there is -- what their job status is. Yes,
23     we've had 24 hour before Chief Hawthorne that

## Page 31

1      we've accommodated. To this day we're
2      accommodating.
3  Q.  Can you tell me who that was that you
4      accommodated that way?
5  A.  Right now it's Jason Law. He's a sergeant.
6  Q.  Okay. Then let me change the question on you.
7      Have you ever had a battalion chief that you
8      accommodated by putting him on 24-hour shifts
9      before?
10 A.  No.
11 Q.  So that's kind of a first?
12 A.  Yes.
13 Q.  Okay. Both of these officers --
14         MR. GUILLOT: They were your Exhibit
15     16 or request for production
16     Response No. 16.
17         I'm going to put them in as
18     one exhibit. These are Ogletree's
19     and Johnson's restrictive duty
20     status.
21     MR. HOWARD: Okay.
22     MR. GUILLOT: I'll mark them as
23     Exhibit 4.

## Page 32

1         (Plaintiff's Exhibit 4 marked for
2             identification.)
3  Q.  This is from you. This is not from Deputy Chief
4      Whaley.
5      Why is it that Johnson and Ogletree were not
6      precluded from driving when they were on
7      restrictive duty?
8  A.  I'll have to read this a second. I don't
9      remember. It was just going -- a cardiac -- he
10     had to report to a cardiologist, and it didn't
11     limit his status. And we probably had a
12     position -- if he drove, that's what he did. He
13     was assigned to desk work only, so evidently he
14     was assigned desk work only by this document.
15 Q.  If he was assigned to desk work only, why does
16     he need to drive a vehicle?
17 A.  I don't know if he drove one or not.
18 Q.  He was allowed to.
19 A.  I don't know if he drove one or not.
20 Q.  On the next page it says he was allowed
21     nonemergency use of department vehicles for
22     deliveries.
23 A.  Then he was, then. I think he was waiting, as

```
                                                33
 1     this said, for a cardiologist appointment.
 2  Q. Same question for Ogletree. He was allowed to
 3     drive, and it specifically says for nonemergency
 4     use.
 5  A. Again, I don't know if he drove a vehicle or
 6     not, but if he was allowed to by these
 7     restrictions, then he could have.
 8  Q. Okay. Do you know how old Ogletree and Johnson
 9     are?
10  A. No, sir, I don't.
11  Q. Would they be substantially younger than
12     Mr. Hawthorne?
13  A. I really don't know. I think they are younger
14     than Chief Hawthorne, yes.
15  Q. Were you ever advised that Hawthorne had asked
16     to be allowed to sleep at home? I'm talking
17     about after he was -- injured his shoulder and
18     he was on the 24-hour light duty restriction,
19     are you aware that he had made, I guess,
20     requests to be able to sleep at home instead of
21     in the fire department?
22  A. I would have to look at the document. I don't
23     remember him asking me.
```

```
                                                34
 1  Q. Okay.
 2          MR. GUILLOT:  This is a composite of
 3              exhibits, but I'm going to put
 4              them all as Number 5.
 5          (Plaintiff's Exhibit 5 marked for
 6              identification.)
 7  Q. I'll represent to you that Chief Hawthorne was
 8     asking about being allowed to sleep at home.
 9     And according to this second page of this
10     exhibit -- it's some email messages --
11     Ms. Thrash is commenting that she had received
12     LPC Baker's request that he be allowed to sleep
13     at home. Okay.
14          So Ms. Thrash is acknowledging that, and
15     you're one of the recipient's of that email on
16     the very bottom of the email.
17          MR. HOWARD:  Where's that at right
18              there?
19          MR. GUILLOT:  Right there.
20          THE WITNESS:  Oh, okay. Here we go.
21  Q. And then Chief Hawthorne responds back to her
22     and says, I wonder if you received
23     Dr. Carpenter's 6/13/18 report recommending
```

```
                                                35
 1     instructions about sleeping at home. And she
 2     then responds back on June 19 saying, we're
 3     providing appropriate accommodations --
 4          And you're copied on this one as well, sir.
 5  A. Yes.
 6  Q. -- we're providing appropriate accommodations
 7     for light duty restrictions. If you decide to
 8     sleep at home during your shift, it will be
 9     assessed against your accrued leave time. That
10     is the report from Dr. Carpenter.
11          Were you in agreement with Ms. Thrash's
12     assessment even though the workers' comp doctor
13     said please allow him to sleep at home?
14          MR. HOWARD:  If possible.
15          MR. GUILLOT:  If possible.
16  A. Right.
17  Q. On June 19 she responds saying, we're providing
18     appropriate accommodations. Basically we're not
19     going to let you sleep at home unless you use
20     your leave.
21  A. Yes, I agree.
22  Q. You do? Okay.
23          Why would it have not been possible for
```

```
                                                36
 1     Chief Hawthorne to sleep at home even though
 2     he's on 24-hour shift? Just go home and sleep
 3     and come back?
 4  A. The whole thing is to get his time in, trying to
 5     help him. In my opinion this is what -- we're
 6     helping him. We're accommodating him under a
 7     light duty status.
 8  Q. Is it helping him if he's got to sleep in a bed
 9     that's not comfortable and causing him to
10     continue hurting and not heal properly?
11  A. He slept in the bed for years, you know. I
12     don't understand what the problem is. We spend
13     a lot of money on beds, and I, too, agree that I
14     didn't see how this was affecting him.
15  Q. So even though his doctor says --
16  A. If possible.
17  Q. -- let him sleep at home if possible --
18  A. If possible.
19  Q. -- it wasn't possible to let him sleep at home?
20  A. I mean, we can go back and forth, and you're the
21     attorney, but we were trying to accommodate
22     Chief Hawthorne where he can receive a check --
23  Q. Okay. Well --
```

