# Deposition of Lisa Thrash

August 9, 2019

Hawthorne v. City of Prattville, AL

2:19-CV-139

Pages 1 through 51



205.545.5155

info@citedepos.com

www.citedepos.com



DEFENDANT'S EXHIBIT 15

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JAY HAWTHORNE,
    Plaintiff,
Vs.                       CIVIL ACTION NO.
                            2:19-CV-139
CITY OF PRATTVILLE, AL,
    Defendant.

* * * * * * * * * * * *

DEPOSITION OF LISA THRASH, taken pursuant to stipulation and agreement before Pamela Wilbanks Owens, Certified Court Reporter, ACCR #391, and Commissioner for the State of Alabama at Large, in the Law Offices of Holtsford, Gilliland, Hitson, Higgins & Howard, 4001 Carmichael Road, Suite 300, Montgomery, Alabama, on Friday, August 9, 2018, commencing at approximately 8:48 a.m.

* * * * * * * * * * * *

## Page 2

APPEARANCES

FOR THE PLAINTIFF:
Mr. Joseph C. Guillot
MCPHILLIPS SHINBAUM
Attorneys at Law
60 Commerce Street
Montgomery, Alabama

FOR THE DEFENDANT:
Mr. Rick A. Howard
Ms. April W. McKay
HOLTSFORD, GILLILAND, HIGGINS, HITSON & HOWARD
Attorneys at Law
4001 Carmichael Road, Suite 300
Montgomery, Alabama

Mr. Rob Riddle
RIDDLE LAW GROUP
Attorney at Law
119 First Street
Prattville, Alabama  36067

ALSO PRESENT:

Mr. Jay Hawthorne

* * * * * * * * * * *

EXAMINATION INDEX

BY MR. GUILLOT . . . . . . . . . . . . . . . . 5

## Page 3

PLAINTIFF'S EXHIBIT INDEX

| No. | Description | Page |
|---|---|---|
| 12 | 6/13/18 email from Cindy Powell to Lisa Thrash and others with Dr. Carpenter's office note attached along with other emails | 24 |
| 13 | 5/25/18 letter to Mayor Gillespie from Joe Guillot along with the Charge of Discrimination and affidavit of Jay Hawthorne | 34 |
| 14 | Emails between Lisa Thrash and Jay Hawthorne regarding accommodation status | 13 |

* * * * * * * * * * *

STIPULATION

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of LISA THRASH is taken pursuant to the Federal Rules of Civil Procedure and that said deposition may be taken before Pamela Wilbanks Owens, Registered Professional Reporter, ACCR #391, and Commissioner for the State of Alabama at Large, without the formality of a commission, that objections to questions other than objections as to the form of the question need not be made at this time but may be reserved for a ruling at such time as the said deposition may be offered in evidence or used for any

## Page 4

Statute.

It is further stipulated and agreed by and between counsel representing the parties in this case that the filing of said deposition is hereby waived and may be introduced at the trial of this case or used in any other manner by either party hereto provided for by the Statute regardless of the waiving of the filing of the same.

It is further stipulated and agreed by and between the parties hereto and the witness that the signature of the witness to this deposition is hereby waived.

* * * * * * * * * * *

COURT REPORTER:  Is this going to be usual stipulations?
MR. HOWARD:  Yes.
MR. GUILLOT:  Yes.

* * * * * * * * * * *

LISA THRASH

The witness, after having first been duly sworn to speak the truth, the whole truth and nothing but the

Page 5

```
 1              EXAMINATION
 2  BY MR. GUILLOT:
 3  Q.  State your name, please, for the record.
 4  A.  Lisa Mullinax Thrash.
 5  Q.  Ms. Thrash, what is your position with the City
 6      of Prattville?
 7  A.  I'm the human resources director.
 8  Q.  Okay.  And how long have you been in that
 9      position?
10  A.  13 years.
11  Q.  Okay.  What did you do before you became the
12      human resources director?
13  A.  I was the assistant director with the City of
14      Prattville for three years.
15  Q.  So how long in total have you been with the City
16      of Prattville?
17  A.  16 years.
18  Q.  Okay.  What did you do before?
19  A.  Prior to the City of Prattville, I worked with
20      Jack Ingram Motor Corporation in Montgomery.  I
21      was the human resources director there.
22  Q.  All right.  And what is your education?
23  A.  I have a bachelor's in business administration,
```

Page 6

```
 1      University of Alabama, certification in human
 2      resources management from Auburn University in
 3      Montgomery, professional certification from the
 4      Alabama Association of Personnel Administrators.
 5  Q.  Just briefly describe what your duties are as
 6      director of human resources.
 7  A.  My duties are to oversee the recruitment,
 8      selection, and retention processes of employment
 9      with the City of Prattville for all of the
10      departments.  My department manages the benefits
11      and employee services areas, including health
12      insurance, workers' compensation, any type of
13      leave, all of those employee benefits.  We
14      manage the performance system as far as
15      performance evaluations.  We manage the
16      classification and compensation system, and I
17      serve as the City's legal representative in
18      personnel matters.  And we also work with
19      employee grievances, employee complaint
20      resolution, that type issue.
21  Q.  Okay.  And so I guess as such, you would be the
22      person that an employee would go to with a
23      discrimination claim?
```

Page 7

```
 1  A.  Yes, sir.
 2  Q.  Okay.  So if an employee comes to the City --
 3      comes to you with a problem -- he's not able to
 4      do his job -- who is involved or what's the
 5      process for determining whether or not a person
 6      is going to be accommodated and, if so, what the
 7      accommodation will be?
 8  A.  We would review the information provided by the
 9      employee and their treating medical provider.
10      Obviously, if it's a workers' comp situation, we
11      would follow the workers' comp protocol as far
12      as getting them treatment for their situation.
13      We would review the job requirements of the
14      position, compare that to any information that
15      we receive from the medical provider, and then
16      try to assist that employee in returning to work
17      or creating an accommodation, providing an
18      accommodation if we're able to.
19  Q.  Okay.  And who is involved in that process?
20  A.  Which process?
21  Q.  Determining an accommodation, if the person is
22      going to be accommodated, and what the
23      accommodation is going to be.
```

