IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JAY HAWTHORNE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-139-RAH |
| | ) | (WO) |
| CITY OF PRATTVILLE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.   INTRODUCTION

This case concerns a local firefighter, Jay Hawthorne ("Hawthorne"), formerly employed with the fire department at the City of Prattville ("the City"), who, due to physical limitations resulting from a motor vehicle accident and a separate work-related injury, was unable to fully return to his job as a battalion chief.  Hawthorne filed this suit against the City, claiming violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (ADA), the Rehabilitation Act of 1973, 29 U.S.C. § 701, and the Age Discrimination in Employment Act, 42 U.S.C. § 621 *et seq.* (ADEA), when the City refused to honor Hawthorne's accommodation requests, thereby ultimately forcing him to retire from the City.

Pending before the Court is the motion for summary judgment filed by the City.  (Doc. 16.)  Hawthorne has filed a response, (Doc. 20), and the City a reply, (Doc. 23).

As explained below, the City's motion is due to be GRANTED.

## II.    BACKGROUND

### A.    The Battalion Chief Position

Hawthorne became a battalion chief in 2011.  (Doc. 16-18 at 2.)  A battalion chief is a heavy-duty-rated, 24-hour position that works 24 hours on-duty followed by 48 hours off-duty.  (Doc. 16-13 at 31.)  Battalion chiefs do not fight fires, but they do attend structure fires, haz-mat and multi-casualty events.  (Doc. 16-13 at 7, 33.)  Their duties principally involve coordinating the efforts of several fire stations and the captains that serve each.  *See, e.g., Atlanta Professional Firefighters Union, Local 134 v. City of Atlanta*, 920 F.2d 800, 804 (11th Cir. 1991) (discussing the hierarchy of a fire department).

At the City, 24-hour employees, such as a battalion chief, are allowed to pay another employee of equal rank to work the overnight portion of the 24-hour shift in the assigned employee's place, and thereby shorten the actual shift worked. (Doc. 16-13 at 31-32.)  Hawthorne regularly used this policy in 2017, the year preceding the events at issue in this case, so that he could manage family obligations, sleep at home, and maintain a normal schedule. (Doc. 16-13 at 31-32.)

### B.   Hawthorne's Car Accident and Temporary Accommodation

On March 31, 2017, Hawthorne injured his neck in a non-work-related car accident for which he ultimately underwent surgery.  (Doc. 16-1; Doc. 16-2.) Hawthorne used and exhausted his twelve weeks of Family and Medical Leave Act ("FMLA") leave but was not immediately released by his physician to return to work full duty.  (Doc. 16-3.)  Therefore, Hawthorne used his accrued sick and vacation time as an accommodation during his continued absence.  (Doc. 16-3.)

On October 13, 2017, Hawthorne provided the City with a return-to-work plan, stating that he could return to light-duty work on October 16, 2017 and then to full-duty work four months later.  (Doc. 16-4.)  Beginning October 23, 2017, the City provided Hawthorne with light-duty clerical work in 8-hour daily shifts as a temporary accommodation while he continued to recover.  (Doc. 16-13 at 28-29; Doc. 16-14 at 4, 9; Doc. 16-15 at 4.)  During the time that Hawthorne was working in the temporary light-duty position, his battalion chief duties were performed by Captain Josh Brown as acting battalion chief.  (Doc. 16-13 at 29; Doc. 16-17 at 3.)

Four months later, in February 2018, the City's Human Resource Director, Lisa Thrash, requested that Hawthorne submit a status plan.  (Doc. 16-4.)  In response, on February 27, 2018, Hawthorne provided an updated plan, stating that he could not return to full-duty work but that he could return to a modified work capacity, lifting no more than 75 pounds for the next 6 weeks.  (Doc. 16-4; Doc.

16-5.)   Hawthorne remained in his temporary position while under these restrictions.

On April 12, 2018, Hawthorne provided another update regarding his recovery and ability to work, stating that he needed to work under restrictions for another month.  (Doc. 16-4.)

On April 19, 2018, Thrash emailed Hawthorne to advise that the temporary accommodation would end on April 21, 2018 and that the City would continue to accommodate him through his use of leave time, or alternatively, he needed to retire.  (Doc. 16-5; Doc. 16-15 at 5; Doc. 21-2 at 2; Doc. 21-13.)  Hawthorne, however, did not want to use his accrued leave or retire, so he convinced his doctor to allow him to return to work full duty, with no limitations. (Doc. 21-2 at 3; Doc. 16-5; Doc. 16-13 at 28.)  This decision proved to be a mistake, at least medically.

### C.   Hawthorne's Second Injury Causing Event

Hawthorne returned to work full duty, per his physician's release, on May 2, 2018. (Doc. 21-2 at 3; Doc. 16-5; Doc. 16-13 at 17.)  The day of his return, Hawthorne participated in a quarterly physical exercise evaluation and afterwards complained of pain and numbness in his neck that radiated through his shoulder. (Doc. 16-6; Doc. 16-13 at 28.) As a result, he visited the City's workers' compensation physician, was diagnosed with a muscle strain, and was released back to work with a lifting limitation of 15 pounds. (Doc. 16-7; Doc. 21-2 at 3.)

### D.     Hawthorne's Second Return to Work

The City scheduled Hawthorne to return to work on May 20, 2018, on a 24-hour shift, restricted-duty status, based on the medical restrictions placed on Hawthorne by his physician. (Doc. 16-8; Doc. 16-13 at 30.)   According to the City (Thrash), their logic was several-fold — Hawthorne could be effective in assisting shift members in his battalion with their reports, it was in his best interest to return to the shift to which he was most accustomed, and he would soon recover from his muscle strain.  (Doc. 16-15 at 6; Doc. 21-7 at 4, 6.)

The City's duty restrictions were outlined in a letter dated May 14, 2018, and included, among others, "no operation of department vehicles," "no responding to incident or emergency scenes," and "no lifting over 15 pounds." (Doc. 16-8.)

The vehicle use restriction was concerning to Hawthorne because the City had never placed this restriction on other employees who had medical restrictions. (Doc. 21-1 at 12-15.)   According to the City, this restriction was not because of Hawthorne's medical condition, but instead was because Hawthorne was not performing the duties of a battalion chief.  (Doc. 16-13 at 7; Doc. 16-15 at 6.)

Another concern for Hawthorne was that he was placed under the direction of Captain Josh Brown who was serving as acting battalion chief, even though Hawthorne held a senior rank. (Doc. 21-2 at 3-4.)  Hawthorne believed this was

egregious because the City took away his accommodated light-duty position as a battalion chief and placed him underneath a subordinate rank employee. (Doc. 16-13 at 8; Doc. 21-1 at 16.)

Of all the new restrictions, the 24-hour shift requirement was the most problematic for Hawthorne.  According to Hawthorne, because of his medical condition, his physician recommended that he sleep on a "regular bed" (that is, his own bed at home), instead of a cot at the station.  Therefore, Hawthorne believed he should not have been required to work 24-hour shifts as did the other fire department employees, including all of the other battalion chiefs.  (Doc. 16-9.) Instead, Hawthorne believed he should have been permitted to work only reduced 8-hour shifts and stay at his own home at night.

Upon hearing of Hawthorne's complaint about the cot and the need to sleep at home instead of completing the 24-hour shifts like everyone else, Thrash confirmed that the City in fact provided regular beds with memory-foam mattresses, not cots, for 24-hour shift personnel such as Hawthorne.  (Doc. 16-15 at 7.)  Thrash also contacted Hawthorne's physician for more information about the cot issue. (*Id.*) During their conversation, the physician clarified that the regular bed request was "not a medical restriction" but instead a suggestion based on Hawthorne's statement to him that the City was "having him sleep on a cot in the fire department" and that Hawthorne "was unhappy with sleeping at the station."

(*Id*.)  For Thrash, this was problematic because this "was a 24-hour shift" and it was inaccurate for Hawthorne to claim that he was sleeping on a cot. (*Id*.)  From Thrash's point of view, Hawthorne was "very angry that he was working a 24-hour shift" and "he did not want to do that." (*Id*.)