9 (Pages 33 to 36)

## Page 37

1  A.  -- from the beginning of the car wreck to this.
2      I'm sorry. But I just ...
3  Q.  But this was after the on-the-job injury.
4  A.  Yes.
5  Q.  Okay. And this is after he's put on 24-hour
6      shifts and having to work under Josh Brown and
7      not being able to drive a car and not able to
8      sleep because he's in so much pain and the
9      workers' comp doctor is asking if possible he
10     could sleep at home, and he's not.
11 A.  I agree with Ms. Thrash's statement or email.
12 Q.  Okay. Before Battalion Chief Hawthorne was
13     injured in the auto accident, was Josh Brown one
14     of his subordinates?
15 A.  He's a subordinate of Chief Hawthorne, yes.
16 Q.  Was Josh Bingham one of Chief Hawthorne's
17     subordinates?
18 A.  If you go by rank, everybody below the rank of
19     BC is Chief Hawthorne's subordinate. But I
20     think it depends on -- Captain Whaley at the
21     time would have been -- I mean, Captain Bingham
22     would have been staff, so it would have been a
23     subordinate of Chief Roberts.

## Page 38

1  Q.  If Brown -- now we're talking about Josh Brown
2      who was Captain Brown who became acting chief --
3      Battalion Chief Brown -- was promoted to acting
4      battalion chief, why is he in the roster as
5      captain?
6  A.  It's a acting battalion chief. His personal
7      election form would reflect that he's an acting
8      battalion chief.
9  Q.  Well, I agree, and I'm looking at it right here.
10     But in the roster, why is he annotated as
11     captain?
12 A.  The roster is just a guide for us. It plays no
13     purpose of -- it's just for us, the chiefs on
14     shift, to know who is going to be assigned to
15     them. And we have a big change in roster every
16     year when we want to move somebody. We usually
17     try to do it the first of December and effective
18     January 1.
19 Q.  Do all of the firefighters and officers who are
20     on shift at the time have access to that roster?
21 A.  Yes. It's filed through the battalion chief's
22     office.
23 Q.  And so they are able to see the rosters that

## Page 39

1      show that Captain Brown is over Battalion Chief
2      Hawthorne on the roster?
3  A.  At the time he's a acting battalion chief. I
4      would call them -- Chief Hawthorne is a senior
5      battalion chief, and we are accommodating him.
6      But at the time, they are equal as a acting
7      battalion chief.
8           (Plaintiff's Exhibit 6 marked for
9            identification.)
10 Q.  I'll show you Exhibit 6. In this particular
11     exhibit, these are three rosters: one is from
12     June 3, 2018, June 11, 2018, and then August 1,
13     2018. These all show that Battalion Chief
14     Hawthorne was under Captain Josh Brown.
15 A.  Yes, it shows Chief Hawthorne on the list
16     underneath the name of Josh Brown.
17 Q.  Right. Do you see how that might be humiliating
18     to Chief Brown -- Chief Hawthorne?
19 A.  I see accommodation being made 24 hours to help
20     Chief Hawthorne is what I see.
21 Q.  That previous exhibit, I think it was 5 --
22          MR. HOWARD: Yeah.
23 Q.  So June 13 -- the first page of that exhibit,