Page 8

```
 1  A.  Ultimately I would make the recommendation on
 2      the accommodation.  I would speak with
 3      department personnel.  Generally that's the
 4      department head -- it could be a supervisor --
 5      to get more specific information on what the
 6      employee is actually going to be asked to do in
 7      their job.  We would make sure that we were
 8      giving the employee an opportunity to perform
 9      their duties without further injuring
10      themselves, or attempt to.
11  Q.  Is the mayor involved in that decision in any
12      way?
13  A.  I would brief the mayor on anything that's going
14      on with the situation.  He generally isn't going
15      to get involved with specific medical issues
16      about employees.  We talk several times a week.
17      I update him on many personnel issues.  That
18      would be his involvement.
19  Q.  Okay.  In particular in Mr. Hawthorne's case, I
20      notice that a lot of the email that you sent to
21      Mr. Hawthorne, the mayor was also copied, and so
22      was that his request?  Was he, you know, wanting
23      to keep track of Mr. Hawthorne's case or
```

**Page 9**

```
 1        something for anything in particular?
 2   A.   No.  I don't -- he did not request.
 3   Q.   So every employee that has medical issues and
 4        needs accommodation, the mayor is copied on
 5        that?
 6   A.   I don't know that every situation I would copy
 7        the mayor.  Mr. Hawthorne was a highly-ranked
 8        officer in the fire department, so the mayor was
 9        aware that he was struggling with a medical
10        issue.  I was just keeping him in the loop.
11   Q.   Now, we've been given the personnel policies and
12        guidelines for the City of Prattville, and I'm
13        just not sure if the supervisor manual is part
14        of that, or is that a separate manual?
15   A.   That is a separate manual.
16   Q.   Okay.  So as far as policies and guidelines,
17        that 1994 manual is what you use?
18   A.   Yes, sir.
19   Q.   Okay.  And then was the supervisor manual
20        something that was developed just to help
21        supervisors do their jobs?
22   A.   Yes.  We have supervisor training when we hire a
23        new supervisor or someone goes into a
```

**Page 10**

```
 1        supervisory role and they are new at being a
 2        supervisor.  We try to provide our supervisors
 3        information to help manage the people,
 4        day-to-day operations.  So, yes, that is a
 5        document that we use to train our supervisors.
 6   Q.   I notice the currency date on that supervisor
 7        manual is April 1 of 2018.
 8   A.   The one that you have in the document is.  We've
 9        done supervisor training for a while.  That was
10        probably the most recent version at the time
11        those documents were presented.
12   Q.   Just as an aside, did you know that was a
13        Sunday -- that's Easter Sunday?
14   A.   I did not.  But I work a lot of weekends, so
15        that doesn't surprise me.  You'll see my car at
16        City Hall many Sunday afternoons.
17   Q.   It's also April Fool's Day.
18             So when Chief Hawthorne was injured on May
19        31 of 2017 in the auto accident, it was a while
20        before he was able to return on light duty,
21        correct?
22   A.   There was a time.  I don't know the length of it
23        off the top of my head, yes.
```

**Page 11**

```
 1   Q.   Because he was on FMLA for a while and used some
 2        leave, and then he was cleared to come back on
 3        light duty.
 4   A.   Yes.
 5             MR. HOWARD:  It was March 31.
 6             MR. GUILLOT:  Didn't I say March?
 7             MR. HOWARD:  I thought you said May.
 8             MR. HAWTHORNE:  He said March.
 9             MR. HOWARD:  Okay.
10             THE WITNESS:  I thought you said May 2
11        as well.  I apologize.
12             (Off-the-record discussion.)
13   Q.   When he came back, when he was ready to come
14        back from that injury on light duty -- and
15        you've been here so you know we've discussed
16        that -- who determined what that accommodation
17        was going to be when he was allowed to come back
18        to work after that injury?
19   A.   Just to clarify, you're referring to his
20        personal automobile accident --
21   Q.   Yes, ma'am.
22   A.   -- in March, and then his temporary assignment
23        at the Public Safety Building?
```

**Page 12**

```
 1   Q.   Yes, ma'am.
 2   A.   And the question was ...
 3   Q.   Who decided on the accommodation that he was
 4        going to receive?
 5   A.   Okay.  The fire department and I discussed that
 6        Mr. Hawthorne's limitations would allow him to
 7        perform those type duties, and I agreed that
 8        that was a proper assignment and reasonable
 9        accommodation for Mr. Hawthorne at that time, so
10        ultimately I made that recommendation.
11   Q.   And you said the fire department.  Would that be
12        Chief Brown or would that be Chief Whaley?
13        Which one?
14   A.   I would have discussed it probably with both of
15        them.  I don't recall a meeting about it, but we
16        would have had conversation.
17   Q.   And that accommodation was basically a
18        nine-to-five job, clerical duties, go home at
19        night, could drive, that kind of thing, right?
20   A.   It would have been Monday through Friday.  I
21        don't know what their hours were.  It would have
22        probably been an eight-hour workday.  It would
23        have been an eight-hour shift.
```

3 (Pages 9 to 12)

### Page 13

1  Q. Okay. Was Chief Hawthorne involved in that
2     decision-making process? Did you talk to him
3     and say, hey, can you do nine to five? Can you
4     do clerical work, can you do -- was he involved
5     in that?
6  A. I did not talk with him about it. I believe
7     either Chief Brown or Chief Whaley probably
8     discussed the opportunity to do that, and I
9     believe that Chief Hawthorne was willing to do
10    that.
11 Q. Toward the end of that temporary accommodation,
12    I believe you sent Mr. Hawthorne an email about
13    returning to full duty.
14           (Plaintiff's Exhibit 14 marked for
15                identification.)
16 Q. I marked this as Exhibit 14. It's kind of
17    several emails, but this is letting him know
18    he's got to come back to work by I think the
19    21st, the very bottom paragraph of the first
20    page.
21           (Brief interruption by the court
22                reporter.)
23 Q. Do you see the bottom there? It says you told