Dissatisfied with the new restrictions and the City's refusal to allow him to work a reduced 8-hour schedule, Hawthorne retained legal counsel. Counsel's first volley was a May 25, 2018, letter that threatened an EEOC filing if Hawthorne was not returned to his "previous accommodation position, with full pay, benefits and privileges." (Doc. 16-10 at 2-3; Doc. 21-16.)  This missive was accompanied by correspondence from a licensed professional counselor, who recommended that Hawthorne be accommodated with an 8-hour shift and be permitted to sleep at home. (Doc. 21-17 at 2.)  Hawthorne then filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") several days later on June 8, 2018. (Doc. 1.)

Although unclear in the record as to the date, Hawthorne says that he discussed with the City about moving into an "administrative battalion chief" position but was told that the City was leaving the position open for 32-year old, Captain Josh Bingham, once Hawthorne retired. (Doc. 21-1 at 28; Doc. 21-2 at 2.) Hawthorne also spoke with Fire Chief Terry Brown, Fire Marshall Dallis Johnson, and Assistant Chief Michael Whaley about being demoted into an administrative

captain position, if the battalion chief position was not available. (Doc. 21-1 at 29; Doc. 21-5 at 4-5; Doc. 21-6 at 4.)   According to Hawthorne, the position would become open if Captain Bingham was promoted to Hawthorne's battalion chief position.   (Doc. 16-14 at 5.)   Although the responses varied, Assistant Chief Whaley confirmed that the City had an administrative captain position that handled emergency medical system (EMS) administration and three training captain positions. (Doc. 21-6 at 5-6.)   Hawthorne was not moved into any of these positions.

Ultimately, matters came to a head in August 2018.   First, Hawthorne's name was removed from the duty roster, even though the names of other injured officers were not removed. (Doc. 21-3 at 1; Doc. 21-20.)   This resulted in other employees asking if he had retired. (Doc. 21-3 at 1.)   According to Hawthorne, he believes his name was removed because his job as battalion chief was given to Captain Josh Bingham who took over Hawthorne's station and moved into Hawthorne's office. (Doc. 21-3 at 1.)

Second, three days later on August 15, 2018, Hawthorne was told that his accommodation had ended and that he needed to go home on workers' compensation.   (Doc. 21-3 at 3.)   The City, through Thrash, testified that Hawthorne was sent home because he continued to complain of pain, his situation remained unclear, and it seemed in his and the City's best interest for him not to be

there.  (Doc. 21-7 at 23.)  Thrash also stated that the City was having to "stretch" to find clerical tasks for Hawthorne while he was on his temporary accommodation and, as Thrash put it, "(y)ou're really making up busy work," which was "not in the best interest of anyone for that to happen." (Doc. 16-15 at 12.) Hawthorne never returned to his job with the City.

On September 17, 2019, Hawthorne notified the City of his retirement due to his work-related injury that prohibited him from being heavy-duty rated as required for his battalion chief position.  (Doc. 16-12.)  Hawthorne concedes that, following his motor vehicle accident on March 31, 2017, he never was able to physically perform all of the duties required of a battalion chief.  (Doc. 16-13 at 6, 9, 14.)

### E.    The Lawsuit

Before he announced his retirement, Hawthorne filed this lawsuit on February 21, 2019, alleging age and disability discrimination and retaliation. (Doc. 1.) Hawthorne claims he was denied a reasonable request for an accommodation, was replaced as battalion chief by a younger, non-disabled individual, was treated less favorably than younger individuals, and was retaliated against for filing, through counsel, an internal complaint of discrimination and the EEOC Charge.

Among the discriminatory and retaliatory actions taken by the City of which Hawthorne complains: (1) he was not allowed to drive a fire department vehicle as was customarily afforded to battalion chiefs, (Doc. 21-2 at 3; Doc. 21-15); (2) he

should have been allowed to return to the 8-hour light duty position as a battalion chief following his on-the-job injury instead of the 24-hour shift that was customarily required of battalion chiefs, (Doc. 16-13 at 22, 29-31, 47-48); (3) he should have been allowed to go home every night, (Doc. 20 at 1); (4) he should have been given a position as an administrative battalion chief, (Doc. 1 at 2), or have been demoted to another position, (Doc. 21-1 at 29-30); (5) he should not have been put under the supervision of an individual who was younger and of a lower rank, (Doc. 1 at 4; Doc. 20 at 2); (6) he was removed from the duty roster in an effort to humiliate him, (Doc. 1 at 5); and (7) employees joked about him because he was taken off the duty roster, (Doc. 1 at 5; Doc 21-1 at 32-33).

Of these, the primary complaint advanced by Hawthorne was that "following the second injury, it [i.e., the City] would not allow a similar accommodation, but instead, required him to work 24-hour shifts, even though he could not respond to emergencies." (Doc. 20 at 1.)

## III.   STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary

judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323.

The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24. If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir. 1993); *see also id*. at 1116, n. 3 (discussing Fed. R. Civ. P. 56(e)) ("When a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response . . . must set forth specific facts showing that there is a genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. The

non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Holifield v. Reno*, 115 F.3d 1555, 1565, n. 6 (11th Cir. 1997); *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995).

However, if there is a conflict in the evidence, "the [plaintiff's] evidence is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## IV.    DISCUSSION

Hawthorne claims the City violated the ADA and ADEA by discriminating against him because of his disability and age, respectively. The City argues that Hawthorne cannot establish the prima facie elements of either claim and, in addition, it acted with legitimate, non-discriminatory reasons for the employment

actions at issue. The Court concludes that summary judgment is due to be granted for the City on all claims.

## A. Disability Discrimination (Count I)

Hawthorne first alleges the City violated the ADA[1] when the City failed to accommodate his request to be placed in an administrative battalion chief position that would allow him to work an 8-hour shift of clerical-type duties instead of the 24-hour shift required of most other fire department employees. (Doc. 1 at 7; Doc. 21 at 16, 19, 21.)  This accommodation, according to Hawthorne, was reasonable and did not constitute an undue hardship upon the City because the City already had administrative positions on its payroll and because the City previously had accommodated him by allowing him to perform mostly administrative tasks. Hawthorne claims that the City's unwillingness to provide these accommodations was nothing more than an effort "to force him to retire so that the Department could give the Administrative Battalion Chief position to a non-disabled man, namely Josh Bingham."  (Doc. 21 at 15.)

The ADA provides that no covered entity (i.e., employer) "shall discriminate against a qualified individual on the basis of disability in regard to job application

---

[1] Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases, *see Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000), with the only relevant difference being the federal funding requirement under the Rehabilitation Act, *see, e.g., Badillo v. Thorpe*, 158 F. App'x 208, 214 (11th Cir. 2005). It is undisputed here that the City receives federal funding, and therefore, the Court analyzes Hawthorne's ADA and Rehabilitation Act claims in tandem.

procedures, the hiring . . . or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff can establish a prima facie ADA discrimination case "using the familiar burden-shifting analysis employed in Title VII employment discrimination cases." *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). To meet this burden, a plaintiff must prove three elements: "(1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255–56 (11th Cir. 2007).

"An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability—unless doing so would impose undue hardship on the employer." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001) (citing 42 U.S.C. § 12112(b)(5)(A) and 29 C.F.R. § 1630.9(a)). Satisfying the reasonable accommodation requirement does not require the employer "to accommodate an employee in any manner in which that employee desires." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation and internal quotation omitted). The accommodation must only "enable[] the employee to perform the essential functions of the job." *Holly*, 492 F.3d at 1256. A plaintiff has the burden to identify an accommodation and to demonstrate that it

allows him to perform the job's essential functions. *Lucas*, 257 F.3d at 1255-56; *see Rabb v. Sch. Bd. Of Orange Cty.*, 590 F. App'x 849, 850 (11th Cir. 2014) (per curiam) ("The plaintiff bears the burden both to identify an accommodation and show that it is reasonable.").