## Page 40

1      June 13, 2018 is when Dr. Carpenter said please
2      allow him to sleep at home. It wasn't until the
3      third page of that exhibit, Monday, August 13,
4      that Ms. Thrash sent Chief Hawthorne a message
5      saying sorry, we can't give you the temporary
6      accommodation anymore. You're released to home
7      on workers' comp. Right?
8  A.  Right.
9  Q.  Why is it that it was two months between the
10     doctor's recommendation and the City sending him
11     home on workers' comp?
12 A.  It's called temporary accommodation. There was
13     no end in sight in my opinion. That's my
14     opinion. I didn't make the decision but agreed
15     with it.
16 Q.  What happened on or about August 13 that drove
17     that decision to, hey, you're not accommodated
18     anymore; you're going home?
19 A.  I just said it. I just stated that I couldn't
20     see an end in sight in this. Chief Hawthorne
21     wasn't staying the full 24 hours.
22 Q.  Was it your decision -- I mean, you just came up
23     and said, hey, that's it?

```
                                                41
1   A.   No. Ultimately it was the mayor's decision.
2   Q.   So the mayor decided?
3   A.   If I'm not mistaken.
4   Q.   Did somebody recommend to the mayor that the
5        accommodation end and the mayor just approved
6        it, or did the mayor come up with that on his
7        own and everybody else went along with it? How
8        did that decision come about?
9   A.   I went along with it. I mean, I can remember
10       it. We had no end in sight. We were working on
11       over two years in accommodating in different
12       areas.
13  Q.   But the first year was because of an auto
14       accident.
15  A.   And we accommodated --
16  Q.   And the second year was because of an on-the-job
17       injury, right?
18  A.   Yes.
19  Q.   Back to the request to sleep at home, I guess
20       I'm -- I've been in a fire station, but I guess
21       battalion chiefs have their own offices.
22  A.   Most all officers have their own offices, yes.
23  Q.   And their own offices include their own beds in
```

```
                                                42
1        their own offices?
2   A.   The offices have beds, yes.
3   Q.   Which makes it a lot easier to be able to sleep
4        during that 24-hour shift?
5   A.   I don't understand the difference. It's a fire
6        station.
7   Q.   Well, I mean, if you're sleeping with the
8        firefighters -- do they have dorm arrangements,
9        or how does --
10  A.   Yes. They have an individual room. It does not
11       have a door. It has a curtain on it. Same bed
12       basically. Well, the officers may have Murphy
13       beds that let down where the battalion chiefs
14       and the captains sleep.
15  Q.   Get a little bit more room in the office?
16  A.   It's room for a bed.
17  Q.   But isn't it -- have you been a battalion chief
18       before?
19  A.   I slept in one of the offices, yes.
20  Q.   Wouldn't you agree that it would be easier for a
21       battalion chief to sleep in his own office on
22       his Murphy bed than it would be to sleep with
23       the firefighters in a dorm kind of arrangement?
```

```
                                                43
1   A.   I never had a problem with it. The bells and
2        all are the same everywhere. And as a chief, as
3        I was, I'm listening to everything going out
4        anyway.
5   Q.   A lot of these emails from Ms. Thrash have you
6        as an addressee. You're cc'd on them.
7   A.   Yes.
8   Q.   Do you send any email?
9   A.   I send very few emails.
10  Q.   Ever send an email that concerns Chief
11       Hawthorne?
12  A.   Not unless it's a group and talking to the BCs
13       or a change in something that's going on
14       policy-wise. I can't remember. You'll have to
15       produce a document that you're talking about.
16  Q.   Well, that's the thing. I don't have any.
17  A.   I don't send many emails. I respond back to
18       emails, but usually I don't send many emails at
19       all to anybody.
20  Q.   Ms. Thrash has sent a lot of email concerning
21       Chief Hawthorne's position --
22  A.   Yes.
23  Q.   -- his condition, and his accommodations and
```

```
                                                44
1        what's going on with him. I don't see any
2        responses or comments from you in email or from
3        the mayor for that matter.
4   A.   I receive their email. If we got something to
5        talk about, we talk in person concerning these
6        individuals that are light duty or what the
7        accommodations are.
8   Q.   Okay.
9             MR. GUILLOT: Let's take a short
10            break.
11            (Brief recess.)
12            MR. GUILLOT: I just have a few more
13            questions.
14  Q.   (Continuing by Mr. Guillot) With regard to
15       requests for accommodations and restrictive duty
16       status and that type of thing, how are decisions
17       made in the City of Prattville or Prattville
18       Fire Department?
19  A.   Concerning light duty status?
20  Q.   Yeah.
21  A.   Well, it's evaluated by whatever the doctor
22       gives us, and then it's -- we look at their
23       restrictions to see if we can accommodate, and
```