### Page 14

1     him his temporary assignment was going to end on
2     Saturday, April 21.
3  A. Yes, I see that.
4  Q. Basically telling him he needed to either be
5     back to full duty or it was going to end.
6  A. It's telling him his transitional temporary
7     accommodation is going to end on that date.
8  Q. Right. And I want to draw your attention to the
9     very top part of the email, because this is from
10    you to Chief Brown, Chief Whaley, Michelle
11    Myers, Ms. Clabough, and Mayor Gillespie just
12    saying this is an email you had received from
13    Mr. Hawthorne. HR's response remains the same.
14    Allowing the use of leave time is an
15    accommodation. FMLA is expired. And then you
16    say, just wanted everyone on the same page.
17    Why did you put that on there?
18 A. Because I wanted everyone to have the same
19    information that I had.
20 Q. Okay. Did you have an idea that maybe someone
21    else was telling him something different or
22    what?
23 A. No, sir. I'm usually the one that follows

### Page 15

1     through with emails and communicates, so I don't
2     know what people said when they weren't with me
3     or I don't get a lot of emails back, so that was
4     my way of making sure everybody had the same
5     information.
6  Q. Okay. And I believe what we've already marked
7     as Exhibit 1 is what was toward the bottom of
8     that second page, isn't it? It's where Exhibit
9     1 picks up. That was your email on April 4
10    telling him he needed to return to full duty.
11 A. That is the email that I'm looking at, yes.
12 Q. Okay. And, again, this was your recommendation,
13    and you got approval from the mayor and Chief
14    Brown --
15 A. My recommendation --
16 Q. -- to make that?
17 A. What was my recommendation? I'm sorry.
18 Q. That his temporary accommodation end if he
19    couldn't get back to full duty.
20 A. Yes, that was my recommendation. The reason for
21    that was Mr. Hawthorne's medical situation was
22    not improving. He was having a lot of medical
23    issues. He couldn't get whatever his issues

### Page 16

1     were healed. There was no clear resolution to
2     what was going to happen with him medically, so
3     that was a temporary assignment he had been on
4     several months. I don't know exactly how long.
5     And there wasn't a need for those duties to be
6     performed anymore, and we weren't really clear
7     what was happening with him medically.
8  Q. And then he responded to you, and this is in
9     Exhibit 14. He responded to you that he was
10    trying to get a return to full duty with no
11    restrictions, right?
12 A. He did respond, yes.
13 Q. Okay. And then we've already marked this as
14    Exhibit 2, but Exhibit 2, his doctor is allowing
15    him to return to full duty, no restrictions,
16    right?
17 A. That is correct.
18 Q. Okay. And then he returns to work on May 2
19    pursuant to his doctor's permission. That same
20    day he gets hurt again, right?
21 A. Yes.
22 Q. And this is an on-the-job injury, so he's
23    treated a little bit different because it's an

                                                                          17

```
 1        on-the-job injury as opposed to a personal
 2        injury, right?
 3   A.   We treat all the injuries the same.  If we need
 4        to make an accommodation, we try to look for an
 5        accommodation.
 6   Q.   I understand.  But he's got to be treated
 7        somewhat differently because it's an on-the-job
 8        injury and therefore workers' comp is
 9        implicated, and there are some other things that
10        are involved, right?
11   A.   Yes.
12   Q.   Okay.  And very soon after he's injured, his
13        doctor says he's okay to come back to work on
14        light duty, right?
15   A.   Yes.
16   Q.   We have Exhibit 3, and this is an email from you
17        to Mr. Hawthorne copying the mayor and others
18        that we've already mentioned, and this also has
19        Chief Whaley's restrictive duty status.
20             Were you involved in determining what that
21        restrictive duty status would be?
22   A.   Yes.
23   Q.   Okay.  Did you come up with the restrictive duty
```

                                                                          18

```
 1        status and provide it to Chief Brown or Chief
 2        Whaley since he wrote the memo, and he's just
 3        following what you recommended?
 4   A.   No.  Normally with the fire and police
 5        department, their staff makes a recommendation
 6        to me.  I review the medical information and
 7        their recommendation, and then we move forward.
 8   Q.   Okay.  So did Chief Whaley recommend that he be
 9        on 24-hour shift?
10   A.   That was actually my idea.
11   Q.   Okay.  Why did you recommend he be on 24-hour
12        shift?
13   A.   We had worked with firefighters -- had looked
14        into working with our firefighters to leave them
15        on the shift that they are accustomed to
16        working.  I had done research and found that
17        with many departments it was in the best
18        interest of the employee to have them on the
19        shift that their world revolved around.  They
20        are used to a 24-hour schedule, being off every
21        two days, child care arrangements.  A lot of
22        them had other jobs.  We were making a move to
23        be more friendly to those employees who had set
```

                                                                          19

```
 1        their life around that work schedule.
 2   Q.   Okay.  Did you also -- were you also involved in
 3        the decision that he not be able to drive?
 4   A.   Yes.  We discussed that.  The doctor's orders
 5        were -- did not -- were silent on that.  With
 6        the particular situation that Mr. Hawthorne is
 7        in -- excuse me -- or Chief Hawthorne is in,
 8        he's a battalion chief with the fire department.
 9        There are three on-shift battalion chiefs.  They
10        work every third day.  They are in charge of
11        operations for the Prattville Fire Department
12        for three stations, so there is a vehicle that
13        the battalion chiefs utilize to do whatever
14        actions they need to do for their shift.
15   Q.   Is there one per station or one total for all
16        battalion chiefs?
17   A.   I believe there is one vehicle for all of the
18        battalion chiefs.
19   Q.   Okay.
20   A.   So there wasn't a need for Mr. Hawthorne to
21        drive.  It wasn't intended as a punishment.  It
22        was simply we needed our resources in another
23        place, not with someone who wasn't able to
```