Here, the City does not dispute that Hawthorne had a disability, and Hawthorne does not dispute that he was physically unable, due to his disability, to perform all of the job duties of a battalion chief, a position that was necessary to the operation of the fire department. (Doc. 21 at 16 ("it put him on a regular 24-hour shift, *even though he could not perform the duties*. (emphasis added)); Doc. 21 at 18 ("While he could not perform the full duty as Battalion Chief…").)

From Hawthorne's Complaint and his brief in opposition to the City's summary judgment motion, Hawthorne's primary focus appears to be the City's unwillingness to provide him his desired accommodation; that is, a battalion chief position that did not require typical duties of a battalion chief, but instead, clerical duties in 8-hour daily shifts, or alternatively, a demotion to a captain's position that worked only during 8-hour shifts.[2]

---

[2] In his deposition, Hawthorne testified that he discussed a possible demotion to an administrative captain position. That is, Hawthorne specifically discussed swapping out for the training captain position that Bingham occupied. Chief Whaley testified in his deposition that the department had an administrative captain position which handled emergency medical system (EMS) administration and three training captain positions. Hawthorne does not specifically discuss the other administrative captain position (as laid out by Whaley) in his brief as forming the basis for his failure to accommodate claim. Instead, Hawthorne discusses the failure to transfer him to the captain position that trains EMS personnel, occupied by Captain Bingham. Perhaps these "administrative captain" and "training captain" positions are the same; nevertheless, the Court will only discuss the position which Hawthorne specifically raised in his brief: the captain position that trains EMS personnel, which was occupied by Captain Bingham.

The City argues Hawthorne's failure to accommodate claim fails because there was no existing administrative battalion chief position into which Hawthorne could be reassigned, nor was the City obligated to create such a position for him. (Doc. 17 at 19-20; Doc. 21 at 20-21.)  The City also argues that it was not obligated to completely redesign Hawthorne's battalion chief position into one that virtually eliminated all of a battalion chief's typical duties and reassigned duties that were only clerical in nature.  (Doc. 17 at 20-21; Doc. 21 at 21-22.)

### 1.    Administrative *Battalion Chief* Position

As to the administrative battalion chief position, the City argues that no such position existed at the time of the events made the basis of this suit and that it was not obligated to create such a position for Hawthorne. Hawthorne responds by stating that the City previously had placed employees in administrative battalion chief positions and therefore could have done the same in his case.  As further evidence, Hawthorne points to Assistant Chief Owens' statement to him that the City was going to move Captain Josh Bingham into an administrative battalion chief position upon Hawthorne's retirement, (Doc. 21-1 at 28; Doc. 21-2 at 2), and the fact that the City previously accommodated Hawthorne by reducing his job duties to those of a clerical nature for the months following his motor vehicle accident.

Undoubtedly, reassignment of a disabled employee is a required "reasonable

accommodation" under the ADA if there is a vacant position available. *Willis v. Conopco, Inc*., 108 F.3d 282, 286 (11th Cir. 1997) ("Reassignment to another position is a required accommodation only if there is a vacant position available for which the employee is otherwise qualified.") (citing 42 U.S.C. § 12111(9)(B)); *see also Haysman v. Food Lion, Inc*., 893 F. Supp. 1092, 1104 (S.D. Ga. 1995) ("The ADA . . . contains explicit language concerning the employer's duty to consider reassignment to a vacant position as a possible accommodation if the employee is no longer able to perform the essential functions of his original job."); *Howell v. Michelin Tire Corp*., 860 F. Supp. 1488, 1492 (M.D. Ala. 1994) ("(I)f an employer has a vacant light-duty position or a vacant permanent position for which the disabled employee is qualified, it would be a reasonable accommodation to reassign the employee to that position.").

However, an employer is not obligated to "bump" another employee from a position to accommodate a disabled employee. *Lucas*, 257 F.3d at 1256. Nor is an employer required to create a new position for an employee. *Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017); *Sutton v. Lader,* 185 F.3d 1203, 1210–11 (11th Cir. 1999) (an employer "is under no obligation to hire an employee for a non-existent job," nor is it required to create a light-duty position for a disabled employee).

Here, Hawthorne's administrative battalion chief argument can be

characterized into two forms: first, that he could have been transferred into an administrative battalion chief position, and second, the City could have reduced and redefined his duties to only those that were clerical or administrative in nature. In either case, it appears Hawthorne desired to retain the position or rank of battalion chief, but largely wanted his job duties redefined as clerical or administrative in nature.

As to the transfer into an administrative battalion chief position, Hawthorne has failed to present sufficient evidence that there actually was an existing, vacant administrative battalion chief position into which he could be transferred.  A random statement by another employee, without more, does not meet his burden. *See Frazier-White v. Gee*, 818 F.3d 1249, 1256 (11th Cir. 2016)  ("Plaintiff did not support the request with any evidence that there was a specific, full-duty vacant position she was qualified for and could have done, given her medical condition."); *Duckett v. Dunlop Tire Corp*., 120 F.3d 1222, 1224–25 (11th Cir. 1997) ("[T]he issue of whether . . . a reasonable accommodation can be made for that employee is determined by reference to a specific position."). Indeed, Hawthorne acknowledged in his deposition the nonexistence of this position at the time of his accident. (Doc. 16-13 at 14.) In his summary judgment response, Hawthorne makes no showing whatsoever that such a position existed in 2017 or 2018, let alone that it was vacant and open to be filled.  That such a position may have

existed years before does not mean that such a position existed at the time of the events made the basis of this lawsuit.  Because Hawthorne has failed to present evidence of such a position into which he could be transferred, summary judgment is due to be granted to the extent Hawthorne claims that the City should have accommodated him by moving him into an administrative battalion chief position.

Second, Hawthorne cannot show that the City wrongfully failed to accommodate him when the City refused his request to assign him job duties that were strictly clerical or administrative in nature, such as when the City previously accommodated his physical limitations while recovering from the injuries he suffered in the traffic accident.  The City notes that the post-accident accommodation was not a position but instead was an amalgamation of temporary duties (or busy work) compiled for Hawthorne while he recuperated after his traffic accident.  According to Hawthorne, this position was a job that he could perform given his disability and clearly was available prior to Hawthorne's on-the-job injury.  Therefore, according to Hawthorne, his placement into that position should have posed no undue hardship upon the City on a permanent basis.

The City responds that this was no position at all, but instead was a good deed performed by the City to *temporarily* keep Hawthorne busy and on the payroll without exhausting his leave while he continued to recover.  The City also argues that previously allowing Hawthorne to temporarily work in that modified

capacity does not indicate the City violated the ADA by not offering this accommodation a second time, especially when it gave Hawthorne an accommodation greater than that required by the ADA.  (Doc. 17 at 21.)

Past accommodations, which exceeded the requirements of the ADA, do not bind an employer to anything outside the requirements of the ADA. *See Holbrook v. City of Alpharetta, Ga*., 112 F.3d 1522, 1527 (11th Cir. 1997). This is because "the ADA defines a qualified individual as one who '*with or without* reasonable accommodation, can perform the essential functions of the employment position.'" *Holbrook*, 112 F.3d at 1527 (quoting 42 U.S.C. § 12111(8)) (emphasis in original).

Therefore, here, the fact that the City previously accommodated Hawthorne by removing all duties, except those clerical in nature, does not mean that the City violated the ADA by refusing to remove these same duties at a later date. The City was not obligated to indefinitely extend Hawthorne's light-duty status; such a request is unreasonable as a matter of law. *E.g., Frazier-White v. Gee*, 818 F.3d at 1256. The pertinent question is whether Hawthorne could perform the essential duties of the battalion chief position with accommodation.  Federal regulations promulgated pursuant to the ADA expressly note that:

> [a]n employer or other covered entity may restructure a job by reallocating or redistributing non-essential, marginal job functions.... An employer or other covered entity is not required to reallocate essential functions. The essential functions are by definition those that the individual who holds the job would have to perform, with or without accommodation, in order to be considered qualified for the

position.