### Page 45

```
 1      then HR looks at it.  And if we can fulfill an
 2      accommodation for somebody, we do.  That's
 3      common practice.
 4  Q.  Okay.  Who is in on the decision to accommodate,
 5      not accommodate, what the accommodation is?
 6  A.  Me and the HR department.
 7  Q.  That's it?
 8  A.  As far as I know.  And the doctor.
 9  Q.  Not the mayor?
10  A.  No, not that I know of.
11  Q.  Okay.  Do you know if the city's personnel
12      manual addresses how such decisions are supposed
13      to be made?
14  A.  I'd have to refer to the document.  It talks
15      about the different type leaves you use in
16      there.
17  Q.  Okay.  What about accommodation requests?  Does
18      the manual address that?
19  A.  I'd have to review the manual.
20  Q.  Okay.  Earlier you said that the City had been
21      accommodating Chief Hawthorne for two years
22      while he was basically -- he was injured.
23  A.  Yes.
```

### Page 46

```
 1  Q.  Okay.  Well, isn't it true that the first year
 2      approximately was for an off-duty accident?
 3  A.  Yes.
 4  Q.  And then the second part of that started on May
 5      2 with an on-the-job injury, right?
 6  A.  Yes.  If that was the date for the PT test, yes.
 7  Q.  May 2.  That's correct.  Of '18.
 8          And then it ended about four months later on
 9      August 13 when Chief Hawthorne was sent home; is
10      that right?
11  A.  If that's the date, yes.
12  Q.  Okay.  I think your comment earlier was that's
13      enough.  That's why you agreed with Ms. Thrash's
14      assessment.  That was enough.
15  A.  They are all temporary assignments, and, I mean,
16      that's the way I take it.
17  Q.  Okay.  Is there some policy manual for the City
18      of Prattville that addresses that, how much time
19      you give somebody on an accommodation?
20  A.  Not that I -- I don't know -- that I'm aware of.
21      I don't know.
22  Q.  Also a little bit earlier you said that when
23      Chief Hawthorne was on eight-hour shifts there
```

### Page 47

```
 1      wasn't enough work for him to do and therefore
 2      you weren't going to let him come back to that
 3      accommodation.
 4  A.  Yeah.  We were finding things for him to do,
 5      yes, to help him, to accommodate him, so he
 6      could draw his check.
 7  Q.  Okay.
 8          (Brief interruption.)
 9  Q.  I think my question -- I had already said my
10      question about the eight-hour shifts.  There was
11      not enough work to be done.
12  A.  Yes.  It had gone on for a long period of time,
13      and actually we were just finding things for
14      Chief Hawthorne to do.
15  Q.  Okay.  When he was sent back on 24-hour shifts,
16      did you find there was a lot more work for him
17      to do while he was on 24-hour shifts?
18  A.  No.  But I did know that he could look over the
19      reports because that was his -- he ran the
20      reports.  He did time, and he could assist them
21      with at least the paperwork and reviewing the
22      150s and documents handled by that office.
23  Q.  Couldn't if he had been on eight-hour shifts --
```

### Page 48

```
 1      seven to five, eight to five, whatever you want
 2      to call it -- and do the same thing at the fire
 3      station?
 4  A.  Just trying to convert him back to where he was
 5      at on his 24-hour status, and we've accommodated
 6      before, you know, the same way.
 7  Q.  Okay.  But you know it wasn't working out well
 8      for him because he was in a lot of pain.
 9      Couldn't he have been allowed to work eight-hour
10      shifts five days a week reviewing reports, doing
11      the job that he could do instead of having him
12      work 24-hour shifts?
13  A.  My opinion, I thought he would be better off
14      helping the shift where he came from on their
15      reports.  I have people assigned to tasks at
16      headquarters that do the reports down there.
17  Q.  Earlier when asked a question about whether
18      Chief Hawthorne could have basically swapped
19      positions with Captain Bingham and worked an
20      administrative position, isn't it true that that
21      accommodation was actually done for Battalion
22      Chief Ellison?
23  A.  Working staff?
```

Terry Brown                                                        August 7, 2019