                                                                          20

```
 1        completely do the job.
 2   Q.   And then you say or -- this is -- Chief Whaley
 3        says that he's only allowed one hour for lunch
 4        and one hour for dinner on each shift.  So what
 5        it implies is the other 22 hours of the 24 he
 6        needs to be at the station.
 7   A.   Yes, sir, that is the shift.  It's a 24-hour
 8        shift, just like an eight-hour employee would be
 9        on their shift for eight hours.
10   Q.   Okay.  Given that he was unable to respond to
11        emergencies and unable to respond to fires and
12        unable to lift more than 15 pounds, what would
13        have been the reason for requiring him to be
14        there those 22 hours?
15   A.   That was his shift.  His medical diagnosis was a
16        muscle strain.  We believed he was going to be
17        able to recover from that pretty quickly, so it
18        made sense to let him transition back into his
19        normal activity as a battalion chief on shift by
20        working the shift.
21   Q.   Okay.  Did you subsequently learn that he was
22        complaining about pain and wanting to sleep at
23        home?
```

**21**

1  A.  I learned that, actually, through some medical
2      information from Dr. Jones. There were multiple
3      medical providers in Chief Hawthorne's
4      situation. Originally he saw the
5      work-comp-authorized physician, Dr. James
6      Carpenter. Dr. Carpenter diagnosed a muscle
7      strain with some limitations.
8          A couple of visits after that -- I don't
9      know exactly how many -- I believe he wanted him
10     to see whoever had performed his surgery from
11     his automobile accident. That particular
12     physician did not treat workers' comp patients,
13     but an associate did. I believe that's
14     Dr. Jones. And Dr. Jones then evaluated Chief
15     Hawthorne.
16         We received information back from the case
17     nurse and from the medical certification which
18     said that Mr. Hawthorne had indicated that we
19     were having him sleep on a cot in the fire
20     department. And we investigated that. I was
21     concerned because I certainly didn't want
22     Mr. Hawthorne to be sleeping on a cot, and that
23     was absolutely incorrect. The beds in the fire

**22**

1      department are all the same whether you are in
2      the battalion chief's office, another office, or
3      you're in the dorm area where other fire
4      employees sleep.
5          So once I investigated that, I contacted --
6      at this time we also had several attorneys
7      involved. We had received a workers' comp
8      claim. We had received intent of an EEOC claim,
9      so we were then having to go through several
10     channels, several doctors, several attorneys.
11     Gathering that information became a little bit
12     convoluted. Getting everybody to work together
13     was a little difficult. So I did learn that.
14         We reached out to that medical provider,
15     both Dr. Jones and Dr. Carpenter. We asked was
16     that a medical restriction or give us more
17     information. That was highly unusual to have a
18     medical restriction telling you what someone's
19     work schedule should be or where they should
20     sleep. So we were told by both treating
21     physicians that that was not a medical
22     restriction, that that was a request for a work
23     schedule and that Mr. Hawthorne had made them

**23**

1      aware he was very unhappy with sleeping at the
2      station and that he was uncomfortable.
3  Q.  The next exhibit I'll show you is Number 5.
4      This is Dr. Carpenter's June 13 report that
5      we've already covered before, and he is asking
6      to allow Chief Hawthorne to sleep at home, if
7      possible, right?
8  A.  He did ask that. We contacted his office. He
9      said that was not a medical restriction, that
10     Chief Hawthorne was complaining he did not like
11     the beds and he wanted to sleep at home.
12 Q.  Okay. And so because it's not a medical
13     restriction, you -- the City of Prattville
14     decided not to allow him to sleep at home where
15     he would be more comfortable?
16 A.  Well, it was a 24-hour shift. The diagnosis we
17     have at this time is muscle strain. That's the
18     information that we have.
19 Q.  Right.
20 A.  His complaint to the physician was he was
21     sleeping on a cot. That was not accurate. He
22     didn't like the noise in the station.
23 Q.  I can imagine.

**24**

1  A.  The noise in the station is the same no matter
2      which bed that you're in.
3  Q.  And so wouldn't you agree that it would help a
4      person to heal if they are able to get good
5      rest?
6          MR. HOWARD: Object to form.
7  A.  I have no idea.
8  Q.  If Dr. Carpenter didn't think it would help
9      Mr. -- Chief Hawthorne by sleeping at home, then
10     why would he as a workers' comp doctor put that
11     on a report?
12 A.  According to the case nurse, because
13     Mr. Hawthorne was very angry that he was working
14     a 24-hour shift. He did not want to do that,
15     and he complained consistently to every medical
16     provider about that situation.
17 Q.  Who was the caseworker? Was that Cindy Powell?
18 A.  I think it was Cindy Powell at the time, yes..
19     It's a different caseworker now. Cindy was
20     probably the caseworker at the time.
21         (Plaintiff's Exhibit 12 marked for
22         identification.)
23 Q.  Okay. Let me give you this what I've marked as

**25**

1  Exhibit 12, and this is an email that Ms. Powell
2  sent to you, Ms. Clabough --
3       Is that how it's pronounced?  Clabough?
4  A.  Yes.
5  Q.  -- and Ms. Horton.  And about two-thirds of the
6  way down in that paragraph, it says, the IW may
7  return to work 6/13/18 light duty with max lift
8  15 pounds and allow the IW to sleep at home if
9  possible.
10      That's the caseworker.
11 A.  Yes.
12 Q.  Okay.  And then the very next page -- I'm
13 sorry -- two pages -- this is the D & D Case
14 Management document.  This also says please
15 allow to sleep at home if possible.
16 A.  Yes.
17 Q.  And then the same doctor's report is in there.
18 I think the rest of that document is the same.
19      With the caseworker and the doctor both
20 saying please let him sleep at home if possible,
21 why wouldn't you -- why wouldn't the City allow
22 him to sleep at home without using his leave?
23 A.  At this point I contacted the workers' comp