29 C.F.R. Part 1630, Appendix at 344; *see also Lucas*, 257 F.3d at 1260 ("While it is true that the ADA may require an employer to restructure a particular job by altering or eliminating some of its marginal functions, employers are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists.").

Hawthorne's assertion that the City could have accommodated him by returning him to the pre-work injury job does not pass muster under the ADA. But Hawthorne's claim is premised upon that very foundation.  Hawthorne makes no real attempt to assert, nor could he, that this accommodation would allow him to perform the essential functions of the battalion chief job.  Instead, his argument is premised upon a complete restructuring of that position.  This, the City was not required to do. *See Frazier-White*, 818 F.3d at 1256 ("Defendant was not required by the ADA to create a permanent light-duty position especially for Plaintiff.") (citing *Sutton v. Lader*, 185 F.3d 1203, 1211 (11th Cir.1999) (holding that the Rehabilitation Act did not require an employer to create a light-duty position for a disabled plaintiff)).

A reasonable accommodation is one that "enables the employee to perform the *essential functions* of the job." *Lucas*, 257 F.3d at 1259-60 (emphasis added).

That is not what Hawthorne proposes here. The proverbial "no good deed goes unpunished" cannot be the foundation for liability under the ADA.

Accordingly, the City's motion for summary judgment with respect to Hawthorne's failure to accommodate claim regarding the administrative battalion chief position is due to be granted.

### 2. Reduced Shift Hours to Accommodate Sleep at Home

When he returned to work after his on-the-job accident, Hawthorne was returned to a 24-hour shift at his station. This required him to sleep at the station or, as he did prior to his disability, pay another battalion chief to cover some of his shift hours. Hawthorne claims that he could not work the longer shift and could not sleep in the bed at the station due to pain and discomfort, and therefore the City should have accommodated him by requiring no more than 8-hour shifts which, in turn, would allow him to sleep in his own bed at night. Hawthorne also claims that, and Josh Brown confirmed, working only 8-hour shifts would not have interfered with the operation of the fire department. (Doc. 21-9 at 10.)

The City responds, arguing that the 24-hour shift requirement was an essential function of the job as battalion chief and that the City provided battalion chiefs such as Hawthorne with high-quality, memory-foam beds—not cots—such that there was no medical need for him to sleep at home. (Doc. 16-14 at 8-9, 10; Doc. 17 at 22.) The City also argues that it previously allowed Hawthorne to work

a reduced shift only as a temporary accommodation while he recuperated from his on-the-job injury but that this was never intended to become a permanent change. (Doc. 17 at 20.)

Mandatory shift rotations are often considered an essential function of an employee's position, particularly in public service positions such as law enforcement and hospitals. *Mattingly v. University of South Florida Bd. Of Trustees,* 931 F. Supp. 2d 1176, 1183 (M.D. Fla. 2013) (citing cases); *cf. Earl v. Mervyns, Inc.,* 207 F.3d 1361, 1366 (11th Cir. 2000) (concluding that punctuality is an essential job function because, *inter alia,* failure to be on time or work a full shift would force other employees to work a longer shift). The Supreme Court has supported this principle more broadly, finding that the operation of a neutral scheduling system designed to meet the needs of all employees "cannot be an unlawful employment practice even if the system has some discriminatory consequences." *Trans Word Airlines, Inc. v. Hardison*, 432 U.S. 63, 82 (1977).

The Court concludes that working a 24-hour shift is an essential function of the battalion chief position within the City's fire department. As Hawthorne admits, the fire department required a battalion chief to be on-duty at all times, and all battalion chiefs and most other fire department personnel worked 24-hour shifts. As such, for Hawthorne to work only a daily 8-hour shift, compared to the 24-hour shifts required of all the other battalion chiefs, there would be a disruption

of the shift rotation of the other battalion chiefs who would have to cover Hawthorne's overnight hours in addition to their own, or alternatively, the City would have had to hire an additional battalion chief.   The Eleventh Circuit has recognized that an employer is under no obligation to accommodate when the outcome places such a burden on other employees or the employer. *See Dalberiste v. GLE Assocs., Inc.*, No. 20-11101, 2020 WL 2529752, at *1 (11th Cir. May 19, 2020) (affirming the district court's grant of summary judgment to an employer in a case where the district court reasoned that Dalberiste's accommodations would require other GLE technicians to bear an additional workload of an already demanding job, force GLE to change its scheduling and work assignment procedures, force GLE to incur additional costs to hire an additional employee, put GLE's contract with the plant at risk, and affect Turkey Point's badging and security procedures).

Hawthorne argues that the 24-hour shift is not an essential battalion chief job function as evidenced by the fact that, prior to his injuries, he could pay other employees to cover his hours.  However, that does not lessen the essential nature of these work hours.   When he paid another employee to cover for him, that scenario clearly required a voluntary agreement between Hawthorne and the employee and was at Hawthorne's own expense. If he could not find voluntary coverage, Hawthorne had to complete his entire shift himself.  That is an entirely different

scenario from Hawthorne's proposal which would forcefully require another employee to cover for him with no benefit to the employee and at no cost to Hawthorne.

In short, the battalion chief position was a 24-hour position that all battalion chiefs were required to cover, and as such, working a 24-hour shift was an essential function of the position. The City is therefore entitled to summary judgment on Hawthorne's ADA claim to the extent Hawthorne claims there was an ADA violation stemming from the City's refusal to allow him to work an 8-hour shift as a battalion chief.

The City is also entitled to summary judgment concerning the alleged failure to accommodate Hawthorne regarding his station bed. This accommodation request is intertwined with Hawthorne's request to work only 8-hour shifts so that he could sleep at home at night in his own bed.  While the parties spend considerable time arguing about whether Hawthorne's physician ordered or recommended that Hawthorne sleep in a normal bed, not "cot" (thereby inferring that he should sleep at home), lost in the parties' argument is whether Hawthorne ever asked for an accommodation at the station of a bed that would satisfy his alleged medical needs.  The City argues that Hawthorne had available to him a bed with a memory-foam mattress, not a cot.  Hawthorne does not really challenge this assertion, nor does he provide any argument or reason as to why a memory-foam

bed was medically insufficient. And, if it was medically necessary, Hawthorne makes no assertion that he requested one at the station.  Instead, Hawthorne's argument somewhat melts into his fallback position that he should have been permitted to work an 8-hour shift and sleep at home at night.

Hawthorne has the burden of proof on this issue and based on the record and argument, the Court concludes that Hawthorne has not stated a prima facie claim on this issue.  While sleeping at home in his own bed may be a preferable option to Hawthorne, as it was prior to his disabling injuries, the ADA does not require that he be provided the accommodation he finds most desirable. *See Stewart*, 117 F.3d at 1286 ("[U]nder the ADA a qualified individual with a disability is 'not entitled to the accommodation of her choice, but only to a reasonable accommodation.'").

### 3.    Administrative *Captain* Position

Hawthorne also claims the City could have demoted him into an administrative captain position as a means of accommodating his disability.  The City disputes this assertion, arguing that Hawthorne would not have been physically able to perform the training captain position and that it was under no obligation to bump another employee in order to make it available to Hawthorne. (Doc. 17 at 9, 14.)

Hawthorne cites to the statements of Assistant Chief Whaley who told him there was an administrative captain position that handled emergency medical

system (EMS) administration, as well as three training captain positions, in the fire department. (Doc. 21-6 at 5-6.)  However, Hawthorne has not shown that he could perform the essential functions of these positions, let alone that these positions were open and available.