---

**49**

1  Q.  Well, wasn't Battalion Chief Ellison demoted to
2      administrative captain and Bingham moved up to
3      battalion chief?
4  A.  Best I remember, Chief Ellison was demoted under
5      a discipline to captain on shift. He didn't
6      just go straight down to headquarters. He was
7      on Engine 2, I think, downtown when he was
8      demoted.
9  Q.  So he didn't move into --
10 A.  Now, he did -- he had a medical situation, that
11     the doctor said he no longer could do his job,
12     and he was filing on a medical. And I think --
13     I don't know how long he was down there. We
14     would have to refer to the records how long he
15     was captain down there. But he also used some
16     leave time to go to doctor's appointments and
17     stuff like that.
18 Q.  Okay. And during that time do you know if he
19     was given an administrative captain position?
20 A.  No.
21     Captain Ellison?
22 Q.  Well, he was battalion chief, but then he became
23     a captain.

---

**50**

1  A.  No. He was not given anything administrative
2      but an accommodation until he could retire.
3          MR. GUILLOT: That's all the questions
4      I have.
5          MR. HOWARD: I've got a couple.
6          EXAMINATION
7  BY MR. HOWARD:
8  Q.  Was Hawthorne ever offered the position of
9      assistant chief?
10 A.  Yes.
11 Q.  Tell me about that.
12 A.  I had budgeted for an assistant fire chief, and
13     we had two eligible and there was a process. I
14     was out of town. Chief Hawthorne was offered
15     the position. I had told Chief Whaley to
16     contact him and offer Chief Hawthorne the
17     position as assistant fire chief. He said that
18     Chief Hawthorne wanted to talk to his wife or --
19     to that, and I said fine, he could talk to his
20     wife. And then I think he turned down the job
21     but later called back wanting it back, but it
22     was past the deadline.
23 Q.  And then somebody else got it?

---

**51**

1  A.  Chief Owens did.
2  Q.  Has anybody donated time to somebody else since
3      Mayor Gillespie has been in office?
4  A.  No.
5  Q.  Is that even a thing now?
6  A.  No.
7          MR. HOWARD: That's all I have.
8          EXAMINATION
9  BY MR. GUILLOT:
10 Q.  Is there any documentation to show that Chief
11     Hawthorne was offered the assistant fire chief
12     position?
13 A.  I'll have to refer to the records. I know it
14     was posted. But I know for a fact he was
15     offered it.
16 Q.  Okay. Is there any formal offer or written
17     offer or letter, an email, something that shows,
18     hey, we're offering you the position?
19 A.  No. I told him to contact -- I was out of town,
20     and I didn't want to wait until I got back to
21     let him know that we were offering him the job.
22     And he was offered the job and turned it down.
23 Q.  Did he say why he was turning it down?

---

**52**

1  A.  No. Not to me.
2          MR. GUILLOT: That's all we've got.
3          (Deposition concluded at approximately
4      3:45 p.m.)
5
6          * * * * * * * * * * * * *
7          FURTHER DEPONENT SAITH NOT
8          * * * * * * * * * * * * *
9          REPORTER'S CERTIFICATE
10 STATE OF ALABAMA:
11 MONTGOMERY COUNTY:
12     I, Pamela Wilbanks Owens, Registered
13 Professional Reporter, ACCR #391, and Commissioner for
14 the State of Alabama at Large, do hereby certify that I
15 reported the deposition of:
16         TERRY BROWN
17 who was first duly sworn by me to speak the truth, the
18 whole truth and nothing but the truth, in the matter of:
19         JAY HAWTHORNE,
20         Plaintiff,
21         Vs.
22         CITY OF PRATTVILLE, AL,
23         Defendant.

---

13 (Pages 49 to 52)

Terry Brown                                                                    August 7, 2019

                                                    53

1              In The U.S. District Court
2              For the Middle District of Alabama
3              Northern Division
4              2:19-CV-139
5  on Wednesday, August 7, 2019.
6         The foregoing 52 computer printed pages contain
7  a true and correct transcript of the examination of said
8  witness by counsel for the parties set out herein.  The
9  reading and signing of same is hereby waived.
10        I further certify that I am neither of kin nor
11 of counsel to the parties to said cause nor in any
12 manner interested in the results thereof.
13        This 21st day of August 2019.
14
15
16
17
18        _____
          Pamela Wilbanks Owens, ACCR #391
19        License Expires:  9/30/2019
          Registered Professional Reporter
20        and Commissioner for the State
          of Alabama at Large
21
22
23

                                                              14 (Page 53)