**26**

1  legal counsel, Steve Herndon, and in-house
2  counsel with Millennium Risk Management, Chad
3  Moore, and we discussed the situation.  I asked
4  what their opinion was, what should we do,
5  should we make this change.  They informed me
6  that was a work schedule issue.  It was not a
7  medical restriction, and they were comfortable
8  with Mr. Hawthorne continuing his temporary
9  assignment transitioning back to his position as
10 a 24-hour firefighter on shift.
11 Q.  Okay.  So even though it would have made him
12 more comfortable, even though he would have
13 gotten better rest, y'all decided that it would
14 be okay to leave him doing that just because you
15 could?
16 A.  No.  We decided to let him work his shift that
17 he's worked for 25 years because his diagnosis
18 at the time was a muscle strain, and there
19 was -- prognosis was he was looking at MMI in
20 approximately four weeks.  That's also in the
21 exhibit --
22 Q.  I saw that.
23 A.  -- you just handed me.

**27**

1  Q.  So then what followed is you sent -- this is
2  probably back in Exhibit 5.  You sent him an
3  email on June 19 saying we believe we're
4  providing appropriate accommodations.
5       I guess that was after you talked to
6  Herndon?
7  A.  Yes, it was.  Not Herndon.  Oh, yes.  Excuse me.
8  Herndon and Moore.
9  Q.  And then August 13 of 2018 is when you sent the
10 email to Chief Hawthorne, Mayor Gillespie, Chief
11 Brown, Chief Whaley and others saying that we're
12 no longer -- the City is no longer able to offer
13 you a temporary work accommodation and sending
14 him home to workers' comp.
15      Why did you use the words "no longer able
16 to"?
17 A.  I don't know why I used those words.
18 Q.  I mean, no longer able sounds like you have a
19 rule or policy or regulation that says the time
20 has come to an end and therefore you can't do it
21 anymore.
22 A.  That's just the way I wrote the email.  There
23 was no significance to the phrase.

**28**

1  Q.  Okay.  So there's no policy that says, hey,
2  after this long you've got to stop?
3  A.  Oh, no.
4  Q.  Okay.  And that was your decision -- your
5  recommended decision that the mayor and Chief
6  Brown, I guess, allow to happen?
7  A.  It was my recommendation.  Mr. Hawthorne, again,
8  was in a situation, as he was similar with his
9  first injury -- his off-duty injury.  He was
10 continuing to complain of his medical issues.
11 They had ordered -- I think he had requested a
12 panel.  The panel was originally denied, an
13 ortho panel.  Then we went back, and he was
14 still having medical issues.  They eventually
15 brought in a different physician and ordered an
16 MRI, so he's still in the middle of -- we still
17 have a muscle strain issue, but obviously
18 there's something else going on.
19      So we made the medical decision or we made
20 the decision at that time based on medical
21 information that we had and the fact that
22 Mr. Hawthorne was complaining to all the medical
23 providers that, you know, he wanted to do a

**Page 29**

1  different thing -- we made the decision at that
2  time to let him go home. We didn't want to
3  further injure him.
4  Q. Okay. Was there any particular thing that
5  occurred just right about that time, August 13,
6  that triggered the decision?
7  A. That was when the MRI was being looked at, and
8  they were trying to figure out exactly what was
9  going on medically with Mr. Hawthorne.
10         (Off-the-record discussion.)
11         MR. HOWARD: Did you finish your
12             answer?
13         THE WITNESS: I'm sorry. I was --
14             I don't know.
15             Could you read --
16         MR. HOWARD: What was the question?
17         THE WITNESS: I don't know where we
18             were.
19 Q. Was there anything that particularly triggered
20  the decision --
21 A. The decision was based on Mr. Hawthorne's -- we
22  had no clear resolution to what his medical
23  situation was going to be, so I knew that they

**Page 30**

1  were looking at bringing in different
2  specialists to try to further evaluate the
3  shoulder, neck situation.
4  Q. Okay. Did Josh Bingham's promotion on August 12
5  have anything to do with that?
6  A. Josh Bingham's promotion would have been a
7  result of him not being able to be there anymore
8  or us not letting him complete that assignment.
9  There were several factors involved in that
10  decision.
11     The three battalion chiefs that we have at
12  the fire stations, there's an A, a B, and a C
13  shift. At that time Battalion Chief Hawthorne
14  had not been medically able to perform his
15  duties since April of 2016. He had not been on
16  shift because of personal medical issues and
17  workers' comp.
18 Q. Are you sure about that date: April of '16?
19 A. I'm sorry. '17. It was immediately following
20  his car accident -- excuse me -- April of '17.
21  So that shift had had people acting on temporary
22  assignments throughout that time.
23     We had a situation also during that year

**Page 31**

1  with Battalion Chief Ellison. Battalion Chief
2  Ellison had his own personal medical situation.
3  A family member had a medical situation. He was
4  at that time going through a disciplinary
5  process and subsequently a month later was
6  demoted, so we had that issue going on.
7     The third battalion chief was Battalion
8  Chief Mike Rogers. Battalion Chief Mike Rogers
9  visited me in late July and told me that he was
10  going to retire. He did not have a specific
11  date. It would be in the next few months. He
12  had an opportunity with another company. He
13  wanted to give me a heads up. He was working
14  out details. He would let me know. He retired
15  October 1. That was the date he ended up
16  retiring.
17 Q. Of '17 or '18?
18 A. '18.
19    So at the time I talked with Mayor
20  Gillespie, I talked with the, Chief and I said
21  I'm really concerned -- they were really
22  concerned that we had three battalion chiefs
23  that we were about to have -- we were about to