In his summary judgment response, Hawthorne does not point to any evidence that any of the captain positions were actually open and available. Instead, he points to the training captain position occupied by Captain Bingham. (Doc. 16-13 at 17.)  However, Hawthorne admits that, at the time, the training captain position was occupied by Captain Bingham, and therefore Captain Bingham would have to be bumped from that position for Hawthorne to get it. (*Id*.)  Presumably, Hawthorne claims that he should have been demoted to Captain Bingham's position when Captain Bingham was promoted to Hawthorne's battalion chief position.  (Doc. 16-14 at 5.)  But even in that scenario, Hawthorne fails to present any evidence that he actually asked to be demoted into that position.  His words show the opposite; after all, his deposition testimony and summary judgment briefs repeatedly display his animosity toward anything that resulted in or could be perceived as a demotion in title or position.  (*See, e.g.*, Doc. 21 at 24-25.)

But even as to that lower-ranked position, Hawthorne admits that he could not perform the essential functions of the training captain position, for the same

reasons he could not perform the functions of his own battalion chief position. (Doc. 16-13 at 17.)  For example, paramedic training captains have to, among other things, move a 160-pound mannequin, a task that Hawthorne admittedly could not perform due to his disability. (*Id*.) This, of course, is separate from the problematic issue for Hawthorne that captains also must work 24-hour shifts.

The *training* captain positions aside, in theory, Hawthorne might have been able to perform an *administrative* captain position. The ADA requires an employer to reassign a disabled employee to a vacant position if the employee is qualified for that position. *See Willis*, 108 F.3d at 284 (citing 42 U.S.C. § 12111(9)(B)). However, the employee must make an effort to identify the vacant position for which he is qualified: "(e)ven assuming an employer has an affirmative obligation—absent an employee's suggestion for a specific accommodation—to engage in the interactive process . . . where a plaintiff cannot demonstrate reasonable accommodation, the employer's lack of investigation into reasonable accommodation is unimportant." *Willis*, 108 F.3d at 285 (citing *Moses v. American Nonwovens, Inc*., 97 F.3d 446, 448 (11th Cir. 1996)).

Hawthorne's claimed discussions with the City about the demotion revolved around the training captain position and potentially swapping with Captain Bingham. Hawthorne does not offer in his brief opposing summary judgment that he specifically discussed the other administrative captain position mentioned

separately by Chief Whaley, but only mentions the training captain position held by Captain Bingham, which Hawthorne himself admitted he could not perform. "(A)n employer's 'duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.'" *Frazier-White,* 818 F.3d at 1255–56 (quoting *Gaston v. Bellingrath Gardens & Home, Inc*., 167 F.3d 1361, 1363–64 (11th Cir. 1999) ("[T]he initial burden of requesting an accommodation is on the employee. Only after the employee has satisfied this burden and the employer fails to provide that accommodation can the employee prevail on a claim that her employer has discriminated against her.")).

The Court is not obligated to make arguments for Hawthorne not mentioned in his brief opposing summary judgment. *E.g*., *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it ...."). Hawthorne has not offered that an administrative captain position was vacant at the time he requested to be reassigned, and the only (potentially) vacant captain position that he identifies is a position he could not physically perform. Thus, largely for the same reasons that the City is entitled to summary judgment on Hawthorne's failure to accommodate claim relating to an administrative battalion chief position, the City is also entitled to summary judgment concerning the administrative-training captain position.

### B. Age Discrimination (Count II)

Count II alleges the same general adverse employment actions, but alleges that they resulted from age discrimination in violation of the ADEA. In particular, Hawthorne claims the City violated the ADEA when it denied his request to transfer to an administrative battalion chief position under the pretext that the position was not going to be filled, when in reality the position was being held for a younger employee, Captain Josh Bingham.  (Doc. 1 at 9.)  Hawthorne also contends he was discriminated against when he was replaced as battalion chief by a younger employee, Josh Brown.  (*Id.*)

In its Motion, the City makes two arguments for why it is entitled to summary judgment on Hawthorne's ADEA claim. First, the City argues that Hawthorne cannot show that age was the "but for" cause of his claimed adverse employment actions (failure to transfer and replacement as battalion chief). (Doc. 17 at 13.)  The City next asserts in the alternative that Hawthorne cannot establish a prima facie case of age discrimination through an actionable adverse employment action, that he suffered disparate treatment because of his age, and that the City's proffered non-discriminatory reasons for its employment actions were pretext for illegal discrimination based on age. (Doc. 17 at 14-15.)  The Court will address each of these arguments in turn.

### 1. Age as the "But For" Cause of Hawthorne's Alleged Disparate Treatment

Under the ADEA, it is "unlawful for an employer to ... discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The Supreme Court has held that the "because of" language in the ADEA statute means that a plaintiff must show that age discrimination was the "but-for" cause of the adverse employment action. *See Gross v. FBL Financial Services*, 557 U.S. 167, 176 (2009) ("To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."). The ADEA does not authorize "a mixed-motives age discrimination claim." *Id.* at 175.

Following the *Gross* decision, courts in this Circuit have disagreed on whether the Supreme Court foreclosed a plaintiff's ability to simultaneously pursue claims under the ADEA and another anti-discrimination statute for the same employment decision. *Compare Culver v. Birmingham Bd. Of Educ.*, 646 F. Supp. 2d 1272 (N.D. Ala. 2009) ("Prior to *Gross*, it was permissible to allege alternative proscribed employer motives, one of which is plaintiff's age. That permission has now been withdrawn by the Supreme Court."), *with McQueen v. Wells Fargo Home Mortg.*, 955 F. Supp. 2d 1256, 1284 (N.D. Ala. 2013) (holding that "under

the ADEA, the plaintiff can allege that the alleged discriminatory acts were committed both because of her age and race").

The Eleventh Circuit recently examined this issue in an unpublished opinion, ruling that because Federal Rule of Civil Procedure 8(d) "expressly permits the pleading of alternative and inconsistent claims," plaintiffs are permitted to pursue ADEA claims along with other claims for unlawful discrimination that stem from the same conduct. *Savage v. Secure First Credit Union*, No. 15-12704, 2016 WL 2997171, at *1 (11th Cir. May 25, 2016) (citation omitted). Procedurally, *Savage* was at the motion to dismiss stage and not the summary judgment stage, and for that reason, some district courts continue to hold that multiple "but for" employment discrimination claims may not proceed past summary judgment. *See, e.g., Jones v. Allstate Ins. Co.*, 281 F. Supp. 3d 1211, 1217 (N.D. Ala. 2016) ("[S]ummary judgment stands as a bulwark against multiple 'but-for' claims beyond even the broadest reading of Rule 8 alternative pleading.").

Hawthorne argues the Eleventh Circuit in *Savage* expressly permitted such alternative theory pleading.  The City counters that *Savage* procedurally was at the motion to dismiss stage and therefore not subject to the evidentiary roadblock posed at summary judgment, as is this case.

While a plaintiff may recover only once for a given adverse action, he may assert different prohibited motives for it.  At the summary judgment stage, the

Court is to analyze each claim independently under the applicable causation standard to assess whether sufficient evidence supports each of the plaintiff's claims. Nothing argued by the City convinces this Court that a plaintiff cannot simultaneously pursue an ADA and ADEA claim past the summary judgment stage and at trial, especially in light of the *Savage* decision. The dilemma for a plaintiff in advancing alternative pleading arises only when a jury returns a verdict in favor of a plaintiff under both claims. That quandary, however, is not before the Court at present. Therefore, the City is not entitled to summary judgment on Hawthorne's ADEA claim purely on the basis that Hawthorne also continues to advance an ADA claim for the same adverse employment actions.

## 2.   Hawthorne's Prima Facie Case Under the ADEA

Hawthorne's ADEA claim largely mimics his ADA claim in that he argues, in the alternative, that if he was not given an administrative battalion chief position because of his disability, then it must have been because of his age. (Doc. 21 at 19-21.)   Hawthorne claims this was discriminatory based on age because a City employee told him the position was not going to be filled by anyone, but in reality, it was being held for Captain Bingham (a younger employee) once Hawthorne retired. (Doc. 21 at 20.)  Among others, Hawthorne points to deposition testimony of other employees who testified that the City had an administrative battalion chief position in the past, that the City had budgeted for five battalion chief positions but

33

only had four of those filled, and that his supervisors generally were unaware that Hawthorne had requested to be placed in such a position.   Therefore, according to Hawthorne, the City's statement that it did not have such a position was pretextual.