**Page 32**

1  be down to nobody was able to do the job. I
2  asked the mayor if -- I said I know this is
3  unusual, but I really believe we need to look at
4  making some promotions. He said, what can we
5  do? What can we legally do? And I said, well,
6  Jay Hawthorne has a job. We don't know his
7  medical situation. Quite frankly, I don't know
8  it today, what Jay's situation is going to be.
9  Mike Rogers is retiring. Ellison is about to be
10  demoted. We're going to be down to nobody on
11  shift every third day commanding the operations
12  of shift personnel of the Prattville Fire
13  Department.
14     So we determined that we needed to make a
15  move. Mayor Gillespie talked with the city
16  council, and they agreed. We talked to the
17  finance committee. We told them what our
18  situation was. We were covered as far as money
19  in the budget. We had some gaps in filling
20  positions, so we had funds. We did not have
21  five BCs listed on the budget, but we had
22  funding for five. This kind of thing has
23  happened before when we've had turnover, medical

### Page 33

situations. The plan was when Mr. Hawthorne comes back, we would have five BCs. I don't know who would be assigned where. We're building a fourth station. That came into play. Maybe somebody would be assigned to a designated station. I don't know what they would do with the fifth BC if everybody reached medical improvement and everybody was able to work. But we made the decision for the good of the department to go ahead and fill those positions. We were about to be faced with a pretty difficult situation, so that's why those decisions were made and that's why they were made at that time.

Q. It looks coincident that -- I think Bingham testified yesterday he was promoted on August 12, and then the 13th of August is the day you give Chief Hawthorne the message that his temporary accommodation is over.

A. We would have had to replace one of those BCs.

Q. Let me ask you this: You mentioned that the funding was there for five. Is that where the administrative battalion chief rumor or the

### Page 34

administrative battalion chief, you know, proposal came about?

MR. HOWARD: Object to form.

A. I don't know of an administrative battalion chief proposal. I've learned of that during this process. That has not been something I've been asked to budget. I prepare the personnel budget for the entire City of Prattville every year, $22 million and then benefits. That particular position is not something I'm familiar with, and I've not been asked to budget it.

The funding that I'm referring to is because we've had turnover in personnel. There's a lag. And when you have a turnover occur and when you actually fill the job -- a firefighter hiring process takes approximately six to eight months, so we have funding because it takes that long to get an applicant cleared, selected, and through the process.

(Plaintiff's Exhibit 13 marked for identification.)

Q. Okay. Since you said you were the person that

### Page 35

the EEO complaints would come to, I'm going to show you what I've marked as Exhibit 13, and this is a letter that we sent to Mayor Gillespie on May 25 of 2018.

Did you receive that letter?

A. Yes.

Q. That letter also has attached to it -- the proposed complaint to the Equal Opportunity Commission attached to it that we later sent to the EEOC.

When Mayor Gillespie received this, do you recall how long it was before he contacted you?

A. No.

Q. Was it within a few days? Was it within a week? two months?

A. I absolutely do not know. It would have been, I would think, close to the time it was received, but I don't know a date.

Q. All right. Did you have a meeting with Mayor Gillespie about this?

A. I believe Mayor Gillespie said, have you received that, and I said yes. And he said, let me know what I need to do.

### Page 36

Q. Okay. What did you tell him?

A. I told him that I would look over the complaint. We would speak with legal counsel. Our city clerk would file it with our liability insurance carrier. Mr. Howard would get involved. That was the plan.

Q. Okay. Is there some reason that you didn't respond to my letter?

A. That I did not respond to your letter? Yes, sir. We had legal counsel. Legal counsel would respond to those type letters.

Q. What was the mayor's disposition when you talked to him about this? I mean, did he appear to be happy? Did he appear to be upset? Did he appear to be angry? What was his --

A. I don't recall him having any reaction other than to let him know what he needed to do. We didn't have a lengthy conversation about this.

Q. Okay. Did you ever have a conversation with Chief Terry Brown about it?

A. I did.

Q. What was Chief Terry Brown's disposition: happy? sad? angry?

**37**

1  A.  In the course of business, Chief Brown received
2      this information and processed it.  I don't know
3      how he felt about it.  He didn't share that with
4      me.
5  Q.  And what about Chief Whaley?  Did you have any
6      discussion with Chief Whaley about it?
7  A.  Not initially.  It would have been later on and
8      would have made him aware if I needed any
9      information from him.  Or when we were preparing
10     responses, I may have contacted him at that
11     time.
12 Q.  It was during this time, I guess -- and I think
13     I've heard it said before -- that the City was
14     doing all it could to accommodate Mr. -- Chief
15     Hawthorne, and here he files a complaint against
16     the City.  I was just wondering if that upset
17     anybody.
18 A.  No one shared their feelings with me about
19     Mr. Hawthorne's claims.
20          MR. HOWARD:  Do you need a break?
21          THE WITNESS:  I'm fine.
22          (Brief off-the-record discussion.)
23 Q.  When did you first learn that Chief Hawthorne

**38**

1      was complaining about pain and having to sleep
2      in a dorm environment, unable to sleep properly?
3      When did you first learn about that?
4  A.  I learned that Mr. Hawthorne had complained to
5      Dr. Jones about sleeping on a cot when we got
6      the notes from that visit in May.
7  Q.  Okay.
8  A.  I don't know about all the other complaints.  I
9      had not heard those at that time.
10 Q.  Did you then have conversation with either Chief
11     Brown or Chief Whaley about his complaints of
12     pain and not being able to sleep?
13 A.  I had conversations with one of them -- I
14     believe it was Chief Whaley -- to try to
15     determine what type of bedding was available for
16     the employees.
17 Q.  Okay.
18 A.  And I had conversations with the attorneys about
19     that.
20 Q.  Okay.  At any time did anybody say why don't we
21     just let him sleep at home?
22 A.  I think I asked the attorneys if that would be
23     something that they would recommend, and they