Hawthorne also claims he was replaced as battalion chief by Captain Josh Brown and was forced to take workers' compensation leave, and therefore Hawthorne was treated less favorably than Brown.  (Doc. 21 at 20.)  According to Hawthorne, therefore he "can show that he did ask for the administrative battalion chief position and also that he can present a comparator." (Doc. 21 at 21.)

Like it did with the ADA claim, the City argues that it is entitled to summary judgment on Hawthorne's ADEA claim because (1) there was no open administrative battalion chief or captain position into which he could transfer, (Doc. 16-13 at 6, 14, 17); (2) Hawthorne could not perform the duties of a training captain, (Doc. 16-13 at 17); and (3) Hawthorne was not permanently replaced as a battalion chief by a younger employee, (Doc. 17 at 14; Doc. 16-13 at 42).  The City also argues that Hawthorne was not subjected to an adverse employment action based on his age, that he was not qualified for the job of battalion chief because he could not perform the essential functions of the job, that he could not show any more favorable treatment toward a younger, similarly situated person, that he cannot establish that the City's reasons for its handling of his accommodations were pretext to mask unlawful age discrimination, and that his

decisionmaker was over age 40 (and older than Hawthorne), and therefore the City could not discriminate against Hawthorne based on age. (Doc. 17 at 16-17.)

The City also points out that, as to the administrative battalion chief position, the City never put Captain Bingham into such a position. (Doc. 17-13 at 42.) Thus, Hawthorne cannot prove that the City discriminated against him based on age when he cannot show that the City gave the desired position to a younger person. (Doc. 23 at 6.)

As to being replaced by Brown, a younger person, as battalion chief, the City points out that Hawthorne admittedly could not fulfill the duties of the position because of his disability and that someone, regardless of his or her age, had to fill the position. (Doc. 23 at 6.) That the replacement happened to be younger is irrelevant. Regardless, the City notes that Hawthorne remained as battalion chief with the same rank and pay, but that the only change was in regard to his duties. (Doc. 16-13 at 9.)

Under the framework created in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Hawthorne must first establish a prima facie case of age discrimination by showing that he was (1) a member of the protected age group, (2) subjected to an adverse employment action, (3) qualified to do the job, and (4) replaced by a younger individual or suffered disparate treatment compared to employees who were not members of his protected class. *Kelliher v. Veneman*, 313

F.3d 1270, 1275 (11th Cir. 2002) (deciding case brought under both Title VII and the ADEA under the same standard); *Williams v. Vitro Servs. Corp*., 144 F.3d 1438, 1441 (11th Cir. 1998).

If a plaintiff meets that prima facie burden, the employer then has the burden of production to articulate some "legitimate nondiscriminatory reason" for its conduct. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1993). Once the employer offers a justification, the plaintiff must show that the employer's proffered reason for its actions is pretextual and that the employer did in fact intend to discriminate. *Sims v. MVM, Inc*., 704 F.3d 1327, 1333 (11th Cir. 2013).

To begin, there is no dispute that Hawthorne falls into a protected age group, as Hawthorne was over 50 years old at the time of the events made the basis of this lawsuit. The City, however, challenges Hawthorne's ability to meet the other three factors of his prima facie case.

The first challenge is to Hawthorne's burden to show an adverse employment action.  An adverse employment action under the ADEA is "a serious and material change in the terms, conditions, or privileges of employment." *Coles v. Post Master Gen. United States Postal Servs*., 711 F. App'x 890, 895 (11th Cir. 2017) (per curiam) (citing *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1193–94 (11th Cir. 2016) (*abrogated on other grounds by Babb v. Wilkie*, 140 S. Ct. 1168 (April 6, 2020)). To establish this element, a plaintiff must show

36

that "the employer's action . . . impact[ed] . . . the plaintiff's job in a real and demonstrable way." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). In addition, "the employment action must be materially adverse as viewed by a reasonable person in the circumstances" not just from the employee's subjective perspective. *Id*. Stated another way, "a 'bruised ego' is simply not enough to constitute an adverse employment action." *Mitchell v. Vanderbilt Univ*., 389 F.3d 177, 182 (6th Cir. 2004) (citation omitted); *see also Flaherty v. Gas Research Inst*., 31 F.3d 451, 457 (7th Cir. 1994) ("a plaintiff's perception that a . . . transfer would be personally humiliating is insufficient, absent other evidence, to establish a materially adverse employment action"); *cf. Doe v. Dekalb Cty. Sch. Dist*., 145 F.3d 1441, 1449 (11th Cir. 1998) ("not everything that makes an employee unhappy is an actionable adverse action.").

Here, Hawthorne states that a reasonable person "might well have been prevented from filing a charge of discrimination if he knew he was going to be treated in the horrible manner the City treated Mr. Hawthorne, after his 27 years of service." (Doc. 21 at 24.) Apparently, this horrific treatment included the City's promotion of Captain Bingham to Hawthorne's battalion chief position and assignment to Hawthorne's office, having Hawthorne answer to Captain Bingham and Brown despite Hawthorne having seniority in rank over them, being required

to work a 24-hour shift instead of being allowed to go home and sleep in a familiar bed, being required to perform administrative work at his station, not being allowed to drive department vehicles, being forced to work in a cold and hostile work environment, and forcing him home on workers' compensation leave at a reduced income rate.  (Doc. 21 at 24-25.)

Most of these so-called adverse employment actions are not actionable. First, to the extent that the complained-of adverse employment action stems from the City's alleged failure to transfer Hawthorne to an administrative battalion chief position from his normal battalion chief position, Hawthorne cannot meet this prima facie element because, as the Court previously discussed, there was no administrative battalion chief position into which Hawthorne could transfer. *See Johnson v. Potter*, 732 F. Supp. 2d 1264, 1280 (M.D. Fla. 2010) ("Failure to promote is generally an adverse action but *not if there is no open position*.") (emphasis added) (citation omitted). Similarly, Hawthorne fails show that there was a vacant captain position into which he could transfer.

Moreover, the City's failure to transfer (or demote) Hawthorne to a lesser position does not constitute a harmful change in terms, conditions, or privileges of employment. Instead, the failure maintained the status quo, except for the City's refusal to grant Hawthorne a desired reduction in responsibilities.  In other words, Hawthorne makes no assertion that he was denied an *increase* in salary, title, or

responsibilities. *See Gaddis v. Russell Corp.*, 242 F. Supp. 2d 1123, 1145 (M.D. Ala. 2003) (in order to state a prima facie case for discrimination, "the position to which the employee was denied a transfer, must entail a serious and material change in the terms, conditions, or privileges of employment."); *Smith v. Alabama Dep't of Corr.*, 145 F. Supp. 2d 1291, 1298 (M.D. Ala. 2001) ("The flip side of this coin would appear to be that a failure to transfer may constitute an adverse employment action if [the new position] entails an increase in pay, prestige or responsibility.") (quoting *Morris v. Wallace Comm'y College*, 125 F. Supp. 2d 1315, 1328 (S.D. Ala. 2001)).

Hawthorne also claims that he was discriminated against by way of joking remarks made to him by his co-workers.  While this assertion sounds more like a hostile work environment claim based on age, which Hawthorne has not pleaded in his Complaint, this assertion easily fails for lack of a tangible impact on the terms and conditions of employment.  But even if a hostile work environment claim was asserted, the record does not reveal the type of severe and pervasive harassment, or a workplace "permeated with intimidation, ridicule or insult" based on age, necessary to support such a claim. *See Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 57 (11th Cir. 2005) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Conversely, a termination or change in employment would constitute an adverse employment action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir.