**39**

1      said, well, if he's got a muscle strain, which
2      is the diagnosis we have at this time, and MMI
3      is looking at four weeks out, it seems
4      reasonable for him to work his normal shift and
5      transition back into duty.  So I think that was
6      the extent of my conversation about why don't
7      we ...
8  Q.  Did you ever hear that he had complained about
9      the fact that he was being assigned to work
10     under Acting Chief/Captain Josh Brown?
11 A.  I heard that when I got a claim.  I did not hear
12     it from a person.  I heard it through the legal
13     actions.
14 Q.  Through this --
15 A.  Uh-huh (positive response).
16 Q.  -- complaint?  Okay.
17          And you understand that in a paramilitary
18     organization like this, rank means something,
19     right?
20 A.  I understand that rank is very important in the
21     fire and police departments which are the
22     paramilitary operations in the City of
23     Prattville, yes.

**40**

1  Q.  And for a senior battalion chief to be assigned
2      under someone who by all outward appearances is
3      a captain, that would be somewhat humiliating to
4      him.
5  A.  I don't know how Mr. Hawthorne felt about it.  I
6      can tell you that our policy to be able to cover
7      the shift with a qualified individual allows us
8      to have someone in a temporary assignment for a
9      period of time.  And the fact that Mr. Hawthorne
10     had a medical situation which didn't allow him
11     to perform his job at the time and he was
12     reporting to that person are incidental.  I
13     mean, those two things are not related.
14 Q.  You said something a minute ago that to this day
15     you don't know what Mr. Hawthorne's -- Chief
16     Hawthorne's diagnosis is.
17 A.  Actually, Chief Hawthorne and I had a
18     conversation about that Monday in here, and we
19     have not gotten information from his last
20     doctor's appointment on June 19, I believe, with
21     Dr. Buggay.  I understand that at that
22     appointment he was released, reached MMI, and
23     there's to be some type of determination to

**Page 41**

```
 1       come, but we have not received any official
 2       notification of what that is.
 3  Q.   Okay. As far as the City of Prattville is
 4       concerned, Chief Hawthorne is still Chief
 5       Hawthorne?
 6  A.   That is correct.
 7  Q.   And since apparently there is money in the
 8       budget for it, why wasn't he allowed just to
 9       continue on shift instead of sent home on
10       workers' comp?
11  A.   You mean when we let him go home in August?
12  Q.   Yes.
13  A.   Because he was complaining, as you've
14       documented, and also his situation was not
15       clear. He's got -- he was having an MRI around
16       that time to try to determine what the medical
17       situation actually was, so it didn't seem to be
18       in the best interest of the City or
19       Mr. Hawthorne to have him there. After speaking
20       with legal counsel, that was the decision that
21       was made.
22  Q.   Was it even considered at that point to let him
23       go back on the eight-hour shifts that he had
```

**Page 42**

```
 1       performed during his previous injury?
 2  A.   It was. And it was my recommendation not to do
 3       that. We have 14 administrative staff in the
 4       fire department who occupy all of the tasks of
 5       those positions. That includes three clerical
 6       personnel. We have a codes and standards
 7       subdivision. We have a training subdivision. I
 8       may be leaving out a subdivision, but there are
 9       14 people there performing those job duties.
10       They had to stretch to find some tasks for
11       Mr. Hawthorne to do when he was there the first
12       time, and we've done that with any employee on
13       the eight hours. You're really making up busy
14       work. It's not in the best interest of anyone
15       for that to happen. Those staff occupy all
16       those duties.
17             MR. GUILLOT: Let's take a short
18                break.
19             (Brief recess.)
20  Q.   (Continuing by Mr. Guillot) Earlier you
21       testified a few times about the injury that you
22       thought Chief Hawthorne had was his -- a muscle
23       strain, right?
```

**Page 43**

```
 1  A.   I testified that that's what the doctor's
 2       diagnosis stated on the physician's statements.
 3  Q.   Right. Right.
 4  A.   Yes.
 5  Q.   Did you later learn that was not the proper
 6       diagnosis?
 7  A.   Not until after the MRI, which was, I think, in
 8       September.
 9  Q.   Of 2018?
10  A.   I think.
11  Q.   But that was a torn labrum in his right -- left
12       shoulder?
13  A.   I don't know when that diagnosis came. I think
14       there was a middle one before it got to that.
15       Maybe it was calling it some kind of other -- I
16       don't want to speak to the medical terminology,
17       but I don't know exactly when the labrum
18       diagnosis came into play. I think there was a
19       muscle strain, another diagnosis, and then
20       eventually they diagnosed that torn labrum.
21  Q.   Okay. By that time he was already off on
22       workers' comp, right?
23  A.   Yes.
```

**Page 44**

```
 1  Q.   That proper diagnosis -- or maybe it was the
 2       middle diagnosis -- occurred after he was sent
 3       home to be on workers' comp?
 4  A.   Yes, I believe so, because that would have been
 5       after the MRI, which I think was in September.
 6  Q.   Is there some reason the City didn't wait until
 7       at least they had that diagnosis before sending
 8       him home?
 9  A.   No.
10  Q.   In your experience doing what you do, I mean,
11       especially with regard to the EEO function, is
12       this the first time that an on-shift officer has
13       been given an accommodation such as this to work
14       24 hours, same profile?
15  A.   Well, I don't know who you're calling an
16       on-shift officer. I would consider 24-hour fire
17       personnel in a category, and this is not the
18       first time that we have provided this type of
19       accommodation to a 24-hour fire personnel.
20  Q.   So there have been previous fire personnel who
21       were light duty rated unable to respond to fires
22       or emergencies but who were put on 24-hour
23       shifts?
```

### Page 45

1  A.  I couldn't make a blanket statement. I mean,
2      every situation is different, so I don't know if
3      there's been one exactly to mirror Chief
4      Hawthorne's. I don't know of another battalion
5      chief who has had that type situation prior to
6      him. We had a situation after him.
7  Q.  Right. I'm familiar with a couple of positions
8      after him.
9          So why was he the first one to be given that
10     type of accommodation?
11 A.  He wasn't the first 24-hour firefighter to be
12     given an accommodation.
13 Q.  I'm talking about a 24-hour firefighter or
14     24-hour person who was unable to fight fires and
15     unable to respond to medical emergencies but is
16     put on 24-hour shifts. That's my question.
17         Isn't he the first one that's been put in
18     that profile?
19 A.  We have had firefighters who may have had
20     stitches and they couldn't get a body part wet,
21     and they were able to remain on their 24-hour
22     shift. They probably couldn't go to a scene. I
23     believe that has happened in the past.