2008) (adverse employment actions include "ultimate employment decisions . . . such as termination, failure to hire, or demotion").  Although Hawthorne does not clearly state it, he apparently claims that he was constructively discharged when Captain Bingham was transferred into Hawthorne's battalion chief position and when Hawthorne was pushed out by being forced to take workers' compensation leave.  The Court will assume that Hawthorne meets this prima facie element with respect to this employment action, as there should be no real dispute that being forced out of a fully-salaried job for workers' compensation leave at a reduced rate of pay constitutes an actionable adverse employment action.

Although Hawthorne may be able to show that his forced workers' compensation leave was an adverse employment action, and that he was replaced by a younger person (Captain Bingham), Hawthorne cannot meet the third prima facie element establishing that he was qualified to perform the job of a battalion chief.  *Liebman v. Metropolitan Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015) ("To make a prima facie case of age discrimination, the employee must show: . . . (4) he was qualified to do the job from which he was discharged.") (citing *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012)).  As to this element, even Hawthorne admits that he could not perform the job duties of a battalion chief—or, for that matter, the training captain position that Captain Bingham held—due to his disability. This admission alone precludes this claim

from going forward.

Hawthorne's admitted inability to perform the job duties of a battalion chief also serves as a legitimate, non-discriminatory reason for Hawthorne's termination, if his separation is characterized as such. *See Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1074 (11th Cir. 2003) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996) (Once a plaintiff demonstrates a prima facie age discrimination case, the defendant has the burden "to articulate a 'legitimate, non-discriminatory reason' for its employment decision.")). This burden is "exceedingly light." *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994) (quoting *Meeks v. Comput. Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)); *see also Phillips v. Aaron Rents, Inc.*, 262 F. App'x 202, 205–10 (11th Cir. 2008) (per curiam) (tardiness constitutes a legitimate, non-discriminatory reason for termination).

Once an employer offers a legitimate, non-discriminatory reason, the burden shifts to the plaintiff to show that this suggested reason is merely a pretext for unlawful age discrimination. *Chapman*, 229 F.3d at 1024–25. The plaintiff may do this by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation and

internal quotation omitted). Importantly, a plaintiff cannot "simply quarrel[ ] with the wisdom of [the employer's] reason" but "must meet that reason head on and rebut it . . . ." *Chapman*, 229 F.3d at 1030. In other words, summary judgment is appropriate in a discrimination case where the plaintiff fails to "set[ ] forth specific facts showing" a genuine issue exists as to whether the employer's articulated reason is pretextual. *Mauter v. Hardy Corp.,* 825 F.2d 1554, 1558 (11th Cir. 1987). Hawthorne has failed to carry that burden.

Here, Hawthorne does little to rebut the City's showing. Indeed, Hawthorne's efforts to prove his ADA claim all but sink his age discrimination claim, as even Hawthorne must admit that his alleged termination was based on his inability to perform his job due to his disability, and not because of his age. Under the "but for" analysis that must be employed regarding Hawthorne's ADEA claim, and given his admission that he could not perform the job of a battalion chief or a training captain, his age discrimination claim must therefore fail.

### C.    ADA Retaliation

Hawthorne claims in Count III that he was retaliated against for retaining legal counsel and filing an EEOC charge in May 2018 when (1) his name was removed from the duty roster in August 2018; (2) Captain Bingham was promoted to Hawthorne's battalion chief position forcing Hawthorne to report to a junior rank employee; (3) he was placed on 24-hour shifts without a legitimate reason and

was not allowed to go home at night; (4) he was not permitted to drive a department vehicle; (5) he was required to use leave if he wanted to go home; (6) he was forced out on workers' compensation leave; and (7) he was subjected to a cold and hostile work environment. (Doc. 1 at 11-12.)

The City argues that it is entitled to summary judgment because these claims are merely "reclothing" of his discrimination claims and because the retaliation claims are due to be dismissed for the same reasons as the discrimination claims. (Doc. 17 at 23.) The City also argues that none of Hawthorne's complained-of retaliatory actions constitute actionable adverse employment actions, (Doc. 17 at 24), and that they are too temporally distant from when Hawthorne filed his EEOC charge, (Doc. 17 at 25).

In order to prove an ADA retaliation claim, a plaintiff must show that: (1) he "engaged in conduct protected by the ADA"; (2) he "was subjected to an adverse employment action at the time, or after the protected conduct took place"; and (3) the defendant "took an adverse employment action against [him] because of [his] protected conduct." *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1158 (11th Cir. 2005) (citing 3C Fed. Jury Prac. & Instr. § 172.24 (5th ed.)). The City argues that Hawthorne's omission from the duty roster is irrelevant since the roster is merely a "guide" for chiefs on shift; that he was assigned to report to Captain Bingham three months after filing the complaint; that the "swapping" policy was in

use prior to his injury, a policy that he utilized frequently to go home and sleep there; that he was not allowed to drive a City vehicle because he was assigned to a desk position and there was only one vehicle per station; that he admitted that he was unable to work and did not question the City's decision to send him home on disability; and that any "teasing" was not attributable to the City and was offhand and unserious. (Doc. 17 at 24-25.)

First, many of the allegedly retaliatory actions of which Hawthorne complains do not rise to the level of actionable adverse employment actions, if they were employment actions at all, because these actions do not constitute serious and material changes in the terms, conditions, or privileges of employment. *Davis*, 245 F.3d at 1238. These include the allegations that (1) Hawthorne's name was removed from the duty roster in August 2018; (2) he was forced to report to an inferior ranked employee who was serving as acting battalion chief; and (3) he was not permitted to drive department vehicles. *See, e.g., Miller-Goodwin v. City of Panama City Beach, Fla*., 385 F. App'x 966, 970 (11th Cir. 2010) (concluding that being ignored and not being allowed to drive her patrol vehicle unless on duty were not actionable because they were not shown to have constituted a serious and material change in the terms, conditions or privileges of employment); *Smith v. Alabama Dept. of Public Safety*, 64 F.Supp.2d 1215, (M.D. Ala. 1999)(citing *Flaherty v. Gas Research Institute*, 31 F.3d 451, 457 (7th Cir. 1994)(holding that a

44

transfer causing plaintiff's title to be changed and resulting in the plaintiff having to report to a former subordinate may have bruised the plaintiff's ego, but did not constitute adverse employment action)).

Still, the following events could, on their face, be considered actionable adverse actions: (1) when Hawthorne was placed on 24-hour shifts without a legitimate reason and was not allowed to go home at night; (2) when he was required to use leave if he wanted to go home; (3) when he was forced home on workers compensation; and (4) when he was subject to a hostile work environment. *See Sharpe v. Glob. Sec. Int'l*, 766 F. Supp. 2d 1272, 1293 (S.D. Ala. 2011) (employee's reassignment involving "a substantial increase in physical demands" met standard for adverse employment action); *Braswell v. Allen*, 586 F. Supp. 2d 1297, 1306 (M.D. Ala. 2008) (shift transfer could constitute an adverse employment action if the transfer resulted in a tangible harm); *Monaghan v. Worldpay US, Inc*., 955 F.3d 855, 860 (11th Cir. 2020) ("retaliatory harassment" is cognizable adverse employment action for purposes of a Title VII retaliation claim); *see also Taylor v. Roche*, 196 F. App'x 799, 803 (11th Cir. 2006) (adverse action where Air Force weapons inspector was denied return to shift he previously worked before serving abroad in order to take his children to school and avoid a "tense environment"); *Terrell v. Paulding Cty*., 539 F. App'x 929, 934 (11th Cir. 2013) (Even if plaintiff's hostile work environment allegations were generally an

45

actionable adverse employment action, "[m]ere ostracism in the workplace is not grounds for a retaliation claim . . . .") (citation omitted); *cf. McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1078 (11th Cir. 1996) (reassignment to post where tasks were difficult for a person of plaintiff's condition to perform constituted an adverse employment action); *Williams-Evans v. Advance Auto Parts, Inc.*, No. CV-118-148, 2020 WL 501752, at *6 (S.D. Ga. Jan. 30, 2020) (Plaintiff's doctor ordered plaintiff to leave her job and take workers' compensation, not her employer; therefore employer did not engage in an adverse action for forcing the plaintiff to take workers' compensation).