### Page 46

1          As far as moving to this program, he was the
2      most recent, the first in a while, that we had
3      done that with, yes.
4  Q.  I'll go back to something that Chief Josh Brown
5      said yesterday. It wouldn't have made any
6      difference to him or his operation if Chief
7      Hawthorne would have been allowed to sleep at
8      home, so why wasn't that allowed?
9  A.  Well, I didn't discuss the situation with Josh
10     Brown.
11 Q.  I understand. But in my questioning him -- you
12     were here -- I asked him if it would have made
13     any difference at all if Chief Hawthorne, when
14     he completed his duties, had just gone home that
15     evening, and he said no. No difference. So why
16     would it have made a difference to you?
17 A.  I mean, it wouldn't have made a difference to
18     me. I based the decision on the advice of legal
19     counsel and Mr. Hawthorne's medical situation.
20     I didn't have a problem with Mr. Hawthorne going
21     home. That was not the decision that was made.
22 Q.  Isn't it true that you or the mayor or Chief
23     Brown were upset with Chief Hawthorne filing

### Page 47

1      this complaint?
2  A.  I'm not upset with Chief Hawthorne. I can't
3      speak on behalf of anyone else. I understand
4      the rights that every employee has, and these
5      are the rights that Chief Hawthorne has.
6  Q.  And because he filed this claim, no one was
7      going out of their way to help him to be more
8      comfortable, to help him heal, were they?
9  A.  I believe that we were. I don't know that he
10     appreciated the timing. But when I'm dealing
11     with four attorneys and multiple physicians and
12     trying to get a resolution to a situation, we
13     were acting as expeditiously as we could.
14 Q.  But you had the case manager and you had the
15     doctor both in agreement that he be allowed to
16     sleep at home, but --
17 A.  No, sir. He lied to the doctor and told him
18     that he was sleeping on a cot. The doctor came
19     back and told us that that was not a medical
20     restriction, that was merely a suggestion.
21     That's why he used the word "possible".
22 Q.  Did Dr. Carpenter say he was told about a cot,
23     or was it someone else?

### Page 48

1  A.  Yes, he did. Dr. Carpenter and Dr. Jones both
2      said they were told about a cot.
3  Q.  And they said that came from Chief Hawthorne?
4  A.  Yes.
5  Q.  Were there ever meetings between yourself, the
6      mayor, and/or Chief Brown concerning
7      Mr. Hawthorne -- Chief Hawthorne?
8  A.  I don't recall a specific meeting with the three
9      of us concerning Chief Hawthorne, no.
10 Q.  I think yesterday we had some discussion or some
11     testimony about an employee named or --
12     Battalion Chief Lowell Strock.
13         How long was Chief Strock's position left
14     open before he retired?
15 A.  I'm not exactly sure of the length of time from
16     when he sustained his injury to when his
17     position was left open. It was -- I mean, at
18     least a year. I'm not sure.
19 Q.  Would two years sound more --
20 A.  It could have been. I truly do not know the
21     length of time from his injury to when he
22     received a workers' comp settlement and
23     medically retired.

**Page 49**

```
 1   Q.   So it was left open until he received the
 2        workers' comp settlement?
 3   A.   I honestly do not know.  I would have to refer
 4        to the documents on that.  I don't know the
 5        dates and the correlation to that.
 6   Q.   Okay.
 7            MR. GUILLOT:  Let's talk one more
 8              time.
 9            (Brief recess.)
10            (Deposition concluded at approximately
11              10:00 a.m.)
12
                * * * * * * * * * * * *
13
                  FURTHER DEPONENT SAITH NOT
14
                * * * * * * * * * * * *
15
16            REPORTER'S CERTIFICATE
17   STATE OF ALABAMA:
18   MONTGOMERY COUNTY:
19        I, Pamela Wilbanks Owens, Registered
20   Professional Reporter, ACCR #391, and Commissioner for
21   the State of Alabama at Large, do hereby certify that I
22   reported the deposition of:
23                LISA THRASH
```

**Page 50**

```
 1   who was first duly sworn by me to speak the truth, the
 2   whole truth and nothing but the truth, in the matter of:
 3            JAY HAWTHORNE,
 4            Plaintiff,
 5            Vs.
 6            THE CITY OF PRATTVILLE, AL,
 7            Defendant.
 8            In The U.S. District Court
 9            For the Middle District of Alabama
10            Northern Division
11            2:19-CV-139
12   on Friday, August 9, 2019.
13        The foregoing 49 computer printed pages contain
14   a true and correct transcript of the examination of said
15   witness by counsel for the parties set out herein.  The
16   reading and signing of same is hereby waived.
17        I further certify that I am neither of kin nor
18   of counsel to the parties to said cause nor in any
19   manner interested in the results thereof.
20        This 22nd day of August 2019.
21
22
23
```

**Page 51**

*Pamela W. Owens* [signature]

Pamela Wilbanks Owens, ACCR #391
License Expires: 9/30/2019
Registered Professional Reporter
and Commissioner for the State
of Alabama at Large

13 (Pages 49 to 51)