As to the requirement that Hawthorne work 24-hour shifts instead of the 8-hour shifts that he desired, this is not actionable under the facts in this case because the 24-hour shift length was a recognized job duty for the position that Hawthorne held—as it was for all battalion chiefs. Hawthorne cannot transform what he claims is an obligation to accommodate into an ADA retaliation claim for failure to give it to him. *See Holbrook*, 112 F.3d at 1528 (prior accommodations outside of ADA requirements can be ended by employer). In other words, this assertion is nothing more than an attempt by Hawthorne to reclothe his failure-to-accommodate claim as one for retaliation, especially because he was required to work a 24-hour shift prior to his disability. *See Williams-Evans*, 2020 WL 501752, at *6 ("the ADA considers a failure-to-accommodate claim a claim for

discrimination and not retaliation.") (citing *Pagonakis v. Express LLC*, 315 F. App'x 425, 431 (3rd Cir. 2009) (a failure-to-accommodate theory "cannot be characterized as a retaliation claim under the ADA. The claim is a direct discrimination claim based on alleged failures to fulfill the affirmative duties prescribed by the ADA.") (citing in turn *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002) (interpreting the ADA's discrimination provision, 42 U.S.C. § 12112(b)(5)(A), as including failures to accommodate)).

The same holds true of Hawthorne's assertion that he suffered an adverse employment action through the City's insistence that he use leave if he wanted to go home instead of completing his 24-hour shift. The City's action in this regard was nothing more than an insistence that Hawthorne comply with a city policy that applied to all battalion chiefs, not just Hawthorne. Furthermore, this assertion too is nothing more than an attempt to reclothe a failure to accommodate claim into a retaliatory adverse employment action, something which, as previously stated, he cannot do. No reasonable worker would be dissuaded from making or supporting a charge of discrimination because an employer insisted that the worker perform the requirements inherent in the job in the first place.

Hawthorne also claims it was retaliatory for the City to force him to take workers' compensation leave. The Court concludes that this action is an adverse employment action as it constituted an indefinite leave from work at a reduced rate

of compensation.[3] *See Herron-Williams v. Alabama State Univ*., 287 F. Supp. 3d 1299, 1311 (M.D. Ala. 2018), *aff'd*, *Herron-Williams v. Alabama State Univ*., 805 F. App'x 622 (11th Cir. 2020) (A significant pay cut, about seventeen-percent of the salary the plaintiff was receiving before the pay cut, "is a quintessential adverse employment action.").

The City argues that this action occurred nearly three months after Hawthorne's complaints of discrimination and therefore is not temporally proximate to show that they are causally related. (Doc. 17 at 25.) Causal relation based on temporal proximity must be very close, and in the Eleventh Circuit, periods generally in excess of one month have been held insufficient to meet that burden. *See Williams v. Waste Mgmt., Inc*., No. 10–13121, 2011 WL 207932, at *3 (11th Cir. 2011) (two months is insufficient); *Herron-Williams*, 805 F. App'x 622, at *9 (not enough temporal proximity to establish causal connection for retaliation claim where plaintiff employee filed EEOC charge in March, employer responded to EEOC in July, and employee's pay was reduced in September of the same year); *Thomas v. CVS/Pharmacy*, 336 F. App'x 913, 915 (11th Cir. 2009) (per curium) (three-and-a-half months is too remote to infer causation); *cf. Robinson v. LaFarge N. Am., Inc*., 240 F. App'x. 824, 829 (11th Cir. 2007)

---

[3] Under the Alabama Workers' Compensation Act, an employee on workers' compensation leave is only entitled to a rate of indemnity equal to 2/3 of his normal average weekly wage. ALA. CODE (1975) § 25–5–57.

(causation sufficiently alleged where adverse action occurred about two months after protected activity); *Stone v. Geico Gen. Ins. Co*., 279 F. App'x 821, 824 (11th Cir. 2008); *Locascio v. BBDO Atlanta, Inc*., 56 F. Supp. 3d 1356, 1370-71 (N.D. Ga. 2014) (sufficient proximity where plaintiff complained about discriminatory conduct in mid-July, was reassigned to "new business" sometime in August, and was terminated from employment in September, all in the same year).

In this case, Hawthorne notified the City of a potential EEOC complaint on May 25, 2018 and filed his charge on June 19, 2018. (Doc. 21 at 22.)  He was required to take workers' compensation on August 15, 2018. (Doc. 21 at 25.) As this Court has noted before, it is sometimes difficult in a retaliation "temporal proximity" analysis to determine whether a month and a half or two months between an employee's protected conduct and an employer's adverse action "is too hot, too cold, or just right," when the doctrine itself is based in part on a "*post hoc ergo propter hoc*" logical fallacy. *E.g*., *Dixon v. Nat'l Sec. of Alabama, Inc*., No. 2:18-CV-00013-RAH, 2020 WL 2312816, at \*18–19 (M.D. Ala. May 8, 2020).

But even if Hawthorne's protected conduct is close enough in time to infer a causal connection, he still has to show that his protected conduct was the "but-for" cause of him having to take leave. *See Herron-Williams*, 805 F. App'x 622, 633 (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) ("But there can be no doubt after *Nassar* that, in order to survive summary judgment and

be entitled to a jury trial, there must be a genuine dispute as to whether the protected activity was a but-for cause of the adverse employment action."). Hawthorne offers no argument whatsoever as to how his lawyers' communications to the City and his subsequent EEOC charge were the but-for cause of him being sent home on workers' compensation months later.

Thus, Hawthorne's failure to otherwise dispute the City's legitimate, nondiscriminatory basis for this employment action proves fatal to this claim. Here, the City based its decision on the fact that Hawthorne's doctors continued to prescribe a significantly reduced workload and the City's belief that his new injury was worse than was initially believed, (Doc. 16-15 at 8-9), neither of which Hawthorne disputes in his opposition brief. *See Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (A party "cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."). Without more, Hawthorne cannot establish the requisite causal link to defeat summary judgment. *See Herron-Williams*, 805 F. App'x at 633.

Finally, Hawthorne's assertion that he was teased by his co-workers is nothing more than a claim for a retaliatory hostile work environment. The Supreme Court has held that, in a retaliation action, an employee must allege "that a reasonable employee would have found the challenged action materially adverse."

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The Supreme Court clarified that a materially adverse action was one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks omitted). Yet in some cases, a hostile work environment can qualify. *See Monaghan*, 955 F.3d at 860.

The Court also finds that Hawthorne's miscellaneous claims to teasing do not as a whole amount to actionable harassment that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan*, 955 F.3d at 861 (quoting *Burlington Northern*, 548 U.S. at 68). Though the standard is somewhat less strenuous for a retaliation claim, Hawthorne still has not asserted conduct by the City, or even by coworkers, that rises to a sufficient level to be actionable. He has not alleged, for example, statements from a supervisor which threatened termination, or any comments by fellow employees specifically regarding his age or injury. *See Monaghan*, 955 F.3d at 863. On the contrary, Hawthorne only obliquely refers to ribbing from other employees about his possible retirement given his absence from the duty roster. These are the quintessential "petty and trivial" perceived slights that are not actionable even under the relaxed standard set forth in *Burlington Northern*. *See Crawford v. Carroll*, 529 F.3d 961, 973, n.13 (11th Cir. 2008) (citing *Burlington Northern,* 548

U.S. at 70-73). Therefore, the City is due summary judgment on Hawthorne's ADA retaliation claim.

## V.   CONCLUSION

For the foregoing reasons, the City's Motion for Summary Judgment (Doc. 16) is due to be GRANTED.

DONE, this 2nd day of October, 2020.

> _____/s/ R. Austin Huffaker, Jr.\_\_\_\_\_
> R. AUSTIN HUFFAKER, JR.
> UNITED STATES DISTRICT JUDGE